```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   JOHN J. WALSH                    )
     and ANNABELLE WALSH,             )
 5                                    )
                 Plaintiffs,          )    CIVIL ACTION
 6                                    )
          V.                          )    2:11CV174
 7                                    )
     WAVY BROADCASTING, LLC           )
 8   and LIN TELEVISION CORPORATION,  )
                                      )
 9               Defendants.          )

10

11

12              TRANSCRIPT OF PROCEEDINGS

13                  Norfolk, Virginia

14                  March 28, 2012

15

16                     JURY TRIAL

17             (Day 2, Pages 224-473)

18

19   Before:  THE HONORABLE TOMMY E. MILLER,
              United States Magistrate Judge,
20            and a Jury

21

22

23   Also Present:

24            Douglas Davis, General Manager of WAVY-TV
              Kate Wayland, Corporate Attorney for WAVY-TV
25
```

```
 1   Appearances:

 2           JEREMIAH A. DENTON, III, P.C.
             By:  JEREMIAH A. DENTON, ESQUIRE
 3                    and
                  VIVILE R. DIETRICH, ESQUIRE
 4                    and
                  RHIANNON JORDAN, ESQUIRE
 5                  Counsel for the Plaintiffs

 6           CHRISTIAN AND BARTON
             By:  CRAIG T. MERRITT, ESQUIRE
 7                    and
                  DAVID LACY, ESQUIRE
 8                  Counsel for the Defendants

 9

10

11

12

13

14                              *    *    *

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    EXAMINATION INDEX

2
    ANNABELLE A. WALSH
3       DIRECT BY MR. DENTON  . . . . . . . .  230
        CROSS BY MR. MERRITT  . . . . . . . .  269
4       REDIRECT BY MR. DENTON . . . . . . .  285

5   CATHY CARTER
        DIRECT BY MS. JORDAN  . . . . . . . .  286
6       CROSS BY MR. LACY . . . . . . . . . .  298
        REDIRECT BY MS. JORDAN . . . . . . . . 304
7
    NORMA FREESMEIER
8       DIRECT BY MS. JORDAN  . . . . . . . .  306
        CROSS BY MR. LACY . . . . . . . . . .  311
9
    MAYA WARBURTON
10      DIRECT BY MS. JORDAN  . . . . . . . .  313
        CROSS BY MR. LACY . . . . . . . . . .  318
11      REDIRECT BY MS. JORDAN . . . . . . . . 322
        RECROSS BY MR. LACY . . . . . . . . .  323
12
    PATTI RITZI
13      DIRECT BY MS. JORDAN  . . . . . . . .  325
        CROSS BY MR. MERRITT  . . . . . . . .  329
14      REDIRECT BY MS. JORDAN . . . . . . . . 331

15  JAMIE BASTAS
        DIRECT BY MR. MERRITT . . . . . . . .  358
16      CROSS BY MR. DENTON . . . . . . . . .  367
        REDIRECT BY MR. MERRITT . . . . . . .  368
17
    ULLA CAPPS
18      DIRECT BY MR. LACY . . . . . . . . . . 369
        CROSS BY MS. JORDAN . . . . . . . . .  382
19
    ANNABELLE WALSH
20      DIRECT BY MS. JORDAN  . . . . . . . .  390
        CROSS BY MR. MERRITT  . . . . . . . .  392
21

22                      *    *    *

23

24

25
```

SHARON B. BORDEN, OFFICIAL COURT REPORTER

```
 1                        EXHIBIT INDEX

 2                                              MAR    /    ADM
       PLAINTIFF'S
 3     40      E-mail                           291        291

 4     41      E-mail                           293        293

 5
       DEFENDANT'S
 6     35      E-mail                           244        244

 7     43      Letter                           245        245

 8     47      E-mail                           360        360

 9     48      E-mail                           362        362

10     72      Photograph                       301        301

11     73      Photograph                       302        302

12

13

14

15

16                        *      *      *

17

18

19

20

21

22

23

24

25
```

```
 1              (Court convened at 9:00 a.m.)

 2          THE DEPUTY CLERK:  John J. Walsh and Annabelle

 3   Walsh versus WAVY Broadcasting, LLC, and LIN Television

 4   Corporation, case No. 2:11cv174.

 5          Are counsel ready to proceed?

 6          MR. DENTON:  We are, your Honor.

 7          MR. MERRITT:  We are.

 8          THE COURT:  All right.  Counsel, there was an

 9   article in this morning's paper about this trial.  I

10   don't know if you have seen it.  I have copies of it from

11   the web site.  It's amazing what reporters can do when

12   they only cover the opening statements and look at the

13   file and don't bother hearing the evidence, but take a

14   look at it and I will ask you -- I am going to ask the

15   jury about it, but I want your advice first.  This

16   appeared on page 2 of the Hampton Roads section above the

17   fold.

18          All right.  Other than asking the jury have they

19   read this against my orders, and I told them I was going

20   to ask them, is there anything you want me to do?  If

21   there's a positive response, then we will interview that

22   juror separately or those jurors separately.

23          MR. MERRITT:  Your Honor, it strikes me that

24   rather than drawing attention to the specific story, the

25   way to approach it might be to say that there has been
```

1  some coverage of the story in the media, as I told you

2  there might be.  Has everyone continued to follow my

3  instructions that you not read or look at any stories

4  about this?  Then if the answer is in the negative, I

5  think we move on.

6          MR. DENTON:  I think that sounds like a fine

7  suggestion, your Honor.

8          THE COURT:  All right.  I'm glad you are in

9  agreement.

10          Bring them in.

11          I didn't check any other of WAVY's competitor's

12  web sites to see if they posted anything.

13          This morning I want you to call the roll,

14  Ms. Forehand.

15          THE DEPUTY CLERK:  Yes, sir.

16          THE COURT:  All right.  If you would call the

17  roll.

18          (Jury in.)

19          (The roll of the jury panel was called by the

20  deputy clerk, all answering present.)

21          THE DEPUTY CLERK:  Everyone is here present,

22  your Honor.

23          THE COURT:  Ladies and gentlemen, there was some

24  coverage in the local media.  I instructed you yesterday

25  not to look at any stories about this case and whatever

```
 1  the media happened to be.  Did you follow my
 2  instructions?
 3            THE JURY:  Yes.
 4            THE COURT:  Good.  Nobody goes to jail today.
 5            (Laughter.)
 6            THE COURT:  You wouldn't go to jail.
 7            All right.  Mr. Denton, your next witness.
 8            MR. DENTON:  I call Annabelle Walsh, your Honor.
 9            (The witness was sworn by the deputy clerk.)
10            ANNABELLE A. WALSH, called as a witness, having
11  been first duly sworn, was examined and testified as
12  follows:
13                    DIRECT EXAMINATION
14  BY MR. DENTON:
15  Q.   Would you state your full name, please.
16  A.   My name is Annabelle Amores Walsh.
17  Q.   And what is your address?
18  A.   My address is 900 Walnut Neck Circle in Chesapeake,
19  Virginia.
20  Q.   And how long have you lived in Chesapeake, Virginia?
21  A.   About eight years.
22  Q.   And what was your formal education?
23  A.   I graduated from St. Mary's of Notre Dame College.
24  Q.   Did you work outside the home for a period of time
25  after you got out of college?
```

1   A.   Briefly.  I worked at Women and Infant's Hospital

2   and Foster Parents' Plan International.

3   Q.   All right.  And what did you do after that job?

4   A.   I stayed at home and took care of our three

5   children.

6   Q.   For how long?

7   A.   Until I started working at the company that my

8   husband and I bought in Virginia.

9   Q.   Okay.  And what led you to go to work for that

10  company?

11  A.   I felt that my husband -- when we purchased the

12  company, it was something I was comfortable working in.

13  I liked the concept of it.

14  Q.   And what company are we talking about here?

15  A.   The company we purchased, Taylor Party Rental Plus.

16  Q.   What did you eventually call it?

17  A.   Atlantic Event Rentals.

18  Q.   And when did you start working for Atlantic?

19  A.   Very slowly a couple of days here and there the

20  first couple of months, then full time probably within

21  the next year.

22  Q.   And what was your role in the business by the end of

23  that first year?

24  A.   By the end of the first year I worked primarily with

25  brides and hotels to help them with their rentals.

A. Walsh – Direct                     232

1   Q.   And what kind of customers did the company have
2   after the first year?
3   A.   After the first year we did a larger amount of
4   brides because of me working there, as well we did
5   backyard barbecues, graduation ceremonies, things such
6   of that nature.
7   Q.   Did the company also represent larger institutions?
8   A.   Yes, sir.
9   Q.   Can you give a couple of examples?
10  A.   We worked with Christian Broadcasting Network, the
11  Founder's Inn, BAE, the Navy, Hampton University.
12  Q.   And who was primarily responsible for those large
13  accounts?
14  A.   The larger corporate accounts were handled by my
15  husband.
16  Q.   And when you were making sales to brides or
17  prospective brides, what exactly was involved in terms
18  of getting them to sign up, so to speak?
19  A.   When brides would come into the business, I would
20  work with them.  We would discuss, for example, their
21  colors.  I would write down the rentals of what they
22  wanted, a green napkin, and we would go over their
23  contract, and I would help them sign their contract.
24  Q.   And what would their obligation typically be under
25  the contract?

A. Walsh – Direct                    233

1    A.   Under the contract, in order for us to hold their

2    items, it would be a 50 percent deposit.

3    Q.   And can you give the jury some idea of what the

4    range was of what the cost of your services was for a

5    bride?

6    A.   It would range anywhere from a small wedding, which

7    would be ten chairs at $3.50 a piece, to larger

8    weddings.

9    Q.   Well, I mean the total price?

10   A.   You mean for a wedding?

11   Q.   Yes.  What was a small one and what would a big one

12   cost?

13   A.   I'm sorry.  Anywhere between $50 to several thousand

14   dollars.

15   Q.   And how did you take to the business?  Did you like

16   it?  Was it a headache?  How did you feel about this

17   work?

18   A.   I loved it.  I felt that the minute it felt like

19   work, I was not going to do it anymore.  I felt like I

20   was everyone's friend.  It was very fun for me.

21   Q.   Back to the company itself.  How many people did

22   Atlantic have as employees at most at any given time?

23   A.   At our height, which we call the bridal season, 30

24   employees.

25   Q.   And did you remain employed at Atlantic Event

A. Walsh – Direct                    234

1   Rentals for the full time that it stayed in business?

2   A.   Yes.  I worked more than full time.

3   Q.   All right.  And did you accept deposits from these

4   bridal customers?

5   A.   Yes, I did.

6   Q.   And what would you tell the bridal customers when

7   you accepted the deposit?  What was it for?

8   A.   We had a software system that tracked if a deposit

9   was received.  An item, for example, 20 blue chairs

10  would be held for them and only them, and no one else

11  can take them once a deposit is received.

12  Q.   And in the process of negotiating the contract and

13  then fulfilling the contract, when was the deposit taken

14  from the customer?

15  A.   The deposit was taken when the customer -- usually

16  when she sat down with me and went over her items, the

17  deposit was taken right then and there.

18  Q.   Would that mean at the very beginning or toward the

19  end?

20  A.   In the beginning more.

21  Q.   Okay.  And when was the balance, the 50 to 75

22  percent balance that you referred to, when did that

23  normally come due?

24  A.   The balance is due two weeks prior to their wedding,

25  or anniversary, or celebration.

A. Walsh - Direct                235

```
 1   Q.   And obviously people wouldn't come to you and say
 2   I'm getting married this weekend, here's my deposit?
 3   A.   Unfortunately, that happened a lot.
 4   Q.   It does?
 5   A.   That's okay, though.
 6   Q.   But, in general, was there a spread of time between
 7   when the contract was signed?
 8   A.   Ideally, yes, that was the goal.
 9   Q.   And typically what would the amount of time be
10   between the time the woman came to you and the time the
11   wedding occurred?
12   A.   Wedding bookings primarily occurred early January,
13   which we called the booking season.  And then for us, it
14   would be May and October would be the big months.
15   Q.   Okay.  Between the time that you got the deposit and
16   the time that the wedding actually occurred, in general,
17   what kind of work did you have to do to perform the
18   services that you were selling?
19   A.   If it was a tent wedding in a parents' backyard, I
20   had a computer rendering program where I would make a
21   3-D composition of their layout of the wedding, as well
22   our tents would be cleaned and prepared, linens would be
23   pulled, and all glassware, flatware, plateware, as well,
24   would be pulled and set aside in the area we call the
25   staging.
```

A. Walsh – Direct                236

1   Q.   All right.  From time to time would things have to

2   be purchased outside of your inventory to service these

3   accounts?

4   A.   On occasion, yes.

5   Q.   Can you give the jury a ballpark estimate of the

6   total number of customer accounts that you handled or

7   took in during the entire time you were working at

8   Atlantic Event Rentals?

9   A.   For me, myself, over several hundred.

10  Q.   All right.

11  A.   Absolutely.

12  Q.   And that would be over what years are we talking

13  about, just as a reminder?

14  A.   From about 2005 to 2009, and that would be all

15  ranges.

16  Q.   During that time period did you ever have a customer

17  come to you and complain that the deposit was not

18  handled properly or people didn't get the services --

19  A.   No, never.

20  Q.   I have to finish my question, for the record.  Or

21  that the person didn't get the services that they paid

22  for?

23  A.   No, sir.

24  Q.   To your knowledge did Atlantic Event Rentals ever

25  have to respond to a Better Business Bureau inquiry or

A. Walsh – Direct                    237

1   complaint about deposits or anything else?

2   A.   No.

3   Q.   Were you ever sued --

4   A.   No.

5   Q.   -- for deposits?

6   A.   Never.

7   Q.   Now, during this period of time, 2005 to 2009, did

8   you get to know Affordable and Luxury Tents?

9   A.   Yes.

10  Q.   Which is run by whom?

11  A.   Run by Mr. Guy Daugherty, also known as Boots, and

12  his wife, JoAnn.

13  Q.   How did you get to know them and what dealings,

14  generally, did you have with them during that period of

15  2005 up toward the end of 2009?

16  A.   There would be items that we owned that they did not

17  that they would borrow from us for their clients, and as

18  well the same goes, we would also on occasion borrow a

19  tent.

20  Q.   So borrow or rent, which?

21  A.   The technical term is called subrental.  So if we

22  didn't own it, we would subrent it from another rental

23  company.

24  Q.   All right.  But with respect to just your company

25  and Affordable and Luxury Tents, did you lend things to

A. Walsh – Direct                238

1   each other or did you rent things to each other?  In
2   other words, were you paying --
3   A.   We rented.  We rented.  Sorry.
4   Q.   Now, to your knowledge what services did Affordable
5   and Luxury Tents provide that Atlantic Event Rentals
6   didn't provide before the two of you got together?
7   A.   They were more of a tent rental company and
8   primarily did large amounts of tents for festivals and
9   that sort of nature.
10  Q.   So what did your company do that theirs didn't do?
11  A.   We were more of a special event rental company where
12  we would have not only the tent, but the tables, chairs,
13  linens, everything but the family, food and friends.
14  Q.   All right.  Before 2010, rough estimate, how many
15  times would you say that your company rented something
16  from Affordable or vice versa?
17  A.   To my knowledge, around ten times.
18  Q.   Now, when eventually it came to pass that your
19  company, Atlantic, went out of business -- correct?
20  A.   Yes, sir.
21  Q.   Okay.  And were you still employed there at that
22  time?
23  A.   Yes, sir.
24  Q.   And when do you recall it becoming clear to you that
25  your company was not going to be able to continue in

A. Walsh – Direct                    239

1    business the way that it had?

2    A.   I'm not -- sorry.

3    Q.   Let me ask a different question, then.  Did there

4    come a time when there was a difficulty with the rental

5    space over on Diamond Springs Road?

6    A.   Yes, sir.

7    Q.   And what was that difficulty?

8    A.   We moved into a large space.  It was beautiful, but

9    it was quite expensive.

10   Q.   Okay.  And what was the difficulty with it?

11   A.   The monthly lease was rather high and something we

12   were not accustomed to.

13   Q.   Okay.  And did there come a time when there was an

14   eviction, that they asked you to leave because you

15   didn't pay the rent?

16   A.   Yes, sir.

17   Q.   Okay.  Now, relative to that time, compared to that

18   time, when did it become apparent to you that your

19   company, Atlantic, was not going to be able to stay in

20   business as a single institution?

21   A.   Towards the end of around 2009.

22   Q.   Okay.  And at that time did you have contracts in

23   the works, on the books, so to speak?

24   A.   Yes, sir.

25   Q.   Okay.  And at that time did your business also have

1  some annual contracts that you were obligated under?

2  A.  Yes, sir.

3  Q.  And can you give some examples of those?

4  A.  Yes.  We had the contract for Old Dominion

5  University, which were all the tents for every single

6  one of their football games.  It was an extremely large

7  account.  As well we had the Regent University

8  graduation where we provided several thousand chairs.

9  Hampton University we provided several thousand chairs

10 for their graduation as well.

11 Q.  All right.  Well, when it became apparent that you

12 might not be able to stay at the Diamond Springs Road

13 location any longer because of La-Z-Boy's rental

14 arrangement, did you soon thereafter enter into some

15 sort of discussions with the Daughertys?

16 A.  Yes, sir.

17 Q.  And what was the purpose of those discussions?

18 A.  The purpose was to consider if we could merger.

19 Q.  And why did you want to do that?

20 A.  Ideally they had a huge tent inventory which we did

21 not have a huge tent inventory.  However, we had a huge

22 special event inventory, tables, chairs, linens and all

23 the party stuff underneath, so we thought it would be a

24 marrying of two very nice companies.

25 Q.  Was there any discussions with them about a possible

A. Walsh – Direct                    241

1    alternative place to put all of your inventory?

2    A.    Yes.

3    Q.    And what place was that?

4    A.    That was the Virginia Beach Boulevard location on

5    Virginia Beach Boulevard in Virginia Beach.

6    Q.    Okay.  Ames?

7    A.    Yes, sir.

8    Q.    Did you actually, yourself, participate in

9    discussions with the Daughertys about this merger that

10   you referred to?

11   A.    Yes.  I was asked to render a computer program

12   showing where the layout of his tents, our tents --

13   Q.    I asked you did you actually participate in

14   discussions?

15   A.    Yes.

16   Q.    Who attended the discussions?

17   A.    As far as I can recall, Mr. Daugherty, my husband

18   and myself.

19   Q.    Okay.  And over approximately what period of time

20   did these discussions take place?

21   A.    In around December of 2009, in that time frame,

22   November, December of 2009.

23   Q.    And how many actual meetings did you have with the

24   Daughertys over this proposed merger?

25   A.    At the minimum, two.

A. Walsh - Direct                242

1   Q.   Okay.  And what do you recall being discussed in
2   those meetings?
3   A.   The discussion was the merging for our two
4   companies, how we would carry on with deposits taken
5   and, as well, contracts such as ODU's football season,
6   how we would process incoming contracts.
7   Q.   What was your understanding of the resolution or
8   conclusion of these meetings?
9   A.   My understanding was that the Daughertys were
10  extremely excited to have me and my husband join with
11  their company because they did not have the clientele
12  that we did.
13  Q.   And other than a list of clientele, what were
14  you-all bringing to the table, so to speak?
15  A.   We had --
16  Q.   Let me be more specific.  In terms of existing
17  contracts?
18  A.   All of my contracts with Founder's Inn, the
19  Marriott, the Westin, the larger companies in Hampton
20  Roads.
21  Q.   What about existing wedding contracts?
22  A.   All of my existing wedding contracts, event
23  coordinators and event designers in Hampton Roads were
24  my clients.
25  Q.   And how many of those would you estimate were

A. Walsh - Direct                    243

1   involved at that time?

2   A.   Anywhere between 50 to 100 clients.

3   Q.   All right.  And had all of those actually signed up

4   and given deposits?

5   A.   No, sir.

6   Q.   Did you discuss with the Daughertys the fact that

7   you did have deposits on some of those?

8   A.   In our meetings, yes, we did.

9   Q.   And did you discuss with them the fact that the

10  deposits had already been spent on ongoing expenses?

11  A.   Yes.  It was understood.

12  Q.   All right.  And what was understood as far as the

13  performance of those contracts, those contracts being

14  completed?

15  A.   It was understood during our meetings that the

16  Daughertys would carry out and honor the deposits made

17  on our contracts.

18  Q.   I would like for you -- I want to show you an

19  exhibit, Defense Exhibit 35.

20       Your Honor, this is an unobjected to exhibit of

21  the defendants.  I would like to offer it into evidence

22  at this time.

23       THE COURT:  All right.  Are you going to display

24  it to the jury?

25       MR. DENTON:  I would like to.

A. Walsh – Direct                    244

```
 1          THE COURT:  Proceed.
 2          (Defendant's Exhibit 35 was admitted.)
 3  BY MR. DENTON:
 4  Q.   And do you see that on your screen?
 5  A.   Yes, I do.
 6  Q.   Whose address is this here?
 7  A.   That is my business e-mail address.
 8  Q.   The date of the e-mail is what?
 9  A.   It's January 21st, 2010.
10  Q.   All right.  And this is an e-mail from whom to
11  whom?
12  A.   This is an e-mail from my Husband, Jack Walsh, to
13  Boots Daugherty, CCing JoAnn Dougherty, Boots' wife, and
14  myself.
15  Q.   Okay.  Look down, please, at paragraph F.
16          Did you read this e-mail at the time?  Are you
17  familiar with it?
18  A.   Yes, sir.
19  Q.   What is this, "Bring us 50-50 in this stuff"
20  referring to?
21  A.   In our meetings prior, our discussions in regards to
22  the benefits of merging our two companies, financial
23  benefits.
24  Q.   Can you be more specific --
25  A.   Yes, I can.
```

A. Walsh – Direct                245

1   Q.   -- what you mean by the 50-50?

2   A.   Sure.  Contracts that we were bringing to them such

3   as ODU football team tent program, a 50-50 share in the

4   profits of that.

5        MR. DENTON:  Your Honor, next I would like to

6   offer into evidence Defense Exhibit 43, which is

7   unobjected to.

8        THE COURT:  Proceed.

9        (Defendant's Exhibit 43 was admitted.)

10  BY MR. DENTON:

11  Q.   I want you to look at Defense Exhibit 43, after I

12  get it all on here.

13       All right.  Do you recognize Defense Exhibit 43?

14  A.   Yes, sir, I do.

15  Q.   Who wrote this?

16  A.   I wrote this.

17  Q.   Read the first sentence, or let me ask you this:

18  Why did you write this?

19  A.   I wrote this to an event coordinator to explain our

20  company merging.

21  Q.   All right.  And if you will look at the third line

22  where it says, "Well, we signed the papers this week."

23  What papers are you referring to there, Ms. Walsh?

24  A.   The papers we were referring to were the peaceful

25  transfer of our inventory, Atlantic Event Rentals'

A. Walsh – Direct                    246

1   inventory, back to the bank so that the bank would sell

2   it to Affordable and Luxury Tents.

3   Q.   The peaceable possession document?

4   A.   I'm sorry, yes, that's what it's called.

5   Q.   And you see where it says at the very beginning,

6   "Jack and I have been working for months to try to merge

7   with a company."  You see that?

8   A.   Yes, sir, I do.

9   Q.   Explain to the jury what you are talking about.

10  What work was being done and what merger with what

11  company?

12  A.   Those were the meetings that I was referring to

13  earlier where both my husband and I were meeting with

14  Mr. and Mrs. Daugherty to try to merge our two

15  companies, their tent company and our special event

16  company, together.

17  Q.   When you wrote in the last line of the first

18  paragraph, "We will continue to function as we were

19  before, fun and fabulous, but now we have an even bigger

20  tent inventory."  What exactly were you talking about

21  when you said "function as we did before"?

22  A.   To allay the fears of the coordinator, I wanted her

23  to understand that Atlantic Event Rentals was still --

24  she would be serviced the same way as when we used to

25  own the company.

A. Walsh – Direct                    247

 1  Q.   And did it actually end up working out that way?
 2  Were you able to function as you had functioned before?
 3  A.   No, sir.
 4  Q.   And there's a reference in this paragraph here that
 5  I'm pointing at, "I am taking appointments at Boots
 6  location on Virginia Beach Boulevard."  What kind of
 7  appointments are you talking about there?
 8  A.   Appointments with my event coordinators, and sales
 9  catering manager coordinators, and brides.
10  Q.   Okay.  And look at the last line where you make
11  reference to "a great partner like Boots."  What was
12  your expectation on how this merger was going to go with
13  them?
14  A.   In our meetings I truly believed the merger would go
15  seamlessly, and it would be a nice mix of two companies.
16            THE COURT:  Are you moving on from this
17  document?
18            MR. DENTON:  Yes, your Honor.
19            THE COURT:  Would you place it back on there?  I
20  have a question.
21            MR. DENTON:  Yes, your Honor.
22            THE COURT:  Who is this message to?
23            THE WITNESS:  I believe this message was to an
24  event coordinator by the name of Malissa Murphy who owns
25  CMT Event Rentals.

A. Walsh – Direct                    248

```
 1          THE COURT:  Is this an e-mail or --
 2          THE WITNESS:  If I recall correctly, sir, it is
 3  an e-mail.
 4          THE COURT:  Well, it doesn't have any date or
 5  time on it.
 6          THE WITNESS:  I do not see one.
 7          THE COURT:  When you said, "Well, we signed the
 8  papers this week," were you referring to this merger that
 9  you had been talking about, or you said it was the
10  turning over material to the bank?
11          THE WITNESS:  The latter, sir, the peaceful
12  possession.
13          THE COURT:  Did this event planner know that you
14  were turning your inventory over to the bank?
15          THE WITNESS:  I believe so, yes.
16          THE COURT:  All right.  Go ahead.
17  BY MR. DENTON:
18  Q.   Are you positive it was Malissa Murphy, or could it
19  have been one of the other event planners?
20  A.   The familiarity with which I wrote the e-mail, I
21  believe it was Malissa Murphy.
22  Q.   I'm asking you if you are positive, though?
23  A.   No, sir, I'm sorry.
24          MR. MERRITT:  Is he trying to impeach his own
25  witness, your Honor?  She has answered it twice.
```

A. Walsh – Direct                    249

```
 1          THE COURT:  Objection sustained.
 2  BY MR. DENTON:
 3  Q.   Did you become employed at Affordable as a result of
 4  your conversations with the Daughertys?
 5  A.   Yes, sir, I did.
 6  Q.   And how long did you work there?
 7  A.   Approximately three weeks.
 8  Q.   And during that time did you actually work on any of
 9  your preexisting contracts?
10  A.   I assume, yes, I did.
11  Q.   Now, what led up to the fact that you stopped
12  working at Affordable?  In other words, what caused this
13  merger to fall apart?
14  A.   My husband and I were asked to go into
15  Mr. Daugherty's office.  The reaction I received from
16  Mr. Daugherty to me, I was very scared.  I had never
17  been treated hostile or spoken to so aggressively.  I
18  was scared the accusations of me not selling as hard as
19  my full potential was, and my reaction to all of that
20  when I was asked to leave was that I left.
21          MR. DENTON:  Your Honor, I want to next ask
22  about an exhibit that there was a hearsay objection to,
23  and this is Plaintiff's Exhibit 39.  And my --
24          THE COURT:  Just a second.
25          Mr. Merritt, are you maintaining your objection
```

A. Walsh – Direct                250

1  to this one?

2          MR. MERRITT:  Your Honor, we are maintaining the

3  hearsay objection to this.

4          MR. DENTON:  Your Honor, I submit that it's a

5  business record.

6          THE COURT:  Based on the date, how could it --

7          MR. MERRITT:  I'll object to it as a hearsay

8  business record.

9          THE COURT:  How could it be a business record if

10 the business had ended?

11         MR. DENTON:  Well, it had ended, your Honor, but

12 there was follow-up and wind-up.

13         THE COURT:  Objection sustained.  It's not a

14 business record.  There's no business.

15         MR. DENTON:  Okay.

16 BY MR. DENTON:

17 Q.  Now, when your employment at Affordable ended, who

18 had possession of your former company's or Atlantic's

19 customer records?

20 A.  Guy and JoAnn Daugherty.

21 Q.  How about the customer lists?

22 A.  Guy and JoAnn Daugherty.

23 Q.  Physical lists?

24 A.  Guy and JoAnn Daugherty.

25 Q.  Phone numbers?

A. Walsh - Direct                251

```
 1  A.   Guy and JoAnn Daugherty.

 2  Q.   Computers?

 3  A.   Guy and JoAnn Daugherty.

 4  Q.   All right.  Explain who Malissa Murphy is, who you

 5  previously mentioned?

 6  A.   Malissa Murphy is a well-respected coordinator that

 7  runs a company called CMT Events.

 8  Q.   And how long had you known her in early 2010?

 9  A.   At least four to five years.

10  Q.   What sort of business had you done with her in the

11  past?

12  A.   She would bring her clients, whether they be brides

13  or private parties, and I would help her fill the event

14  rentals.

15  Q.   At the time of the falling out of the Daughertys,

16  had there been a contract of Malissa's that was being

17  serviced at the Daughertys as a result of you having

18  brought it over there?

19  A.   Yes, sir.

20  Q.   Okay.  What kind of contract was that?

21  A.   I believe there were two, and one event I know was a

22  wedding.

23  Q.   Had deposits been made on either of those contracts?

24  A.   Yes, sir.

25  Q.   A few days after you left Affordable did you receive
```

A. Walsh - Direct                    252

1  a telephone call from Malissa?

2  A.  Yes, I did.

3  Q.  And without saying what Malissa said, what was the

4  subject matter of the phone call?  What was the call

5  about?

6  A.  The call was about a client that the deposit was

7  supposed to be honored by Affordable and Luxury Tents,

8  and it was no longer.

9  Q.  As a result of that, did you take any action to take

10  care of that client?

11  A.  Immediately a phone call was made to Distinctive

12  Event Rentals to service that client.

13  Q.  To your knowledge was the client's contract taken

14  care of?

15  A.  Yes, sir.

16  Q.  To your knowledge did the client have to pay any

17  more money?

18  A.  Absolutely not.

19  Q.  I want to move now to the interview at your house.

20  Sometime after this phone call -- or let me ask you

21  this:  Did you receive other indications during that

22  general time period that you had the phone call from

23  Malissa Murphy that other clients or customers were

24  having difficulties?

25  A.  Yes, I did.

A. Walsh – Direct                    253

```
 1   Q.   All right.  Did you have any means of getting in
 2   touch with those customers?
 3   A.   I did not.
 4   Q.   Why not?
 5   A.   I didn't have the phone.  I was not allowed access
 6   back into Affordable to get the records.  The doors were
 7   locked on us.
 8   Q.   And why is it they had your records and you didn't
 9   have them?
10   A.   When they asked me to leave, I left with my purse
11   and my briefcase and did not expect to be treated that
12   way and was never allowed back in.
13   Q.   All right.  And having had this conversation with
14   Malissa Murphy and heard that some other customers were
15   having difficulties, did you have an occasion to meet a
16   lady named Lori Crouch?
17   A.   Yes, sir, I did.
18   Q.   And had you ever met her before?
19   A.   No, sir.
20   Q.   And did she call you before you met her?
21   A.   No, sir.
22   Q.   And how did you meet her and where did you meet her?
23   A.   There was a knock on my door, and she was at my
24   door.
25   Q.   And what were the circumstances?
```

1    A.   My family was home.  I opened the door and she

2    proceeded to speak to me.

3    Q.   All right.  And did she ask you a question?

4    A.   She asked me several questions, immediate questions.

5    Q.   And what were they?

6    A.   Is your name Annabelle Walsh?  Have you taken money

7    from brides without any intent to pay them back?  Have

8    they called you, knocked on your door and asked for

9    money back and you said no?  Do you owe Affordable and

10   Luxury Tents $30,000?

11   Q.   How did you answer those questions?

12   A.   I was in shock.  I asked her to take the cameraman,

13   whose camera was in my face, away and asked her to

14   please come in and let me explain, this was not the

15   truth whatsoever.

16   Q.   And what did you explain?

17   A.   I brought her in, sat her down, and my husband

18   joined me, and we completely explained that it was a

19   merger that was supposed to take place.  The merger was

20   no longer being honored, and Mr. Daugherty was telling

21   people that they would not service those clients

22   anymore, and I said that we will be able to service

23   every client.

24   Q.   What, if anything, did you tell her about the

25   obligation of the Daughertys to service those deposited

A. Walsh – Direct                    255

1   accounts?

2   A.   I told them the Daughertys had reneged on their

3   agreement with us and that they were to service them.

4   They were not.  However, we found people that would.

5   Q.   What, if anything, did you tell her about the

6   Daughertys knowing about these contracts where deposits

7   had already been made?

8   A.   When I went into that full explanation I was given

9   the response, "That's bad blood between your two --"

10  Q.   You can't quote her.

11  A.   Sorry.

12  Q.   What did you tell her about the deposits?

13       Excuse me.  What did you tell Lori Crouch about

14  whether or not the Daughertys knew those deposits had

15  been made?

16  A.   I specifically said the Daughertys knew deposits

17  were made and agreed to honor them.

18  Q.   Did you ask Lori Crouch for any information about

19  customers?

20  A.   Yes, I did.

21  Q.   And what information did you ask her about?

22  A.   I asked her specifically -- I tried to recall as

23  many clients as I had.  I thought I had recalled every

24  single client that I was in fear a deposit was not being

25  honored.  I asked her please give me the names of these

A. Walsh – Direct                256

1    people so I can have them serviced, they would be taken
2    care of.  She said there were three or four.
3    Q.   Did you get those names?  Were you able to get those
4    names from her?
5    A.   No, sir.  She said they were in the truck.
6    Q.   Please try to avoid saying what some other person
7    said.
8    A.   All right.
9    Q.   Now, was some arrangement made for her to interview
10   your husband the following day?
11   A.   Immediately following that meeting in our home,
12   arrangements were made.
13   Q.   And to your knowledge did she meet with your husband
14   the next day at a picnic table and interview him?
15   A.   Yes.
16   Q.   Were you present?
17   A.   No, sir.
18   Q.   Did you know ahead of time that there was going to
19   be a news clip about the situation?
20   A.   Yes, sir.
21   Q.   And where were you when this program first aired
22   that's Plaintiff's Exhibit 6?
23   A.   Upstairs in my bathroom.
24   Q.   All right.  Why were you not watching the news
25   broadcast?

A. Walsh - Direct                257

```
 1   A.   I assumed from the way I was greeted at my front
 2   door with a camera in my face and a reporter in my face
 3   that it would not be a good broadcast.
 4   Q.   Who else was in your house at that time?
 5   A.   My client and friend, Cathy Carter, who owns East
 6   Beach Catering, and my husband.
 7   Q.   After the broadcast had aired, what did you do?  I
 8   mean, right there in that ten-minute period?
 9   A.   I was told by Cathy Carter that it was not well for
10   me, that it did not portray us well, and I received
11   phone calls after.
12   Q.   All right.  Did you subsequently view the program?
13   A.   Yes, sir, I did, on a video.
14   Q.   And what was your personal reaction to it?
15   A.   It was everything I feared.  It was not good.
16   Q.   Well, can you be more specific?
17   A.   It portrayed my husband and I as people who were
18   running away from a responsibility when, in fact, we
19   were not.  It portrayed my husband and I without
20   character and integrity, which, in fact, we very much
21   are.  It portrayed us -- we were the ones that found the
22   event rental companies to take care of the other clients
23   and it portrayed it like they were, not us.
24   Q.   Well, did you see the statement in the broadcast by
25   Boots Daugherty that he was unaware of the $25,000 in
```

A. Walsh - Direct                    258

1    deposits?

2    A.   Yes, sir.

3    Q.   Was that a true statement or a false statement?

4    A.   Absolutely false.

5    Q.   Now, if this program aired on March 31st, would you

6    have seen it that night on the computer?

7    A.   I don't recall if it was exactly that night or the

8    following day.

9    Q.   All right.  And did you subsequently have occasion

10   to try to contact Lori Crouch about what had been aired

11   on T.V.?

12   A.   Yes.

13   Q.   Now, how did you know how to contact her?

14   A.   On the day when she came into my house she gave me

15   her cell phone number.

16   Q.   All right.  And did you call the cell phone number?

17   A.   Yes, sir, I did.

18   Q.   And what day was that?

19   A.   April 1st.

20   Q.   And what did you say to Lori Crouch?

21   A.   Lori Crouch assured me when she met with us in our

22   living room -- excuse me.

23        THE COURT:  Would you start over?  I couldn't

24   understand you.

25        THE WITNESS:  I'm so sorry.

A. Walsh – Direct                    259

1        I said to Lori Crouch that the interview was not

2   fair and did not show what we had told her and we had

3   explained to her.  I said that it was devastating to us

4   and that she has ruined our lives.

5   BY MR. DENTON:

6   Q.   Did she offer to do any kind of retraction or have

7   any other kind of response?

8   A.   Her simple response was, "I cannot --"

9        MR. MERRITT:  Your Honor, this is pure hearsay,

10  what she offered.

11       MR. DENTON:  It's not offered for the truth,

12  your Honor, and I can explain that very clearly if

13  necessary.

14       MR. MERRITT:  Maybe a foundation should be laid

15  to see if she asked Ms. Crouch to retract it, and then

16  maybe it can be followed up with a response.

17       MR. DENTON:  Can we approach on this, your

18  Honor?

19       THE COURT:  Ladies and gentlemen, if you will

20  step out for a minute.

21       It may be more than a minute.  You have probably

22  figured that out by now.

23       (Jury out.)

24       THE COURT:  I should have told you this

25  earlier.  I don't care for bench conferences because they

A. Walsh – Direct                    260

1  are awkward for the court reporter, awkward for

2  everybody.  So if you need to have something heard

3  outside of the presence of the jury, just ask and I will

4  send them out.  They need some exercise every once in a

5  while anyway.

6          MR. DENTON:  Okay, your Honor.

7          I simply want to establish that this phone call

8  actually occurred, that Ms. Walsh was upset enough to

9  call the reporter.  If you will recall, at the very end

10 of Lori Crouch's examination, I asked her if she went on

11 vacation on April 1st, and she said yes.  What Ms. Walsh

12 will testify, if the Court permits it, is did Ms. Crouch

13 tell you she was going on vacation?  And Ms. Walsh would

14 say yes, that comment was made.

15         It's not offered to prove that there was a

16 vacation.  It is only offered to demonstrate that this

17 lady had knowledge of something that she couldn't have

18 had unless she was on the phone with Ms. Crouch, as she

19 says.  I'm trying to show the conversation actually

20 occurred on the phone between Lori Crouch and Annabelle

21 Walsh because Annabelle Walsh has knowledge of a vacation

22 she could have only learned about in a conversation with

23 Lori Crouch.

24         THE COURT:  But it was April 1st when she had

25 the conversation.

1          MR. DENTON:  Yes, your Honor.

2          THE COURT:  Mr. Merritt, if you would come to

3    the podium.

4          MR. MERRITT:  Yes, sir.

5          The question, if I recall, sought to elicit an

6    answer as to whether Ms. Crouch ever offered a

7    retraction.  Here's the difficulty I have with that.

8    Ms. Crouch has already testified that no retraction was

9    demanded.  This witness, and I'm happy to show her her

10   deposition again, was asked repeatedly by counsel of

11   Willcox & Savage everything that she told Ms. Crouch in

12   that conversation.  She never demanded a retraction.  So

13   to ask the question did she ever offer a retraction

14   implies that one was sought, and it's very misleading to

15   this jury, very troublesome.

16         Now, I don't mind impeaching her on the fact

17   that she never asked for one, but to get a hearsay

18   statement about something that's a response to a question

19   that there's no foundation it was ever asked, will leave

20   this jury with the impression that something happened in

21   that conversation that clearly did not.

22         THE COURT:  Mr. Denton was at the deposition?

23         Mr. Denton?

24         MR. DENTON:  There's another issue.  First of

25   all, I simply want to introduce the conversation to show

A. Walsh – Direct                    262

```
 1  how upset Ms. Walsh was.

 2          THE COURT:  You have already done that.

 3          MR. DENTON:  I understand that, your Honor.

 4          The other issue is that it seems to me that

 5  there ought to be some -- and we are not maintaining, as

 6  I said in the final pretrial conference, and we will not,

 7  that there's been any spoliation issue here, but there

 8  was a disk made of this recording at the picnic table

 9  where Jack Walsh said things that were exculpatory for

10  him and his wife that never got on the air.  That disk

11  wasn't preserved.

12          Lori Crouch knew the Walshes were very upset

13  that a one-sided story had been presented.  It seems to

14  me that effort should have been made to preserve the

15  disk.  It's not a spoliation argument.

16          THE COURT:  No, no, no.  You are not going

17  there.

18          Just a second, Mr. Merritt.

19          MR. MERRITT:  Yes, sir.

20          THE COURT:  Mr. Denton, you have moved on from

21  one topic to another.  The question you had was, did Lori

22  Crouch offer a retraction?  Now, that was the hearsay

23  objection to that.

24          Now, Mr. Merritt tells me that at the deposition

25  Ms. Walsh never asked for a retraction.
```

A. Walsh – Direct                    263

```
 1          MR. DENTON:  I don't really remember if that's
 2   accurate or not, your Honor.  I guess I could check the
 3   transcript.  That may or may not be.  The case, you know,
 4   it depends on -- can I just check the transcript?
 5          Thank you.
 6          MR. MERRITT:  Your Honor, I am delighted to hand
 7   up the transcript.  The questioning on this begins on
 8   page 6 of her deposition.
 9          THE COURT:  Show it to Mr. Denton.  He may agree
10   quickly.
11          MR. MERRITT:  Your Honor, what I'm talking about
12   is he asked her --
13          MR. DENTON:  Where's the part in the
14   transcript?
15          MR. MERRITT:  "Tell me everything that you said
16   to her."  Never a word about a demand for a retraction.
17          Your Honor, I will hand you the transcript.
18   Mr. Shumadine asked her that question.
19          MR. DENTON:  As I understand it, he's saying the
20   word "retraction" was never used, your Honor.  Let me
21   look in the index.
22          MR. MERRITT:  I will stipulate the word
23   "retraction" was never used.  That's my point.  The
24   witness was asked repeatedly on the record, "is that
25   everything you remember?"
```

A. Walsh – Direct                   264

1          "What did you tell her was wrong with this

2   broadcast?"  It's over several pages.

3          THE COURT:  I'm going to sustain your objection

4   as to the question, Did Lori Crouch offer a retraction?

5   Correction, or whatever the word was that you used, which

6   I have forgotten by now.

7          MR. DENTON:  Would your Honor look at the

8   transcript?  I don't think that this is really improperly

9   represented to the Court.

10          THE COURT:  Stop.  Ask her.

11          Did you ask Lori Crouch for a retraction, or an

12   apology, or anything else?

13          THE WITNESS:  I'm almost positive I did.  To be

14   very honest, from the context of how upset I was and how

15   wrong it was, I can't imagine me saying otherwise that it

16   was wrong, to be very honest.

17          THE COURT:  Why didn't you tell Mr. Shumadine

18   that when he asked you to explain everything that you

19   said?

20          THE WITNESS:  It is very -- to me, I have never

21   been in that situation before and he's pressing and

22   pressing, and my head is spinning, just like it's

23   spinning now.  So I'm very sorry.

24          THE COURT:  I'm going to let the question come

25   in and I'm going to let you cross-examine her as long as

A. Walsh – Direct                265

1  you want.

2          MR. MERRITT:  Your Honor, I thank you for that.

3          The second thing, while the jury is out, you

4  recall at the final pretrial conference one of the last

5  things I raised was this evidence spoliation?

6          THE COURT:  Mr. Denton is not going to get into

7  it and he's not going to make the suggestion that this

8  should have been preserved, because no one asked the disk

9  be preserved.

10          MR. MERRITT:  And, your Honor, given the highly

11  prejudicial nature of that, if Mr. Denton does that, I

12  think am going to have to be obliged on behalf of my

13  client to seek a mistrial, so we think this is a really

14  important issue.

15          THE COURT:  That will be the least of

16  Mr. Denton's problems if he goes there since he made a

17  statement he wasn't going there.

18          Mr. Denton, you may proceed.

19          Bring in the jury.

20          (Jury in.)

21          THE COURT:  All right.  Counsel, let the record

22  reflect all jurors have returned to the jury box.

23          You may continue, Mr. Denton.

24          MR. DENTON:  Thank you, your Honor.

25  BY MR. DENTON:

A. Walsh – Direct                    266

1   Q.   Tell the jury everything you remember about this

2   conversation you had with Lori Crouch after you saw the

3   broadcast on the computer.

4   A.   I was extremely upset with the broadcast portraying

5   us and was crying very hard.  I said that we were not

6   portrayed in the information we gave her, it was not on

7   the broadcast, and I didn't believe it should be done

8   that way.  It was very hurtful and the information

9   relayed was wrong.

10  Q.   And did she respond in any meaningful way to you?

11  A.   Her response cut me short and said she had to leave.

12  Q.   Had to leave why?

13  A.   She was going on vacation.

14  Q.   All right.  Ms. Walsh, I want you to tell the jury

15  what impact, if any, the airing of this program on the

16  television has had on your life?

17  A.   The impact of this program has made a great effect

18  on us.  I feel like every single person has seen it and

19  thinks that, according to the newscast, that my husband

20  and I are without character and integrity and, according

21  to the newscast, it says that we ran with money when, in

22  fact, that wasn't the truth.

23        When you, as jurors, were asked did you see the

24  newscast, I'm shocked that you didn't.  I feel like

25  every single person has seen it.  When I go to the

A. Walsh – Direct                267

1   grocery store, I fear that someone will say something to

2   me terrible.  I don't get out of the parking lot when my

3   children are at sporting games because I fear everyone

4   thinks ill of me.  It has made me run.  I did not want

5   to live here anymore.  We only stayed because of the

6   children.  I feel like I am nothing.  I feel like I'm

7   nothing now.

8   Q.   How did you behave in terms of your socializing and

9   so forth in the six months, say, after the broadcast as

10  opposed to the rest of your earlier life?

11  A.   Being in the event rental industry, we knew

12  everyone.  It was a very fun industry.  We are very

13  involved with the school, our industry.  After this

14  airing, even though I knew and people I worked with knew

15  it was false, I went into seclusion.  I feared that

16  despite the fact that I knew it was wrong, that people

17  in our industry, you know, even though they knew it,

18  they started that inkling of, oh, maybe the Walshes

19  aren't all we thought they are.  I left.

20  Q.   When you say you went into seclusion, be real

21  specific about what you did.

22  A.   Sure.  I left Hampton Roads for several months.  I

23  took our children, as soon as they got out of school,

24  and I left.  My husband stayed here.  I just wanted to

25  run away.

A. Walsh – Direct                268

```
1   Q.   Where did you go?

2   A.   I went to my mom's with my children.

3   Q.   And did there come a time after you came back when

4   some women called you and took you out of town?

5   A.   I have three dear friends who believed that and

6   feared that I was in too deep a depression and they took

7   me away to a small house in North Carolina and tried to

8   talk me out of being so sad.

9   Q.   Has the aftereffects of the program had any effect

10  on your family life?

11  A.   Every day.

12  Q.   What effects?

13  A.   Something as silly as the three of us girls in the

14  house do not answer the doorbell.  We are afraid.  I

15  have lived in constant fear that everyone sees us.

16  Q.   Well, Ms. Walsh, have you-all -- concerning the debt

17  and so forth that you are unable to pay, have you-all

18  made sacrifices yourselves financially?

19  A.   Yes, absolutely.

20  Q.   What?

21  A.   We have not had heat on in the first floor of our

22  house for the last three years because we can't afford

23  to pay it.  Our children, despite the fact that they are

24  in a Catholic school, they have been given grants so

25  that they can attend, even though we cannot afford it.
```

A. Walsh - Cross          269

1  Q.   Are you able to buy Christmas presents and so forth

2  like you always were?

3  A.   We were given gifts by our in-laws, Christmas gifts,

4  because we could not afford them.

5       MR. DENTON:  All right.  Thank you, ma'am.

6  Answer counsel.

7       I have no further questions, your Honor.

8                   CROSS-EXAMINATION

9  BY MR. MERRITT:

10 Q.   Good morning, Ms. Walsh.

11 A.   Hello, Mr. Merritt.

12 Q.   You have a friend named Cathy Carter, don't you?

13 A.   Yes, I do.

14 Q.   Mrs. Carter was one of the three friends who took

15 you on the beach trip you just talked about?

16 A.   You are correct.

17 Q.   Does Ms. Carter own a business?

18 A.   Yes.

19 Q.   What is her business called?

20 A.   East Beach Catering.

21 Q.   Do you have any connection at present with East

22 Beach Catering?

23 A.   Yes, sir, I do.

24 Q.   What is your connection?

25 A.   I work part-time.

A. Walsh - Cross                    270

1   Q.   How long have you been working there part-time?

2   A.   Beginning of January of this year.

3   Q.   So you are back in the business you love now, aren't

4   you?

5   A.   You are correct.

6   Q.   Now, while Atlantic Event Rentals was in business,

7   the financial and legal details were primarily handled

8   by your husband, Mr. Jack Walsh, correct?

9   A.   Yes, you are correct.

10  Q.   Things like contracts and leases and loan documents?

11  A.   Yes, you are correct.  Yes.

12  Q.   And you were primarily on the sales side of the

13  business interacting with the customers?

14  A.   Marketing, PR, web site.

15  Q.   But from time to time, especially after you became

16  the majority shareholder in the company, did your

17  husband give you basic information about how the

18  business was going and how it was operating?

19  A.   Basic, such as CAM charges and things like that.

20  Q.   The CAM charges that La-Z-Boy was trying to charge

21  you in connection with the default on the rent?

22  A.   Yes, you are correct.

23  Q.   Now, in late 2009 and early 2010 you were involved

24  in at least some discussions with Boots and JoAnn

25  Daugherty; is that correct?

A. Walsh - Cross                271

1    A.   Yes, sir, you are correct.

2    Q.   And there was a meeting or maybe two in December to

3    talk about the possible business transaction between

4    your companies?

5    A.   Yes.

6    Q.   And did you have, as a result of your discussions

7    with the Daughertys, a basic understanding of what had

8    and had not been agreed between yourselves and the

9    Daughertys?

10   A.   I'm sorry.  Ask that again, please.

11   Q.   Yes, ma'am.

12        As a result of either your meetings with the

13   Daughertys or your conversations with your Husband, Jack

14   Walsh, did you form a basic understanding of what you had

15   or had not agreed to with the Daughertys?

16   A.   Yes.

17   Q.   And isn't it true, Mrs. Walsh, that there was no

18   merger, at least nothing legally signed in the papers?

19   A.   Are you asking me was the merger legally --

20   Q.   Was there a merger?

21   A.   There was not a legal merger in the paper.

22   Q.   There's nothing legally signed merging the

23   companies, correct?

24   A.   Not as far as I know, sir.

25   Q.   In fact, it was more of a verbal thing in your view;

A. Walsh – Cross                    272

```
 1   is that right?
 2   A.   It was a gentleman's agreement.
 3   Q.   But the truth of the matter is that at the end of
 4   the day what simply was done was a peaceful acquisition
 5   of the Daughertys purchasing your goods, correct?
 6   A.   There was a peaceful acquisition signed by us, that
 7   is correct.
 8   Q.   And that's simply the only thing that was done,
 9   correct?
10   A.   No, sir.  We had meetings.
11   Q.   Your Honor, may I have this handed to the witness,
12   please.
13            THE COURT:  Tell Mr. Denton the line and page
14   number, please.
15            MR. MERRITT:  Yes, line 5, page 22.
16   BY MR. MERRITT:
17   Q.   Now, ma'am, you gave a deposition in connection with
18   this case, didn't you?
19   A.   Yes, I did.
20   Q.   And you --
21            MR. DENTON:  Does she have a copy of the
22   deposition?
23            THE WITNESS:  I do.
24            MR. MERRITT:  She does, yes.
25   BY MR. MERRITT:
```

A. Walsh - Cross                273

```
 1  Q.   Do you recall in August of 2011, you were at
 2  Mr. Denton's office and you were placed under oath and
 3  testified?
 4  A.   Yes.
 5  Q.   And do you recall being asked the question:  "There
 6  was no merger; is that correct"?
 7  A.   I recall.
 8  Q.   And on that day did you give the following answer:
 9       "There was briefly -- there was nothing legally
10  signed in papers."
11       I'm at line 4, Mr. Denton, at page 22.
12       "It was more of a verbal thing.  As well, we
13  told our clients there was a merger.  The clients
14  understood it as a merger, but legally there was nothing
15  we signed saying this is a merger.  What was simply done
16  was a peaceful acquisition of the purchase of our goods."
17       Do you recall saying that?
18  A.   Yes, sir, I do.
19  Q.   And that was a true statement, was it not?
20  A.   Yes, sir, it is.
21  Q.   Now, you talked about a gentleman's agreement
22  between the Daughertys and yourselves to -- you can set
23  that aside now.
24  A.   Oh, sorry.
25  Q.   -- between yourselves and the Daughertys concerning
```

1  honoring of the deposits.  You believe there was a

2  gentleman's agreement regarding that, correct?

3  A.  Yes.

4  Q.  But you weren't really sure how those deposits were

5  going to be accounted for in the future, were you?

6  A.  I believe I was sure.

7  Q.  Would you please again look at your deposition,

8  ma'am.  This time page 23.  And would you look, please,

9  at line 18 of page 23.  Do you see that?

10      Do you have that in front of you, ma'am?

11 A.  Yes, I do.

12 Q.  Would you read the question and the answer that

13 begin at line 18?

14 A.  Mr. Shumadine asked me how were the deposits going

15 to be accounted for, and my response was --

16 Q.  Ma'am, the full question.  Just read the text and

17 then stop.  Question and answer, please.

18 A.  "How were deposits going to be accounted for in the

19 future?

20      "I am not really sure."

21 Q.  Was that a true statement at the time you gave it?

22 A.  I believe so.

23 Q.  And you are not aware of any money being given to

24 the Daughertys to cover those deposits, are you?

25 A.  You are correct.

A. Walsh - Cross                    275

```
 1   Q.   No money was ever given to them that you had taken?
 2   A.   I did not give any money to them.
 3   Q.   Okay.  And you don't know of anybody else who did,
 4   do you?
 5   A.   You are correct.
 6   Q.   Now, after the purchase of the assets, you and your
 7   husband, Jack, were going to be employed by the
 8   Daughertys with salaries of 20 to $24,000 a year; is
 9   that right?
10   A.   I believe in that area.
11   Q.   And the only document you ever signed in any of this
12   process with the Daughertys was the peaceful possession
13   agreement, correct?
14   A.   You are correct.
15   Q.   Now, you testified in response to a question from
16   Mr. Denton --
17          THE COURT:  Mr. Merritt, one second.  I'm
18   confused.  The peaceful possession document, I thought it
19   was between the Walshes and the bank.
20          MR. MERRITT:  It was.  They had to give consent
21   to the bank's sale of their assets.
22          THE COURT:  It wasn't directly between them?
23          MR. MERRITT:  It was not between them and the
24   Daughertys, no, sir.
25          THE COURT:  Go ahead.
```

A. Walsh – Cross                    276

1        MR. MERRITT:  Mr. Walsh explained that to us and

2   showed us the consent form.

3        THE COURT:  That's my understanding.

4        MR. MERRITT:  Yes, sir.  I'm sorry if I left

5   that unclear.  I apologize.

6   BY MR. MERRITT:

7   Q.   Now, you testified in response to a question from

8   Mr. Denton that you knew your company could not continue

9   by the end of 2009.  You recall that?

10  A.   Yes, sir.

11  Q.   You did have some outstanding contracts in place at

12  the end of 2009, ODU and some of these other people you

13  told us about?

14  A.   Huge.

15  Q.   Big contracts out there?

16  A.   Yes.

17  Q.   But after 2009, in January of 2010, after you knew

18  your company could no longer continue, you continued to

19  make new contracts right up until the time your

20  inventory was sold off at the end of 2010, correct?

21  That's a yes or a no.

22  A.   I'm not really sure if I did.

23  Q.   Did Atlantic Event Rentals continue making contracts

24  in January 2010?

25  A.   Yes, you are correct, sir.

```
 1   Q.   And you had a couple of categories of clients that
 2   you dealt with at Atlantic Event Rentals.  Some were
 3   professional event planners, correct?
 4   A.   Yes, sir.
 5   Q.   And many of those people are in your personal circle
 6   of friends?
 7   A.   Yes, sir.
 8   Q.   You knew them well?
 9   A.   Yes, sir.
10   Q.   And then there were some other people who might be
11   one-time customers who might come in to have a wedding
12   done or some other event, but they weren't really
13   professionals; is that right?
14   A.   Yes, sir.
15   Q.   Like I might go in for my daughter's wedding, for
16   example?
17   A.   Yes.  Congratulations.
18   Q.   It was in October.  Thank you.
19        And one of those people was Malissa Murphy at
20   CMT Event Planning, correct?
21   A.   You are correct.
22   Q.   And she was an event coordinator that you were
23   dealing with at the time; is that not right?
24   A.   Yes, you are correct.
25   Q.   You told event coordinators like Ms. Murphy that
```

A. Walsh – Cross          278

```
 1  there was going to be a merger between your company and
 2  the Daughertys' company, didn't you?
 3  A.   You are correct.
 4  Q.   And, in fact, would you look again at the
 5  defendant's exhibit book, please, the big book that's in
 6  front of you.
 7  A.   Okay.
 8  Q.   Mr. Denton asked you about Exhibit No. 43.  If you
 9  could turn to Tab 43 and take a look at that.
10       I believe you told us that Exhibit 43 is an
11  example of you telling a coordinator that the companies
12  were going to be doing a merger?
13       THE COURT:  43?
14       MR. MERRITT:  Yes.
15       THE WITNESS:  I think it's 43.
16       MR. MERRITT:  Defendant's 43.  It starts with
17  "It's been a busy week."
18       THE COURT:  Let me get the right book.
19       Go ahead.
20       THE WITNESS:  I'm sorry.  Ask your question
21  again, please.
22       MR. MERRITT:  Let's wait for everybody to get on
23  the same page.
24       THE COURT:  I'm here.
25  BY MR. MERRITT:
```

A. Walsh - Cross                 279

1    Q.   Look at Defendant's Exhibit 43.   I believe you told

2    us this was a message you sent to Malissa Murphy; is

3    that correct?

4    A.   You are correct.

5    Q.   And because of the intimate language that you used,

6    you are pretty sure it's Ms. Murphy, correct?

7    A.   You are correct.

8    Q.   You were talking, even at this point, in terms of a

9    merger, correct?

10   A.   Yes.

11   Q.   And you were telling her that there was a merger,

12   even though you had signed the papers this week?

13   A.   I'm sorry.   I don't know what you are asking me.

14   Q.   Well, the only papers you ever signed were on

15   January 29th, 2010, right, the peaceful possession

16   papers with the bank?

17   A.   Yes, you are correct.

18   Q.   So if there's a reference to having signed the

19   papers this week, you wrote this sometime right after

20   January 29th; isn't that true?

21   A.   I believe so.

22   Q.   It would have to be true, wouldn't it?

23   A.   Right, right.

24   Q.   In the week of January 29th?

25   A.   In that time frame.

A. Walsh - Cross                    280

1   Q.   Okay.  And so even after you had signed off to let

2   the bank sell off your assets to Boots Daugherty and

3   nothing more, you were still talking to this friend of

4   yours as if there were a merger, correct?

5   A.   You are correct.

6   Q.   In saying there was a merger was a positive way to

7   present the situation; isn't that true?

8   A.   Absolutely.

9   Q.   And saying that your business had failed and the

10  assets were being sold off by the bank would have been a

11  negative way to present the situation, correct?

12  A.   You are correct.

13  Q.   Now, after your arrangements with the Daughertys

14  fell apart, some customers were looking to you and to

15  others for some help?

16  A.   You are correct.

17  Q.   And one day Lori Crouch, the WAVY-TV reporter, came

18  to the door of your house; is that true?

19  A.   Yes, you are correct.

20  Q.   And part of what you told Ms. Crouch on March 31st,

21  2010 was the same merger story that you had been telling

22  customers and event planners; isn't that true?

23  A.   Yes, you are correct.

24  Q.   But by the end of March 2010 your friends in the

25  event planning industry like Malissa Murphy, they had

1  already known there had been no merger, right?

2  A.   They knew our business relationship with Affordable

3  did not work out.

4  Q.   You never told them there was no merger?

5  A.   Pardon me?

6  Q.   You never told your good friends that there really

7  had never been any merger?

8  A.   I didn't see that, being our relationship wasn't

9  working.

10 Q.   Now, the evening of March 31st when the WAVY 10 On

11 Your Side broadcast was on T.V., you told us you didn't

12 watch it, correct?

13 A.   You are correct.

14 Q.   You were upstairs doing what, peeling wallpaper?

15 A.   I was hiding.

16 Q.   You were hiding.

17      You were already very upset about the broadcast

18 before you ever knew what was in it, weren't you?

19 A.   Yes.

20 Q.   Why were you already upset before you even knew what

21 it said?

22 A.   Because Lori Crouch came to my door and asked me

23 if -- accused me of three huge points that were not, in

24 fact, true.

25 Q.   And the main point that seems to be not true is a

A. Walsh – Cross                    282

1   statement by Boots Daugherty, correct, about the bridal
2   deposits?  That really bothered you, did it not?
3   A.   Several points hugely bothered me.
4   Q.   But the one we have heard an awful lot about was the
5   Boots Daugherty comment.  You have been here the last
6   two days.  That was very upsetting to you, wasn't it?
7   A.   You are correct.
8   Q.   Would you look, please, at plaintiff's exhibit book
9   and look behind Tab 7.
10  A.   I'm sorry?
11  Q.   Tab 7.  Do you have that in front of you?
12  A.   I do.
13  Q.   Down at the bottom of Plaintiff's Exhibit 7, first
14  page, now, you recognize this as the Fox43TV web site,
15  correct?
16  A.   Yes, I do.
17  Q.   And I used a marker to draw a circle around two
18  paragraphs.  Do you see that?
19  A.   I see that.
20  Q.   The two paragraphs have to do with Boots Daugherty
21  and with a quotation from Mr. Daugherty, right?
22  A.   I see that.
23  Q.   Now, is there any doubt in your mind that during
24  January 2010 Atlantic Event Rentals had taken at least
25  $19,000 in customer deposits?

A. Walsh - Cross                    283

1   A.   I'm sorry.  Repeat your question, please.

2   Q.   Is there any doubt in your mind that in January of

3   2010 your company, Atlantic Event Rentals, had taken at

4   least $19,000 in deposits?

5   A.   In that ball park, sir.

6   Q.   So the deposits were taken?

7   A.   You are correct.

8   Q.   So the statement, "There about $25,000 balance

9   dues on bridal and brides' weddings," was maybe off by

10  $5,000, right?

11        THE COURT:  If you are planning to show that,

12  what you have just highlighted, to the jury, you might

13  want to move it so it's displayed.

14        MR. MERRITT:  I let it slip.

15  BY MR. MERRITT:

16  Q.   In that bottom paragraph, the part I have

17  highlighted, "There was about $25,000 balances due on

18  bridal, brides' weddings," other than the fact that it

19  was actually 19, that was a substantially true

20  statement, correct, that portion of it?

21  A.   Other than the fact that it wasn't 19, which I knew

22  of, you are correct.

23  Q.   And I believe we heard yesterday from your husband

24  that maybe another 1200 or so was taken after you

25  started work with the Daughertys?

A. Walsh - Cross                     284

1   A.   I, myself, did not do that.

2   Q.   Okay.  But roughly 20,000 was taken?

3   A.   In that ball park.

4   Q.   Okay.  And so that statement that I highlighted is

5   absolutely a true statement other than this quibble over

6   a few thousand dollars, right?

7   A.   He was aware of it.

8   Q.   The part I have highlighted.  We are going to get to

9   that in a moment, ma'am.

10  A.   Oh, I'm sorry.  I thought you meant what you

11  circled.  I'm so sorry.

12  Q.   No, the part I highlighted is true?

13  A.   Roughly speaking, in that ball park.

14  Q.   Is it substantially true, yes or no?

15  A.   Yes, sir, it is substantially true.

16  Q.   And the part that you have a quibble with has to do

17  with whether Boots knew about all of that or not?

18  A.   You are correct.

19  Q.   All right.  Ms. Walsh, assume with me that this

20  article had said Boots Daugherty, owner of Affordable

21  and Luxury Tents, bought the Walsh's inventory.  What

22  the computers held was not a surprise.  We knew that

23  there was about $25,000 balance dues on bridal and

24  brides' weddings.  You still took $25,000 from brides

25  when you were going out of business, whether he knew it

A. Walsh - Redirect                285

```
 1  or not, correct?
 2  A.   That process of us taking that money had occurred
 3  from early fall on.
 4  Q.   Do you really think that the damage, if any, that's
 5  done by this story comes from the quibble over Boots
 6  Daugherty's awareness as opposed to your relationship
 7  between your company and your customers?
 8  A.   Absolutely not.  The damage was from him saying he
 9  was unaware and saying that we did this woefully, that
10  we were the ones doing wrong.  That was my damage.
11           MR. MERRITT:  I have no further questions.
12           THE COURT:  Mr. Denton, we will let you finish
13  up with this witness before we take a break.
14           MR. DENTON:  If I may have just a second, your
15  Honor, I may not have any questions.
16           THE COURT:  Yes.
17                    REDIRECT EXAMINATION
18  BY MR. DENTON:
19  Q.   Ms. Walsh, did you consider this to be a merger?
20  A.   Yes, sir, I did.
21  Q.   And what did you consider was being merged?
22  A.   Affordable and Luxury Tents were receiving our
23  clients; ODU University, Regent University, Hampton
24  University, huge accounts.  We were merging our two
25  businesses.
```

A. Walsh – Redirect                286

```
 1          MR. DENTON:  Okay.  That's all.  Thank you.
 2          THE COURT:  Nothing further?
 3          MR. MERRITT:  No, sir.
 4          (Witness excused.)
 5          THE COURT:  All right.  We will take our
 6  mid-morning break.  At 20 minutes of we will be back here
 7  with our next witness.
 8          You may step out.
 9          (Jury out.)
10          THE COURT:  Do either of you have anything to
11  take up?  Otherwise, we will just recess.
12          MR. MERRITT:  No.
13          THE COURT:  All right.  Court's in recess.
14          (A recess was taken at 10:25 a.m., after which
15  court reconvened at 10:40 a.m.)
16          THE COURT:  Mr. Denton, you may call your next
17  witness.
18          MR. DENTON:  Yes, sir.  I will go out and get
19  her.
20          THE COURT:  Bring in the jury.
21          (Jury in.)
22          (The witness was sworn by the deputy clerk.)
23          CATHY CARTER, called as a witness, having been
24  first duly sworn, was examined and testified as follows:
25                    DIRECT EXAMINATION
```

```
 1  BY MS. JORDAN:
 2  Q.   Good morning.  Will you please state your name for
 3  the Court.
 4  A.   Cathy Carter.
 5  Q.   What do you do for a living?
 6  A.   I own a catering business.
 7  Q.   What's the name of your business?
 8  A.   East Beach Catering.
 9  Q.   Where is it located?
10  A.   In Norfolk.
11  Q.   What's the address?
12  A.   1512 East Bayview Boulevard, Norfolk.
13  Q.   Tell me about the daily functions of your business.
14  How does a catering business work?
15  A.   People call to set a wedding or a function.  We meet
16  with them.  We plan their menu.  We book them.  Then we
17  cook their food, deliver it, set it up, feed them, clean
18  it up, and make them happy.
19  Q.   And how often are you involved with other companies
20  involved in event planning?
21  A.   A lot.
22  Q.   How long have you been in business?
23  A.   Since 2004.
24  Q.   And does Annabelle currently work for your company?
25  A.   She helps a little now, yeah.
```

C. Carter - Direct                    288

```
 1   Q.   How did that come about?
 2   A.   I was sick in December and I just asked her if she
 3   could come help me in the office a little bit, answer
 4   the phones.
 5   Q.   And what is her role when she comes to help?
 6   A.   She answers the phone.  She will make my
 7   appointments.  She will set up constant contact and work
 8   on the web site.  She will do a proposal for me.
 9   Q.   Does she deal with the public?
10   A.   She won't -- she will help anything behind the
11   scenes.
12   Q.   How long have you known Annabelle Walsh?
13   A.   Since I started my business in 2004.
14   Q.   And do you know Jack Walsh?
15   A.   Yes.
16   Q.   And how long have you known him?
17   A.   Same time, 2004.
18   Q.   How did you meet them?
19   A.   From renting equipment.
20   Q.   Did your company do business with Jack and Annabelle
21   Walsh's company?
22   A.   Yes.
23   Q.   How often?
24   A.   At least probably about three, four times a month.
25   Q.   Did your business have a positive or a negative
```

```
 1   interaction with the Walsh's company prior to March of
 2   2010?
 3   A.   Positive.
 4   Q.   Did any of your customers ever have a problem
 5   regarding their business interactions with the Walsh's
 6   or Atlantic Event Rentals?
 7   A.   No, not that I recall.
 8   Q.   What is Jack Walsh's reputation in the event
 9   planning industry?
10   A.   He's very well-respected.
11   Q.   And Annabelle Walsh, what was her reputation in the
12   event planning industry?
13   A.   Great reputation.
14          THE COURT:  I'm sorry.  I couldn't hear you.
15          THE WITNESS:  She has a great reputation.
16   BY MS. JORDAN:
17   Q.   Did Annabelle Walsh -- you said you met her through
18   business; is that correct?
19   A.   Correct.
20   Q.   Did she stay a business acquaintance, or did she
21   become a friend?
22   A.   No, eventually we became friends.
23   Q.   As you got to know Annabelle Walsh, what was her
24   personal reputation in the community?
25   A.   She was very community oriented, very outgoing,
```

1  always connecting everyone.  She introduced me to a lot

2  of coordinators and people that could make your business

3  grow.  She is just a great connector.

4  Q.  Would you categorize Annabelle Walsh as honest or

5  dishonest?

6  A.  Honest.

7  Q.  Would you say she is helpful or self-serving?

8  A.  Very helpful.

9  Q.  And is she a hard-working person, or is she more of

10  a laid back person?

11  A.  No, she is very hard working.

12  Q.  At some point in late 2009, early 2010, did you

13  learn of a business deal between the Walshes and the

14  Daughertys?

15  A.  Yes.

16  Q.  When did you learn of this?

17  A.  It was probably December, the end of the year.

18  Q.  And at some point after this did you receive a bill

19  from Affordable and Luxury Tents?

20  A.  Yes.

21  Q.  Do you recall if that bill was for a late fee?

22  A.  Yes, it was.

23  Q.  Explain to me what that bill was about.

24  A.  I had rented some tablecloths, and I knew they were

25  in the middle of moving, and instead of returning them

C. Carter – Direct                    291

1  on the day they were supposed to be returned, I washed

2  and ironed them and returned them later.  I gave them to

3  Annabelle to take them back because they didn't have

4  laundry service where they were moving to.

5  Q.  When you say they, who are you referring to?

6  A.  Boots, his company.  Well, they were merged at the

7  time.  They just moved in together.

8         MS. JORDAN:  I would like to offer into evidence

9  Plaintiff's Exhibit 40, which is not objected to.

10        THE COURT:  Without objection, received.

11        (Plaintiff's Exhibit 40 was admitted.)

12 BY MS. JORDAN:

13 Q.  What's the date on the top of this e-mail?

14 A.  March 1st, 2010.

15 Q.  Is this the e-mail that you were just describing?

16 A.  Yes.

17 Q.  And the e-mail address is at the top.  Whose e-mail

18 addresses are those?

19 A.  Annabelle's, Scott Steward and Affordable.

20 Q.  And why did you send this e-mail?

21 A.  Because I thought it was wrong.  I kept the linens

22 and washed and laundered them to help them out and was

23 charged a late fee for it.

24 Q.  And in response to this e-mail did you receive a

25 response?

1  A.   I don't recall.

2  Q.   Do you recall receiving an e-mail from JoAnn

3  Daugherty regarding the late fee?

4  A.   I do remember that she sent me an e-mail.

5       MS. JORDAN:  Your Honor, I would like to offer

6  into evidence No. 41, which is objected to.

7       MR. LACY:  This is Plaintiff's 41?

8       MS. JORDAN:  Yes, it is.

9       MR. LACY:  Your Honor, we maintain our

10  objection, hearsay.

11      THE COURT:  You want to say anything?

12      MS. JORDAN:  Yes, your Honor.  This is a

13  business record kept by Cathy Carter in the course of

14  conducting her ordinary business.

15      MR. LACY:  Your Honor, I would note, first, that

16  this Exhibit 41 is supposed to be in response to the

17  e-mail that is Exhibit 40.  You will note at the top of

18  Exhibit 40 it seems to be a printout from Ms. Walsh's

19  e-mail account, not Ms. Carter's.  So as a first matter,

20  I'm not sure how this is Ms. Carter's business records.

21  Secondly, your Honor, it would still just be a hearsay

22  business record.

23      MS. JORDAN:  Your Honor, the first line is East

24  Beach Catering, which is her business e-mail.

25      THE COURT:  The objection is overruled.

C. Carter – Direct               293

```
 1  Ms. Carter can identify it.

 2         MS. JORDAN:  Thank you, your Honor.

 3  BY MS. JORDAN:

 4  Q.   Do you recall receiving this e-mail?

 5  A.   Yes.

 6  Q.   And who is it from?

 7  A.   Affordable Tent.

 8  Q.   And who specifically is it from at Affordable Tents?

 9  A.   JoAnn Daugherty.

10  Q.   Would you please read the first paragraph of that

11  e-mail, please?

12  A.   Yes.  "Mergers are difficult for everyone involved.

13  I'm sorry you are not feeling comfortable about our

14  policies and procedures here at Affordable and Luxury

15  Tents.  I understand you never had to worry about

16  clients' contracts, deliveries, payments, etc."

17         MS. JORDAN:  Thank you.

18         I would like to offer this into evidence at this

19  time.

20         THE COURT:  Received, over objection.

21         (Plaintiff's Exhibit 41 was admitted.)

22  BY MS. JORDAN:

23  Q.   Ms. Carter, I want to talk to you about a T.V.

24  segment that aired about the Walshes on March 31st,

25  2010.  Did you see the T.V. segment that aired about
```

SHARON B. BORDEN, OFFICIAL COURT REPORTER

C. Carter - Direct                    294

1   them?

2   A.   I did.

3   Q.   Where were you when you saw it?

4   A.   I was at the Walshes' home.

5   Q.   How did it come about you were at the Walshes' home

6   on this day?

7   A.   Annabelle had called me the day before and was

8   upset.  I knew it was going to air.  I just stopped by

9   just to be supportive.

10  Q.   And did you watch the T.V. segment with Annabelle,

11  or did you watch it alone?

12  A.   I watched it alone.

13  Q.   Did the T.V. segment give you a positive or negative

14  impression of the Walshes?

15  A.   Negative.

16  Q.   Immediately after viewing this T.V. segment, what

17  did you do?

18  A.   She had went upstairs because she didn't want to

19  watch it, and I went up to find her to tell her that it

20  was over.  I found her and told her that it was over.

21  Q.   Did you tell her what you saw?

22  A.   She asked me was it bad?

23  Q.   And what did you say?

24  A.   I said it wasn't very positive, but it will come on

25  later and you can watch it yourself.

C. Carter - Direct                    295

1   Q.   And what was her demeanor when you came upstairs?

2   A.   She was actually in the bathroom peeling off

3   wallpaper and I said, "What are you doing?"  She was,

4   like, "I'm just going to peel off the wallpaper.  I'm

5   going to peel the wallpaper.  Maybe I will redo it."

6   She was in disarray.

7   Q.   Were you concerned for her?

8   A.   Yes.

9   Q.   At some point after the segment aired did she come

10  downstairs?

11  A.   She did.

12  Q.   What did she do or say when she came downstairs?

13  A.   She was just crying and she was like, "Did it make

14  us look like we were bad people?  We are not bad people,

15  Cathy," and she just started crying.  She just curled up

16  in a ball, in a fetus, and sobbed.  I just covered her

17  up and tried to comfort her, and Jack came home.

18  Q.   After Jack came home did you have an opportunity to

19  observe his demeanor?

20  A.   He had the children and he was trying to be very,

21  you know, calm.

22  Q.   How long did you stay at the Walshes' home that

23  night?

24  A.   I left at that time.

25  Q.   After that evening, what was the next time you

```
 1  talked to either Jack or Annabelle Walsh?
 2  A.   I think I called Jack the next day.
 3  Q.   Why did you call him?
 4  A.   To see how Annabelle was.
 5  Q.   And what did he say?
 6  A.   He said she is -- she was upset, you know.
 7  Q.   And when was the first time after the airing of this
 8  T.V. segment that you talked to Annabelle Walsh?
 9  A.   It was probably a couple days later.
10  Q.   And what was her demeanor like during this?
11  A.   She was very upset.
12  Q.   Did she tell you how she was feeling?
13  A.   She was just -- she was hurt.  She was, you know,
14  like really upset that her children were going to have
15  to hear what people thought or had heard, that they
16  would think they were, you know, bad people, that they
17  didn't do what they were supposed to do.  She was a
18  mess.
19  Q.   In the weeks and months after the T.V. segment
20  aired, how frequently would you call Annabelle Walsh?
21  A.   I tried to call her a lot.
22  Q.   And would she answer?
23  A.   Sometimes.
24  Q.   Was it normal for her to go long periods of time
25  without speaking to you?
```

C. Carter - Direct                    297

```
 1   A.   No.
 2   Q.   And during this period of time was she going lengthy
 3   periods of time without speaking to you?
 4   A.   Yes.
 5   Q.   In response to your concern for Annabelle, did you
 6   do something?
 7   A.   A couple girls, we decided to go get her and take
 8   her out of town -- I had a place in Nags Head -- just
 9   take her away.
10   Q.   When was this?
11   A.   It was probably September.
12   Q.   And who went on this trip with you?
13   A.   It was Maya Walburton, Charlene, and Jennifer
14   Schumacher.
15   Q.   During this trip did you have the opportunity to
16   observe Annabelle's behavior?
17   A.   Yes.
18   Q.   And what was her behavior like?
19   A.   Well, I didn't tell her everyone was going to go.  I
20   just told her, her and I were going to go.  She wasn't
21   real pleased everyone was with me, but she went.  She
22   was real quiet.
23   Q.   Was she crying?
24   A.   Not at first.  She was just not real -- she wasn't
25   herself.
```

1  Q.   Did she end up opening up and telling you how she

2  was feeling?

3  A.   Yes.

4  Q.   And what did she say?

5  A.   She was just disappointed.  She wanted to move, you

6  know, was the big thing.  Maybe we can find a job and

7  move somewhere else and get out of here.  You know, she

8  was just hurt.  She didn't want people to feel like they

9  were bad people or did something wrong.  She said, I'm a

10 good girl, Cathy.  We are good people.  We did

11 everything we can to make things right.  We are good

12 people.  I don't want people to look at us as any other

13 way.

14 Q.   And were you concerned for her at this time?

15 A.   Oh, yes.

16 Q.   Why?

17 A.   Because it's just not who she was.  I mean, she was

18 always outgoing and fun and friendly, and now she was

19 just very quiet and just there, you know.

20         MS. JORDAN:  Thank you.

21                 CROSS-EXAMINATION

22 BY MR. LACY:

23 Q.   Good morning, Ms. Carter.

24 A.   Good morning.

25 Q.   Ms. Carter, you mentioned that you and Ms. Walsh are

1    friends; is that correct?

2    A.   We are.

3    Q.   How long have you known the Walshes?

4    A.   When I went in business in 2004 and I started

5    renting from them at that time.

6    Q.   Okay.  So you have known them since about 2004?

7    A.   Um-hum.

8    Q.   And would you say they are personal friends of

9    yours?

10   A.   They are now.

11   Q.   They are now?

12   A.   Yes.

13   Q.   When did that start?

14   A.   Probably about 2006.

15   Q.   How often do you think you speak with Ms. Walsh, for

16   example?

17   A.   Then?

18   Q.   Or now.  How about now?

19   A.   At least a couple times a week, two, three times a

20   week.

21   Q.   Okay.  Ms. Carter, you mentioned after the broadcast

22   Ms. Walsh became reclusive?

23   A.   Um-hum.

24   Q.   And she works for you now; is that right?

25   A.   She helps me out.

1   Q.   She helps you out?

2   A.   Yeah.

3   Q.   I believe you said she does things behind the

4   scenes?

5   A.   Right.

6   Q.   She doesn't do anything in public?

7   A.   She doesn't like to, no, uh-huh.

8   Q.   She began working with your company in January of

9   this year; is that right?

10   A.   Yes.

11   Q.   Your company, East Beach Catering, do you ever have

12   booths at shows?

13   A.   Yes, we do.

14   Q.   Has Ms. Walsh ever attended one of those shows for

15   you?

16   A.   Yes, she did.

17   Q.   Okay.  In fact, she does go out in public in the

18   industry?

19   A.   Well, she did one time for me, yes.

20        MR. LACY:  May I present this to the witness,

21   your Honor?

22        THE COURT:  What exhibit is it?

23        MR. LACY:  It's not an exhibit, your Honor.

24   It's for impeachment purposes.

25        THE COURT:  All right.  Show it to her.

C. Carter - Cross                    301

```
 1  BY MR. LACY:
 2  Q.   Ms. Carter, can you take a look at the document you
 3  have just been handed and let me know if you can
 4  identify it.
 5  A.   Yes.
 6  Q.   What is it?
 7  A.   It was a wedding show that I did this year.
 8  Q.   This year in 2011?
 9  A.   Um-hum.
10  Q.   Okay.  And can you identify the people that are in
11  the picture?
12  A.   It was myself, a chef, two servers and two friends,
13  Annabelle and Iris.
14       MR. LACY:  Your Honor, we would move this
15  picture be admitted as Defendant's 72.  We have withdrawn
16  70 and 71.  So it can be either 70 or 72.
17       THE COURT:  Ms. Jordan, any objection?
18       MS. JORDAN:  No, your Honor.
19       THE COURT:  All right.  Received.  Defendant's
20  72.
21       (Defendant's Exhibit 72 was admitted.)
22  BY MR. LACY:
23  Q.   And this, I am pointing to Ms. Walsh in this
24  picture?
25  A.   Um-hum.
```

C. Carter - Cross                302

```
 1   Q.   This is from January of this year?
 2   A.   Yes.
 3   Q.   May I hand another document to the witness.
 4        Ms. Carter, you have been handed a document.  Do
 5   you know what it is?
 6   A.   It's the same show.
 7   Q.   It's a picture from the same show?
 8   A.   Right.
 9        MR. LACY:  We would like to have this moved as
10   Defendant's Exhibit 71, or 73.
11        MS. JORDAN:  No objection.
12        THE COURT:  Received without objection.
13        (Defendant's Exhibit 73 was admitted.)
14   BY MR. LACY:
15   Q.   Ms. Carter, can you identify for the jury who is in
16   this picture?
17   A.   Preston Bailey and myself and my two friends, Iris
18   and Annabelle.
19   Q.   And Ms. Walsh is attending this event on behalf of
20   your company?
21   A.   On behalf of my company?
22   Q.   She was working with you, with your company, for
23   this event; is that correct?
24   A.   She wasn't really working the event.  She was there
25   to support me.
```

C. Carter – Cross                    303

1   Q.   Okay.

2   A.   We had aprons on.  My friends have their regular

3   street clothes.

4   Q.   You mentioned in your testimony earlier about being

5   told that there was a merger between the Walshes and the

6   Daughertys; is that correct?

7   A.   Correct.

8   Q.   That's what Ms. Walsh told you?

9   A.   Yes.

10  Q.   Okay.  Later did you find out that, in fact,

11  Ms. Walsh and Mr. Walsh were only employees of the

12  Daughertys' company?

13  A.   I never really understood that part.

14  Q.   Later on you found out that -- you were told that

15  Ms. Walsh had been fired from the Daughertys' company;

16  is that correct?

17  A.   She said she was dismissed, yes.

18  Q.   And that surprised you because you didn't know how

19  someone could be dismissed from a merger; is that right?

20  A.   Right.

21  Q.   Okay.  And that's because when you were told it was

22  a merger, you understood that the Walshes and the

23  Daughertys were going to be partners; is that correct?

24  A.   Yes.

25  Q.   And as you understand it now, they were not

1    partners?

2    A.   Well, I assume not, but even in JoAnn's e-mail it

3    said that there was a merger.

4    Q.   I understand.

5         You mentioned also that you were at the Walshes'

6    house when the broadcast aired?

7    A.   Yes.

8    Q.   And you went upstairs and told Ms. Walsh that the

9    broadcast had not reflected well on she and her husband;

10   is that right?

11   A.   Right.

12   Q.   But before you told her that Ms. Walsh was already

13   upset; is that correct?

14   A.   She was upset that it was getting ready to air.

15   Q.   Right.  And she hadn't, obviously, seen the

16   broadcast yet because it hadn't aired?

17   A.   No, she wasn't --

18   Q.   Okay.  And she was upset because she thought that

19   her family was going to be embarrassed; is that right?

20   A.   Yes.  She was afraid how they were going to be

21   portrayed.

22        MR. LACY:  No other questions.  Thank you very

23   much, Ms. Carter.

24        THE COURT:  Any redirect?

25        MS. JORDAN:  Yes, your Honor.

```
 1                  REDIRECT EXAMINATION
 2  BY MS. JORDAN:
 3  Q.   Ms. Carter, you just stated that Annabelle Walsh was
 4  upset when you went upstairs.  She was in the bathroom
 5  tearing down wallpaper, correct?
 6  A.   Right.
 7  Q.   Okay.  Was she more or less upset when you told her
 8  about the airing?
 9  A.   Oh, way more.
10  Q.   Okay.  Regarding the event and the pictures that you
11  just saw, did Annabelle Walsh volunteer to do that event
12  or did you ask her to do that event?
13  A.   I asked her if she would come and support me, and
14  she didn't really want to.
15          MS. JORDAN:  Thank you.  I have no further
16  questions.
17          MR. LACY:  No further questions, your Honor.
18          THE COURT:  May this witness be excused?
19          MS. JORDAN:  Yes, your Honor.
20          MR. LACY:  That's fine, your Honor.
21          THE COURT:  All right.  Ms. Carter, you are free
22  to go, but you are not to discuss your testimony with
23  anyone about this case except the lawyers involved until
24  the completion of the trial, but you are free to go now.
25          (Witness excused.)
```

N. Freesmeier - Direct               306

```
 1              THE COURT:  Next witness?
 2              MS. JORDAN:  Norma Freesmeier.
 3              (The witness was sworn by the deputy clerk.)
 4              NORMA FREESMEIER, called as a witness, having
 5  been first duly sworn, was examined and testified as
 6  follows:
 7                        DIRECT EXAMINATION
 8  BY MS. JORDAN:
 9  Q.   Good morning.  Will you please state your name for
10  the Court.
11  A.   I'm Norma Freesmeier.
12  Q.   And your address?
13  A.   4935 Admiration Drive, Virginia Beach, Virginia,
14  23464.
15  Q.   Ms. Freesmeier, what do you do for a living?
16  A.   I work for Distinctive Event Rentals in sales.
17  Q.   And what exactly do you do for Distinctive?
18  A.   I book weddings and events and meet with clients.
19  Q.   Do you work with others in the event planning
20  industry?
21  A.   Yes.
22  Q.   And how often?
23  A.   Daily.
24  Q.   How long have you been involved in the event
25  planning industry?
```

1   A.   Probably over 20 years.

2   Q.   Do you know Jack and Annabelle Walsh?

3   A.   Yes, I do.

4   Q.   How long have you known them?

5   A.   Ten years.

6   Q.   Did you work for their company at one time?

7   A.   Yes, I did.

8   Q.   How long?

9   A.   Three or four years.

10  Q.   And did they or did they not terminate your

11  employment with their company?

12  A.   They did.

13  Q.   What is Annabelle Walsh's reputation in the event

14  planning industry?

15  A.   Her reputation is stellar.  She's awesome.

16  Everybody who knows her, loves her.

17  Q.   Even though they terminated their employment

18  relationship with you, you still have a good

19  relationship with them?

20  A.   Absolutely.

21  Q.   And Jack Walsh, what is his reputation like in the

22  event planning industry?

23  A.   Same as Annabelle's, only she's just a little bit

24  more open and easier to talk with.  She's excellent.

25  Q.   You said earlier that you worked for Distinctive.

1  Is that a small or large company?

2  A.   Large company.

3  Q.   Is it fair to say that it's the industry leader in

4  this area?

5  A.   We are the largest rental company south of

6  Washington, D.C. in the State of Virginia.

7  Q.   And does Distinctive work with other rental

8  businesses in the area?

9  A.   We have a good relationship with almost every rental

10  company in the State of Virginia.

11  Q.   Does Distinctive work with Affordable and Luxury

12  Tents, the company owned by Boots Daugherty?

13  A.   No, ma'am.

14  Q.   Are there any other companies that Distinctive

15  refuses to work with in the area?

16  A.   No, ma'am.

17  Q.   I want to talk to you about the T.V. segment that

18  aired in Virginia Beach about Annabelle and Jack Walsh.

19  Are you aware of that T.V. segment?

20  A.   Yes, I am.

21  Q.   Did you view it?

22  A.   Yes.

23  Q.   When did you view it and where were you?

24  A.   The day after and in our office on the Internet.

25  Q.   How did you come to find out about it?

N. Freesmeier – Direct                309

1   A.   Actually, those who didn't see it on T.V. the night

2   before, which I did not see it the night before, it was

3   the talk of our office.

4   Q.   When you say the talk of your office, what do you

5   mean?

6   A.   I mean everybody was talking about it.  Everybody

7   was going to a computer to see what had happened, what

8   the interview was like, and we just all wanted to see

9   what had happened.

10  Q.   Did you have the opportunity to talk to Annabelle

11  Walsh after the T.V. segment aired?

12  A.   I did.

13  Q.   And what was her demeanor during this conversation?

14  A.   I walked into work and she was on the phone with

15  another sales associate, and that sales associate said,

16  "This is Annabelle."  She said, "I think you need to

17  talk to her."  She was hysterical on the phone.  She was

18  crying.  She was inconsolable.  I had never heard her or

19  seen her like that before.

20  Q.   And in response to that conversation, were you in

21  fear for Annabelle?

22  A.   Yes.

23  Q.   Were you concerned for her?

24  A.   Yes.

25  Q.   And what did you do as a result?

1  A.   I called her back later that afternoon to see how

2  she was, and she was better.  And I also e-mailed her

3  during the few months afterwards.

4  Q.   And do you keep in contact with Annabelle Walsh via

5  e-mail and phone?

6  A.   Yes.

7  Q.   Okay.  And what types of things do you talk about in

8  the e-mails?

9  A.   Well, the first one I sent to her was about how I

10  knew that they were such good people and that even

11  though this was a very dark time for them and it was

12  very upsetting and she was so concerned about their

13  reputation and will Jack ever be able to find a job?

14  Would anybody ever trust him to give him a job in this

15  area, because it was so damaging to them, and it was so

16  upsetting to her, as it was to me, because I had a

17  husband who we went through the same thing with our

18  family.  Not through a media thing, but he lost his

19  business, and I explained to them that they would become

20  stronger because they loved each other so much and they

21  were so grounded in their faith with God.

22  Q.   And do you remain concerned for Annabelle Walsh?

23  A.   I always want the best for them, and I wouldn't say

24  I'm concerned because I think that they are better, but

25  I don't think they are as high on things as they were

 1   before this all happened to them.  It's been very

 2   damaging.

 3          MS. JORDAN:  Thank you.  I don't have any

 4   further questions for you.

 5          THE COURT:  Mr. Lacy.

 6          MR. LACY:  Thank you, your Honor.

 7                       CROSS-EXAMINATION

 8   BY MR. LACY:

 9   Q.   Good morning, Ms. Freesmeier.

10   A.   Good morning.

11   Q.   My name is David Lacy.

12          Ms. Freesmeier, you mentioned that after the

13   broadcast aired the next day everyone wanted to see it to

14   find out what happened.

15   A.   Um-hum.

16   Q.   And that's because no one knew that the Walshes'

17   business was in trouble; isn't that right?

18   A.   No.  I think we all kind of knew that.

19   Q.   Okay.  Did you know that the Walshes were selling

20   their inventory to the Daughertys because their business

21   was failing?

22   A.   I don't know that that --

23          THE COURT:  Wait one second.  I don't believe

24   that's what the evidence has shown.  And I asked this

25   question earlier to get it clarified.  The Walshes signed

1  a release to the bank and the bank sold it to the

2  Daughertys.  It was not a direct transaction, according

3  to Mr. Merritt.

4          MR. LACY:  That's right, Judge.

5          THE COURT:  Do you want to correct him?

6          MR. LACY:  No, I'm not going to correct him.

7  That was being shorthand.

8  BY MR. LACY:

9  Q.  Were you aware that the Walshes had agreed or had

10  consented to allow their bank, PNC Bank, to sell the

11  inventory to the Daughertys?

12  A.  No.

13  Q.  Were you aware that the Walshes were simply

14  employees of the Daughertys?

15  A.  I don't know if I knew that before or after, but I

16  think I did hear that they were working with them.

17  Q.  Okay.

18  A.  Not necessarily as employees, was not my

19  understanding.

20  Q.  Okay.  And that's because it was being presented by

21  the Walshes as a merger?

22  A.  I don't know.

23          MR. LACY:  Okay.  Thank you very much,

24  Ms. Freesmeier.

25          THE COURT:  Ms. Jordan, anything further?

```
 1            MS. JORDAN:  No, your Honor.
 2            THE COURT:  Ma'am, you are free to go, but you
 3  are not to discuss your testimony with anyone but the
 4  lawyers in this case until the completion of the trial.
 5            THE WITNESS:  Okay.
 6            (Witness excused.)
 7            THE COURT:  Next witness?
 8            MS. JORDAN:  Maya Warburton.
 9            THE COURT:  Ms. Jordan, how many witnesses do
10  you have in this line?
11            MS. JORDAN:  One remaining, your Honor.
12            (The witness was sworn by the deputy clerk.)
13            MAYA WARBURTON, called as a witness, having been
14  first duly sworn, was examined and testified as follows:
15                     DIRECT EXAMINATION
16  BY MS. JORDAN:
17  Q.   Good morning.  Will you please state your name for
18  the Court.
19  A.   Maya Warburton.
20  Q.   And your business address?
21  A.   It is 12 Best Square, Norfolk, Virginia.
22  Q.   Ms. Warburton, what do you do for a living?
23  A.   I own a bridal retail store.  I sell wedding gowns
24  and bridal party dresses.
25  Q.   And how exactly does your business work day to day?
```

M. Warburton – Direct                314

1   A.   We work with brides and grooms on a daily basis

2   helping them find their wedding attire.

3   Q.   Do you work with other businesses in the event

4   planning industry?

5   A.   Yes, I do.

6   Q.   And how long have you been in the business?

7   A.   Since October of 2004.

8   Q.   Before owning Maya Couture, were you involved in the

9   event planning industry?

10  A.   Yes, I was.

11  Q.   About how long have you been involved in that

12  industry?

13  A.   I've been in it for about ten years.

14  Q.   Do you know Jack and Annabelle Walsh?

15  A.   Yes, I do.

16  Q.   How long have you known them?

17  A.   Since 2004.

18  Q.   When did you first meet them?

19  A.   I met them at a bridal event.

20  Q.   What is Jack Walsh's reputation in the community?

21  A.   Upstanding.  He is a genuine, kind man, reliable,

22  great father and great husband.

23  Q.   And how about Annabelle Walsh, what's her reputation

24  in the community?

25  A.   Very favorable.  She's magnetic, outgoing.  People

1   enjoy being around her.

2   Q.   More specifically, what is Jack Walsh's reputation

3   in the community for character and integrity?

4   A.   I would say one of the best.  You just want to be

5   around him.  You want to know him as a friend.  You want

6   to work with him.

7   Q.   Would you consider him to be honest or dishonest?

8   A.   Honest.

9   Q.   And how about Annabelle Walsh, what is her

10  reputation for character and integrity?

11  A.   Very sincere, very genuine, positive attitude, just,

12  again, great to be around.

13  Q.   Would you consider her to be honest or dishonest?

14  A.   Honest.

15  Q.   Did your company do business with Jack and Annabelle

16  Walsh's company, Atlantic Event Rentals?

17  A.   Yes.

18  Q.   About how often?

19  A.   I would say two to three times a year.

20  Q.   Did you refer clients to them?

21  A.   Absolutely.

22  Q.   And did your business have a positive or negative

23  interaction with the Walshes' business?

24  A.   Positive.

25  Q.   Prior to March of 2010, did you ever have any of

M. Warburton - Direct          316

1   your customers come to you with a problem about the

2   Walshes or Atlantic Event Rentals?

3   A.   No, I did not.

4   Q.   What was Jack and Annabelle Walshes' reputation

5   among vendors and clients in the event planning industry

6   prior to March of 2010?

7   A.   I would say very favorable.

8   Q.   I want to talk to you about the T.V. segment that

9   aired on March 31st, 2010.

10  A.   Okay.

11  Q.   Did you see it?

12  A.   I did not.

13  Q.   Did you hear about it?

14  A.   Yes, I did.

15  Q.   How did you hear about it?

16  A.   From an e-mail.

17  Q.   Did you speak with Jack and Annabelle Walsh after

18  you heard about it?

19  A.   Yes, I did.

20  Q.   What was Jack's demeanor like when you talked to him

21  about it?

22  A.   He was very calm, but I would say a bit in shock,

23  disturbed.  I think his tone when I spoke with him was

24  one of he felt defeated and helpless.

25  Q.   And how about Annabelle, what was her demeanor like

M. Warburton - Direct          317

1   when you talked to her after?

2   A.   She was a wreck.   She was a mess.

3   Q.   Was she crying?

4   A.   Oh, yeah.

5   Q.   Since the T.V. segment aired, have you had the

6   opportunity to observe Annabelle Walsh in social

7   situations?

8   A.   Yes, I have.

9   Q.   Have you noticed any difference in the way that she

10  interacts with others since the T.V. segment aired?

11  A.   Yes.   She is more closed off.

12  Q.   Is she as social as she was before the T.V. segment

13  aired?

14  A.   No.

15  Q.   Is she as outgoing as she was before the T.V.

16  segment aired?

17  A.   No.

18  Q.   Were you concerned for Annabelle in the weeks or

19  months after the T.V. segment aired?

20  A.   Yes.

21  Q.   Why?

22  A.   She was a recluse.   I couldn't talk to her on a

23  regular basis like I used to.   I would call and e-mail

24  and they wouldn't be returned.   She just hibernated.

25  Q.   And as a result of your concern for her, did you

| | |
|---|---|
| 1 | plan a trip for Annabelle Walsh? |
| 2 | A.   Yes. |
| 3 | Q.   Where did you go? |
| 4 | A.   We went to Duck, North Carolina. |
| 5 | Q.   And who went with you? |
| 6 | A.   Cathy Carter, Jennifer Lalonde and Charlene Wallace. |
| 7 | Q.   What was Annabelle's demeanor during this trip? |
| 8 | A.   Very somber.  She cried almost through the entire |
| 9 | weekend.  It was really hard. |
| 10 | Q.   Did she explain how she was feeling at this time? |
| 11 | A.   Yes. |
| 12 | Q.   What did she say? |
| 13 | A.   I think most of the weekend was spent talking about |
| 14 | how her character and Jack's character were in question, |
| 15 | that they looked like bad people, and how is she going |
| 16 | to face her community, her church, her children's |
| 17 | school?  How would she ever be able to go back in |
| 18 | public?  I mean, she was just really broken. |
| 19 | Q.   And were you concerned for her? |
| 20 | A.   Very. |
| 21 | MS. JORDAN:  I don't have any further questions. |
| 22 | CROSS-EXAMINATION |
| 23 | BY MR. LACY: |
| 24 | Q.   Good morning, Ms. Warburton. |
| 25 | A.   Good morning. |

```
 1   Q.   My name is David Lacy.
 2         You mentioned, Ms. Warburton, that you have
 3   known the Walshes since 2004; is that right?
 4   A.   Yes.
 5   Q.   And you have done business with them since that
 6   time?
 7   A.   Yes.
 8   Q.   At least until they went out of business?
 9   A.   Um-hum.
10   Q.   Would you consider yourself friends?
11   A.   Yes.
12   Q.   Personal friends?
13   A.   Yes.
14   Q.   Okay.  You socialize together?
15   A.   Yes, we do.
16   Q.   Okay.  You mentioned that you had occasion to speak
17   and witness Ms. Walsh after the broadcast; is that
18   right?
19   A.   Um-hum.
20   Q.   And she was very upset; is that right?
21   A.   Yes.
22   Q.   And she became reclusive?
23   A.   Um-hum.
24   Q.   She wasn't answering your phone calls and e-mails;
25   is that right?
```

M. Warburton - Cross          320

1  A.   Yes.

2  Q.   She was hard to track down?

3  A.   Yes.

4  Q.   But isn't it correct, Ms. Warburton, that Ms. Walsh

5  was upset and distraught and reclusive before the

6  broadcast?

7  A.   She was not reclusive before the broadcast to my

8  knowledge.

9  Q.   Is it correct, Ms. Warburton, that after the

10 business failed Ms. Walsh became reclusive?

11 A.   She may have.

12 Q.   And she stopped seeing people before the broadcast

13 aired?

14 A.   She may have, yes.

15 Q.   Well --

16 A.   I can't speak one way or another to that.  I spoke

17 with her a lot prior to the broadcast, and after it was

18 difficult to get in touch with her.

19 Q.   After the broadcast?

20 A.   (Witness nods head.)

21 Q.   Your Honor, if I could present this to the witness.

22      Ms. Warburton, if you will look at page 27.  But

23 let me ask you before you even get there, do you recall

24 giving a deposition or being deposed in this case?

25 A.   Yes, I do.

M. Warburton - Cross          321

```
 1   Q.   And you understood you were under oath?

 2   A.   Yes, I do.

 3   Q.   Actually, you were under oath when you gave your

 4   deposition?

 5   A.   Yes, I was.

 6   Q.   If you would look at page 27, please.

 7   A.   Okay.

 8   Q.   If you look at line 1, there's a question there.

 9   A.   Um-hum.

10   Q.   Is that question, "And after the business failed,

11   did she become reclusive then?"

12   A.   Yes, it is.

13   Q.   Did you answer that question:  "Yes, she did become

14   reclusive then"?

15   A.   I did answer it yes.

16   Q.   And the next question is:  "So she stopped seeing

17   people before the broadcast; is that correct?"

18   A.   I believe, yes, um-hum.

19   Q.   You answered that question that, yes, she had

20   stopped seeing people before the broadcast?

21   A.   Yes.

22   Q.   Was that a true and accurate answer when you gave

23   it?

24   A.   I believe it was.

25   Q.   Okay.  You can put that down, Ms. Warburton.
```

M. Warburton – Redirect          322

1          And Ms. Warburton, you have never seen the

2   broadcast?

3   A.   I have not seen the broadcast.

4   Q.   Anything you have heard about it, you have heard

5   from other people?

6   A.   Yes.

7   Q.   Okay.  Thank you very much.

8   A.   Absolutely.

9          THE COURT:  Any redirect?

10         MS. JORDAN:  Yes, sir, your Honor.

11                 REDIRECT EXAMINATION

12  BY MS. JORDAN:

13  Q.   You just stated that you haven't seen the broadcast

14  and that everything that you know about it was through

15  other people?

16  A.   (Witness nods head.)

17         THE COURT:  Could you answer instead of nodding

18  your head?

19         THE WITNESS:  Yes.

20  BY MS. JORDAN:

21  Q.   The things you have heard about it, have they been

22  positive or negative?

23  A.   They have been negative.

24  Q.   I would also like to direct you to Annabelle Walsh,

25  her demeanor in the months of January and February and

M. Warburton – Redirect          323

1   early March prior to the airing of this broadcast versus

2   after the airing of the broadcast.  Was there a

3   difference in Annabelle Walsh before and after the

4   broadcast?

5   A.   Yes, there was.

6   Q.   What's the difference?

7   A.   The difference is that after the broadcast there was

8   a perception out there that she could not control and it

9   attacked the character of herself and her family.

10  Q.   Was she acting differently after the broadcast than

11  she was before?

12  A.   Yes, she was.

13  Q.   Describe the difference.

14  A.   Withdrawn, embarrassed, helpless, and she just did

15  not want to leave her daily circle.  She did not want to

16  go beyond that.

17  Q.   Was she crying when you would talk to her before the

18  broadcast?

19  A.   No, not so much.

20  Q.   Was she crying after you talked to her after the

21  broadcast?

22  A.   Absolutely.

23        MS. JORDAN:  No further questions, your Honor.

24        MR. LACY:  Very briefly, your Honor.

25                  RECROSS-EXAMINATION

M. Warburton - Recross          324

```
 1  BY MR. LACY:
 2  Q.   Ms. Warburton, you mentioned just now that
 3  Mrs. Walsh was not crying very much before the broadcast
 4  aired?
 5  A.   (Witness nods head.)
 6  Q.   Isn't it correct that after the business fell apart
 7  but before the broadcast aired, Ms. Walsh was very
 8  distraught?
 9  A.   She was upset, yes.
10  Q.   Okay.  And you spoke with her and she was crying?
11  A.   The very first conversation we had about the
12  business folding, yeah, she was.
13  Q.   And she was having difficulty composing herself; is
14  that correct?
15  A.   At the very first conversation, yes.
16  Q.   That was before the broadcast?
17  A.   That was before the broadcast.
18        MR. LACY:  Thank you, Ms. Warburton.
19        THE WITNESS:  Um-hum.
20        THE COURT:  Anything further?
21        MS. JORDAN:  No, your Honor.
22        THE COURT:  All right.  Ma'am, you may step
23  down.  You are excused.  You are not to discuss your
24  testimony with anyone except the lawyers in this case
25  until the completion of the trial.
```

P. Ritzi – Direct                    325

```
 1              THE WITNESS:  Okay.

 2              (Witness excused.)

 3              THE COURT:  Next witness?

 4              MS. JORDAN:  Patti Ritzi.

 5              (The witness was sworn by the deputy clerk.)

 6              PATTI RITZI, called as a witness, having been

 7    first duly sworn, was examined and testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MS. JORDAN:

10    Q.   Good morning.

11    A.   Good morning.

12    Q.   Please state your name for the Court.

13    A.   Patti Ritzi.

14    Q.   Ms. Ritzi, what do you do for a living?

15    A.   I'm an event planner.

16    Q.   What's your business address?

17    A.   It's 2133 Upton Drive, Virginia Beach, Virginia,

18    23454.

19    Q.   And how often does your business work with other

20    businesses in the event planning industry?

21    A.   Very frequently.

22    Q.   How long have you been in business?

23    A.   21 years.

24    Q.   Do you know Jack and Annabelle Walsh?

25    A.   Yes, I did.
```

P. Ritzi – Direct                 326

```
1   Q.   And how do you know them?
2   A.   Jack and Annabelle were originally a rental company
3   that we worked with for tents and other supplies, and
4   then we became friends.
5   Q.   How long have you known them?
6   A.   Wow!  Probably seven, eight years.
7   Q.   Describe Jack Walsh's reputation in the community.
8   A.   Jack is a conscientious individual, very caring,
9   very upstanding, honest, has a lot of integrity.
10  Q.   Describe Annabelle Walsh's reputation in the
11  community.
12  A.   Annabelle was very energetic, very enthusiastic,
13  very talented and creative, also very honorable, very
14  honest.
15  Q.   Did your business have positive or negative
16  interactions with the Walshes' business prior to March
17  of 2010?
18  A.   Positive.
19  Q.   And what was their company's reputation in the
20  industry?
21  A.   Their company was growing.  I mean, they had
22  developed a good client base.  Their equipment was
23  getting a higher and higher quality.
24  Q.   I want to talk to you about the T.V. segment that
25  aired about the Walshes on March 31st, 2010.  Did you
```

P. Ritzi - Direct                327

```
 1  see it?
 2  A.   Yes, I did.
 3  Q.   Where were you when you saw it?
 4  A.   I was actually at my mother-in-law's home with my
 5  family.
 6  Q.   Who was there when you saw it?  Who was with you?
 7  A.   Our grandmother, our husband, my mother-in-law,
 8  father-in-law.
 9  Q.   Did you discuss it with those individuals after it
10  aired?
11  A.   Yes, I did.
12  Q.   And what was that discussion about?
13  A.   How tragic it was that something could be -- or that
14  people could be destroyed virtually on a television
15  segment with only like one side of a story.
16  Q.   Did you feel that the segment about Jack and
17  Annabelle Walsh was positive or negative?
18  A.   Negative.
19  Q.   Did you speak with Annabelle Walsh after the T.V.
20  segment aired?
21  A.   Yes, I did.
22  Q.   What was her demeanor like during this conversation?
23  A.   She was in tears.  She was crushed.  She was
24  distraught, just that she was in terrible shape.
25  Q.   And have you had the opportunity to view Annabelle
```

P. Ritzi - Direct                          328

1  Walsh in social situations since the airing of the T.V.

2  segment?

3  A.   Very rarely.

4  Q.   Why is that?

5  A.   Annabelle sort of disappeared from the network.

6  When I say network, it's the event industry as a whole.

7  We had lunch alone, but she wasn't attending any of our

8  special events, society meetings or out in public.  I

9  didn't see her at any other normal events where we, as

10 event planners, trade out for tickets or attend events

11 because they are comped or whatever.  I hadn't seen her

12 at any of those functions.  Aside from that, we had

13 dinner with Jack and Annabelle after.

14 Q.   Was it normal for her to be absent from these

15 functions?

16 A.   No.  She was always the life of the party.

17 Q.   Is there a difference in the way she interacts with

18 others since the T.V. segment aired?

19 A.   Yes, there is.

20 Q.   What is that difference?

21 A.   She's very cautious.  I don't think Annabelle has

22 completely recovered from just the anguish that she

23 suffered and the damage to her reputation, because in

24 our industry reputation is everything.  She is very

25 reserved.

1   Q.   Were you concerned for Annabelle Walsh after the

2   T.V. segment aired?

3   A.   Yes, I was concerned for her.  Again, their

4   business, like my business, is everything to them.

5   Their heart and soul, everything they had was invested

6   in it, and part of that is the character of the

7   individual running it, and in her case, being the main

8   salesperson, her character was in question.  You know,

9   having to build that back up and having to develop that

10  reputation back in the community around here is very

11  difficult.

12  Q.   And are you concerned for Jack as well?

13  A.   Jack, yes.  Probably not to the same extent as

14  Annabelle, but I know Jack, again, had his whole heart

15  invested in his business.

16          MS. JORDAN:  Thank you.

17                    CROSS-EXAMINATION

18  BY MR. MERRITT:

19  Q.   Ms. Ritzi, good morning.  How are you?

20  A.   Okay.

21  Q.   My name is Craig Merritt.

22          You testified that the reputation of the Walshes

23  was that their company was growing; is that correct?

24  A.   Yes, sir.

25  Q.   Would you be surprised to learn that the Walshes'

P. Ritzi - Cross                    330

```
 1  company, in fact, had not been growing for several years
 2  before it closed?
 3  A.   Yes, I would be very surprised to hear that.
 4  Q.   Do you recall the date when their company went out
 5  of business?
 6  A.   No, I don't.
 7  Q.   If I told you end of January 2010, does that sound
 8  about right?
 9  A.   No, not out of business.  No.
10  Q.   Why do you believe that's not correct?
11  A.   I believe at that point they were merging with
12  another company, was the impression I was given.
13  Q.   Who gave you that impression?
14  A.   Wow!  It may have been a conversation with Jack, I'm
15  not sure.
16  Q.   In talking to you over the years, did Mrs. Walsh
17  ever tell you about any of the business affairs of
18  Atlantic Event Rentals, her company?
19  A.   No.
20  Q.   Were you aware of any of the loan obligations or
21  other details of the business that they had?
22  A.   No, I was not.
23  Q.   Would you be surprised to learn that at the end of
24  January 2010 their business ended because they consented
25  to a sale of all their inventory by their bankers to
```

P. Ritzi - Redirect                331

1    Mr. Daugherty?

2    A.   Would I be surprised?  Yes, I would be surprised.

3    Q.   You never heard that before --

4    A.   No.

5    Q.   -- until right now?

6    A.   Right.

7         MR. MERRITT:  I have no further questions.

8         THE COURT:  Redirect?

9                   REDIRECT EXAMINATION

10   BY MS. JORDAN:

11   Q.   Ms. Ritzi, when you said that Jack and Annabelle's

12   business was growing, what did you mean by that?

13   A.   They had displayed, at various bridal shows and

14   various events where we did things together as partners,

15   new equipment, new pergola for a wedding, for example,

16   newer chairs, a nice tent, other, you know, linens that

17   Premier wasn't carrying that they offered.  So, you

18   know, we were working together on those types of things.

19   Q.   Ms. Ritzi, were you privy to any of the business

20   dealings between the Daughertys and the Walshes?

21   A.   No, not until post, I guess, chaos, you could say.

22        MS. JORDAN:  Thank you.

23        MR. MERRITT:  No questions, your Honor.

24        THE COURT:  All right, ma'am.  You can step

25   down.  You are not to discuss your testimony with anyone

P. Ritzi - Redirect          332

```
 1  except the lawyers involved in the case until the
 2  completion of the trial.
 3          THE WITNESS:  Okay.
 4          THE COURT:  And you may go about your business.
 5          THE WITNESS:  Okay.  Thank you.
 6          (Witness excused.)
 7          THE COURT:  All right.  Next witness?
 8          MR. DENTON:  The plaintiff rests.
 9          THE COURT:  The plaintiff rests.
10          All right.  Ladies and gentlemen, if you would
11  step out for a few moments.
12          (Jury out.)
13          THE COURT:  Do you have any motions?
14          MR. MERRITT:  Your Honor, we have a motion under
15  Rule 50 of the Federal Rules of Civil Procedure.
16          THE COURT:  Come to the podium, please.
17          MR. MERRITT:  Yes, sir.
18          Your Honor, this is on a motion for judgment as
19  a matter of law in favor of the defendants.  One of the
20  things I want to mention is that, as the Court is well
21  aware, you declined to enter summary judgment in our
22  favor earlier in the case.  It is clearly the law of this
23  circuit, and the case is *Malone versus Microdyne*, 26 F.3d
24  471, that judgment as a matter of law can be appropriate
25  even where the Court has previously denied a motion for
```

1  summary judgment.

2         THE COURT:  I have done that before.

3         MR. MERRITT:  You have things before you now

4  that simply were not present at the summary judgment

5  stage.

6         We believe that there are three big holes in

7  this case and that it should not be permitted to go

8  forward and this jury should not be permitted, for these

9  three reasons, to be given the opportunity to enter a

10 judgment against our clients:

11        First of all, and as a point of reference, I'm

12 going to use the Court's proposed jury instructions

13 because they have the points of law in them and they are

14 an easy point of reference.  Your Honor's proposed draft

15 Instruction 23 addresses the issue of falsity.  In a

16 nutshell, falsity must be substantial.  It must be

17 substantial falsity.

18        Now, you are well aware at this point that the

19 plaintiff's theory of falsity turns largely on quibbling

20 over minor elements of this broadcast and of this web

21 site article, and that quibbling is over what Boots

22 Daugherty knew or did not know.

23        Now, whether or not Boots Daugherty was

24 surprised by the fact that these folks were taking

25 deposits while they were going out of business or not,

P. Ritzi - Redirect                334

1   there is no question that the substantial truth of this
2   case is that they knew they were going out of business at
3   the end of 2009.  They knew, as they both admitted in
4   their depositions and were impeached on in this
5   courtroom, that there was no merger between themselves
6   and the Daughertys.

7          THE COURT:  When you say they, you are referring
8   to the Walshes?

9          MR. MERRITT:  Jack and Annabelle Walsh.  Each
10  plaintiff was directly impeached on that point.

11         So they were, in fact, making contracts, and you
12  saw Plaintiff's Exhibit 44, which it was not all of the
13  contracts they made, because there were other older
14  contracts in there.  But some of them were contracts they
15  had made as late as January 2010.

16         So it's not Boots Daugherty's surprise or lack
17  of surprise that is delivering the defamatory sting of
18  this broadcast.  It is the fact that we now know to be
19  absolutely true, that these folks were not being
20  absolutely straightforward with their customers about
21  what the status of their business was and that there
22  were, in fact, by Mr. Walsh's own admission, $19,000 in
23  deposits that were taken in the dying days of Atlantic
24  Event Rentals.

25         Now, we also have the admission, which we think

1  is dispositive on this question from Mr. Walsh -- I asked

2  him two questions yesterday:  "Did you know in January of

3  2010, as you made contracts with these customers, that

4  they were at risk because you didn't have a firm deal

5  with Mr. Daugherty?"

6           The answer was, "I knew that."

7           "Did you tell your customers so that they would

8  know about that risk?

9           "No, I did not."

10           Now, the damaging sting of this story is wrapped

11  up in those two questions and answers.  The fact is that

12  they were taking deposits with a dead business.  They

13  knew they were putting their customers at risk.  They

14  were not telling their customers they were at risk.

15           And this quibbling over what Boots Daugherty did

16  or did not know, let's look at it differently, and you

17  will recall that I asked Mrs. Walsh about this.

18           Let's just say that the story had said Boots

19  Daugherty was well aware that the Walshes were continuing

20  to take deposits in January of 2010, even though their

21  business, even though their business, was dead.  There's

22  no quibbling about whether they were doing it.  Would the

23  story deliver the same damaging message either way?  We

24  think it would, because the facts that carry the damage

25  are the taking of the deposits without telling the

1  customers, not whether Boots Daugherty knew it or not.

2          Frankly, we don't know if Boots Daugherty knew

3  it, didn't know it, was actively colluding with them, had

4  an agreement or didn't have an agreement, but it's all a

5  trivial, immaterial element of the story that just

6  doesn't go to the gist of it.

7          Now, the other piece of this relates to proposed

8  Instruction No. 28.  That has to do with proximate cause

9  of injury to reputation.  It relates somewhat to the

10 point I just discussed because the defamatory "gist" or

11 "sting" has to be delivered by the false aspect of the

12 story for it to be actionable, not the true aspect of the

13 story.  The true aspect of the story carries the weight

14 of it, not this minor falsity.

15         In addition, the witnesses called by the

16 plaintiffs in this case have all confirmed that the

17 Walshes told them the same merger story, the same spin on

18 the situation, that they had been telling their

19 customers.  People who were their good friends and

20 business associates all got on this witness stand and

21 said, Yeah, they told us there was a merger going on and

22 we were stunned to find out they had been fired.  How do

23 you get fired from a merger?

24         And you also heard the very last witness on

25 here, Ms. Ritzi, acknowledge something that's pretty

P. Ritzi - Redirect                337

1   important.  Whatever the Walshes were telling folks that

2   was affecting their reputation in the community, and this

3   is a case about damage to their reputation, was not the

4   full picture.  Their business went down.  They continued

5   to tell people, or not tell people, what the real

6   circumstances were, like Ms. Ritzi, the last witness, who

7   just heard in the courtroom for the first time today that

8   their business had gotten in debt trouble and their

9   assets had been sold off.  And yet they are brought in

10  here to have a jury find that WAVY, or to have it

11  suggested to a jury that WAVY caused that injury.  That's

12  not right.  That's a shifting of cause that is not

13  supported by the record.

14          Finally, Instruction No. 24 has to do with proof

15  of fault, negligence.  This is the third big hole in the

16  case behind falsity and proximate cause.  There has to be

17  a failure to exercise reasonable care.  You have to be

18  negligent.  It's been well-established since 1966 as a

19  matter of federal constitutional law, in *New York Times*

20  *versus Sullivan* that you cannot assign liability for

21  defamation without proof of fault, the minimum fault

22  being negligence.

23          There is no proof in this case, none.  Even if

24  you assume that these minor quibbles about whether Boots

25  knew it or not are really material facts, but let's give

SHARON B. BORDEN, OFFICIAL COURT REPORTER

1  them the benefit of the doubt for this argument that they

2  are material, there's no suggestion in any evidence that

3  this Court has or that a jury could rely on that Lori

4  Crouch, when she put together these stories, did anything

5  negligent.  She interviewed everybody.  She put it

6  together.  A piece came out, a spin came out, a detail

7  came out that these plaintiffs didn't like, but that's

8  not proof that she failed to exercise reasonable care in

9  any way.

10         There was an opportunity to ask her that, and

11 the plaintiffs took it, and no evidence came in that she

12 fell below par anywhere or from which a jury could fairly

13 be permitted to infer she fell below par.  There's no

14 evidence that WAVY or LIN Broadcasting was negligent or

15 that any of their employees were.

16         So that being the case, we think, your Honor, it

17 would be improper as a matter of law to allow the jury to

18 take this case and on a speculative basis decide that

19 there's substantial falsity if there's proximate cause

20 between damages that were actually suffered in anything

21 that WAVY did or that anybody, either of these

22 defendants, was negligent.  We don't believe it is there

23 on the record.  It would be speculative, and we think it

24 would be error for a jury to be permitted to speculate on

25 that basis.

1          Thank you, sir.

2          THE COURT:  Mr. Denton, you may respond.

3          MR. DENTON:  Yes, your Honor.  Essentially what

4  Mr. Merritt is saying is that there's no evidence of

5  falsity, there's no evidence of proximate cause, and

6  there's no evidence of negligence.  Starting with the

7  last, your Honor, the negligence is palpable.  We had

8  both Mr. and Mrs. Walsh testify that the reporter, Lori

9  Crouch, was specifically told that the Daughertys did

10  know about the deposits all along, and yet she failed to

11  carry their version of the story.  She created a false

12  impression by only presenting one side of the story.

13          Now, was there underlying falsity or is this a

14  minor detail, as Mr. Merritt would have you say?

15  Implying and stating outright that the Walshes had taken

16  the deposits with no visible means of returning them is

17  not a detail.  It certainly stings.  It is saying that

18  they took monies from brides who are expecting,

19  obviously, to get married with no means of making good on

20  those contracts.

21          THE COURT:  Isn't that what your client said

22  yesterday when Mr. Walsh said that in January he took in

23  the $19,000 or so and he knew there was a risk because

24  the Daughertys hadn't agreed to do the business because

25  there was no firm deal, or words to that effect?  Isn't

1  that what your client said?

2        MR. DENTON:  He said there was a risk.  He said

3  there was a risk.  He also said -- I mean, there are

4  risks in every business venture, your Honor.  There's a

5  risk in everything.  The fact that there's a risk doesn't

6  mean that they took in deposits knowing they had no way

7  of paying it back.

8        THE COURT:  Well, they didn't have any way of

9  paying it back.  He also testified that he spent them.

10        MR. DENTON:  I know, your Honor, but he said he

11  had $250,000 worth of business coming in.  He had

12  accounts receivable.  He had family that he could borrow

13  from that he had borrowed from before.  And most

14  importantly, he had Distinctive and these other companies

15  out there who he knew he could turn this responsibility

16  over to in the worst case situation, which he never

17  imagined, your Honor, which was that the Daughertys would

18  welsh on their arrangement.

19        The import of the evidence is on balance, and

20  the jury could certainly find this as a matter of fact,

21  is that the Walshes were very vulnerable, as was

22  testified, and that they took the best deal they could

23  get out of the Daughertys because they trusted them.

24  They believed that they had good faith, and they got into

25  the deal, and then they were, essentially, snookered and

1  were kicked out the door in short order, leaving all the

2  book of business with the Daughertys because the

3  Daughertys literally had it, literally changed the locks

4  on the keys.  They couldn't get their business back.

5         THE COURT:  It wasn't their business at the

6  moment they turned it over to the bank, was it?  The

7  assets didn't belong to them anymore as of January 29th?

8         MR. DENTON:  Well, that's true, your Honor, but

9  there are factoring organizations.  These companies

10  worked together.  They trade stuff back and forth.

11  Arrangements could be made.  You don't necessarily have

12  to own an inventory to function in this business with all

13  of the kinds of connections that the Walshes had with the

14  other people working in the industry.

15         Mrs. Walsh's testimony was that she on a dime

16  was able to turn around and solve a contract problem that

17  Malissa Murphy's client had.  Just based on a phone call

18  she was able to call Distinctive and get that contract

19  taken care of.

20         But, your Honor, I think you also have to --

21  from the plaintiff's point of view the evidence is that

22  the Walshes saw the handwriting on the wall, that they

23  were not going to be able to continue on like they had

24  been going and they looked around and they had several

25  options.  One option was to go in with the Daughertys.

 1  There were other people that they could have gone in

 2  with.  They had accounts receivable.  They could have

 3  paid --

 4          THE COURT:  Was there any evidence that they

 5  could have gone in with anybody else?  I don't recall

 6  any.

 7          MR. DENTON:  I believe so, your Honor.

 8          Well, no.  The evidence was they could have

 9  assigned these contracts to other companies, to

10  Distinctive, not necessarily they could have done a

11  merger with them.  I didn't mean that.

12          Incidentally, your Honor, Mr. Merritt makes a

13  big point out of saying, well, all this talk about a

14  merger was a fraud, essentially, is what he is saying.

15  The concept of a merger that we think about reflectively

16  is the one we learned about in the first or second year

17  of law school, but that's not what the rest of the world

18  thinks about.  The dictionary says, the second definition

19  of a merger is absorption of one estate, interest,

20  obligation, contract, etc., in another.  That's exactly

21  what these folks, what the plaintiffs, have testified

22  they contemplated and they actually did, was they merged

23  a lot of things.

24          It wasn't just the inventory.  They didn't merge

25  the inventory.  They let the bank sell that.  But they

P. Ritzi - Redirect                343

1  had the goodwill.  They had their phone number.  They had

2  Annabelle's marketability.  They had Jack's expertise,

3  although his financial acumen wasn't very good, but he

4  did bring a lot of things to the table, according to

5  everybody in the industry that you have heard from here.

6  And most importantly, they had contracts.  They had

7  recurring, rolling contracts with big institutions, and

8  Annabelle had a book of business on the weddings.

9          It's very plausible, your Honor, I would submit,

10 and a very natural thing.  Let's just say my practice was

11 folding and I wanted to turn it over to another lawyer.

12 I have some cases no lawyer would necessarily like, but

13 on the other hand, I have got some that everyone would

14 love.  So I would attempt to work an arrangement whereby,

15 hey, you have got to take all of them.  You can't just

16 cherry pick them.

17          It appears, the logical inference from the story

18 the Court has heard here, the testimony the jury has

19 heard here, is that the Walshes were in more or less dire

20 straits.  After all, they had been kicked out of their

21 place.  This gentleman comes up to them and says, By the

22 way, I could get you immediate occupancy over in the Ames

23 Building and then we can work out something where we are

24 working together.

25          And even Ms. Dougherty, I believe, in one of

1  these exhibits, refers to, as the witness just said,

2  refers to the arrangement as a merger.

3       We have got Mr. Walsh's e-mail where he referred

4  to the deal as, you know, Mr. Boots, you mentioned the

5  50-50 business.  When are we going to get back to that?

6  It was clearly contemplated by the Walshes.  We don't

7  really know for certain what the Daughertys -- well, we

8  will never know for certain, whether they come in here

9  and testify or not, we will never know for certain.

10 There's no evidence up to this point other than the

11 Walshes' impressions.  There's no direct evidence of what

12 the Daughertys planned, but what the Walshes obviously

13 thought was planned was that they were going to fold

14 their business into the Daughertys.

15       Now, they characterized it as a merger, not in

16 the law school sense.  And they had every reasonable

17 expectation to believe that all the contracts would carry

18 forward.  And some of the contracts did carry forward.

19 What happened was that two things happened, two things.

20 One was, and you heard this from the testimony of

21 Mr. Walsh, one thing that happened was that the

22 Daughertys did not like the fact that the Walshes were

23 saying, You need to use this kind of inventory system,

24 that is the Universal software, in order to be sure we

25 will actually have available the items for the brides

1  when the event comes up.  The Walshes had this Universal

2  system that would do that.

3         The program that the Daughertys had, I believe,

4  was called a QV system.  It's in some of the exhibits.

5  It hasn't been mentioned by name yet, but in some of the

6  exhibits it has been.  Their system was not capable of

7  predicting the allocation of the inventory downstream.

8  That caused the problem with the two couples.

9         The other big thing that caused the immediate

10 problem with the two couples was this particular event

11 named after some magazine, and the Walshes had promised

12 the vendors, as they always did, that they would stock

13 some of their booths without charging them.  The

14 Daughertys didn't want to do that.  So they had two

15 conflicting situations there, and the deal quickly fell

16 apart.  Whoever hears of -- you don't hear of a

17 three-week employment, let alone a three-week merger,

18 very often, but that's what happened in this case.  They

19 had a disagreement over management.

20         THE COURT:  Disagreement over management or the

21 employees, the Walshes, had a disagreement with

22 management?

23         MR. DENTON:  It ended up being the latter.

24         THE COURT:  That's what Mr. Walsh testified to.

25         MR. DENTON:  Yes, your Honor, that's what it

P. Ritzi - Redirect                    346

1   ended up being.  The Walshes had no bargaining position.

2   They were, essentially, drawn into this situation and

3   ended up with what they could get, which was 24,000 each

4   and jobs.  They thought it was going to be something much

5   different, and when they tried to input on the management

6   decisions, they were, essentially, cut off.  Bad feelings

7   developed.  They had this hostile meeting that was

8   described, and the Walshes said, We can't work here; we

9   are leaving.

10          But when they were taking the deposits is what

11   matters.  When they were taking the deposits, they had no

12   reason to expect that they were not going to be able to

13   continue in business with the Daughertys.

14          Now, Mr. Merritt makes a big deal out of, well,

15   they didn't tell their customers that their inventory was

16   being sold, and they didn't tell their customers the

17   exact nature of the deal that they were doing with the

18   Daughertys.  Well, number one, the exact nature of the

19   deals they were doing with the Daughertys was a moving

20   target and they didn't really know until it actually

21   happened and it was a *fait accompli*.

22          But beyond that, you are not required -- if I am

23   going to do a merger with another law firm, if I'm going

24   to move over to Christian & Barton, I don't have to warn

25   all my clients, I'm going over there now and you may not

 1   get the same quality of representation you have been used

 2   to.  That's not incumbent upon a business owner.  So I

 3   think it's fatuous to suggest and almost presuppose that

 4   the Walshes had some duty to disclose things like what

 5   their bank --

 6         THE COURT:  Let's get back to the elements.

 7         MR. DENTON:  Okay.

 8         THE COURT:  Is the falsity substantial?

 9         MR. DENTON:  Yes, your Honor.  It's substantial

10   because --

11         THE COURT:  Just give me --

12         MR. DENTON:  I'm sorry.

13         THE COURT:  -- a bullet point what the falsity

14   is.

15         MR. DENTON:  The falsity is a couple of things.

16   It's airing the statement by Mr. Daugherty that he never

17   knew about the deposits when the reporter knew that was

18   true, I mean, it was false, that the Walshes said it was

19   false.  That's falsity.  That's a major falsity.

20         The television supplemented that falsity with

21   the statement by Ulla Capps that that shows these people

22   don't have character and integrity.  You cannot have a

23   more -- and that's clearly false.  You have heard witness

24   after witness saying they had the highest character and

25   integrity.  It is false.

P. Ritzi - Redirect                 348

1          Now, this may not lack the sting to be

2   cognizable, I will hand you, it's a close question, but

3   it certainly is false that the Walshes were tracked

4   down.  It created the impression that they were in

5   hiding.  It supported the general theme of the program

6   that the Walshes had done something bad because now they

7   were trying to hide it.

8          And finally, your Honor, to further support the

9   theme that the Walshes cared so little about their

10  customers that they would, essentially, defraud these

11  brides, the news broadcast made it appear as if companies

12  came in out of the blue to take up the slack on these

13  deposited contracts when the reality is that the Walshes

14  went out and got those people to -- got Distinctive and

15  Premier to cover those contracts.

16         And then to characterize all of that, kind of

17  wrap it up with a rhetorical ribbon and characterize it

18  as lacking character and integrity, if you don't have

19  it -- If you can't pay it back, don't take it.  Well,

20  Lord, businesses take risks.  They operate on -- the free

21  enterprise system is nothing but risk, and debt is not

22  something that is unique to the Walsh family.

23         THE COURT:  All right.  The proximate cause.

24         MR. DENTON:  Well, the only proximate cause -- I

25  think, your Honor, every jury instruction -- I mean, the

1  proximate cause jury instruction in Virginia makes it

2  very clear that it's "a" proximate cause, not "the"

3  proximate cause.  So the fact the Walshes were also upset

4  about their business going out of business, that doesn't

5  mean they weren't proximately caused damage to their

6  reputation.

7         Actually, your Honor, if you think about it, the

8  proximate cause argument that the defense has made

9  doesn't even apply to reputation, because witness after

10 witness said they didn't realize that Atlantic was in

11 trouble.  They didn't know about the business failure.

12 They thought it was a merger.  So there's certainly no

13 proximate cause as to damage to reputation.  The only

14 issue is whether plaintiffs have put on enough evidence

15 to go to the jury as to proximate cause of the emotional

16 harm to the Walshes, which is also compensable under the

17 jury instructions, of course.

18        And, yeah, there's evidence of two sources from

19 that, but it's not an A or a B, it's not an on or off

20 switch.  It can be both.  It can be Part 1.  But the

21 evidence, I feel, was very, very strong, your Honor, that

22 the gravitas of the emotional harm came from what were,

23 really, the despicable allegations on the news broadcast

24 that these people lacked character and integrity because

25 they had defrauded blushing brides.  So that's my

1  response to proximate cause.

2        THE COURT:  Negligence you have already talked

3  about.

4        MR. DENTON:  Yes.

5        THE COURT:  All right.  Merritt, do you have

6  any --

7        MR. MERRITT:  I do, your Honor.

8        MR. DENTON:  And finally, your Honor, I didn't

9  really directly address this "sting" point.  I mean, it's

10  implicit in everything I said, but the final thing I

11  should say about it is that's a jury determination,

12  that's a factual determination.  The jury can decide the

13  business about him not being aware.  And, Lord knows, how

14  can you argue saying somebody doesn't have character and

15  integrity doesn't sting?

16        MR. MERRITT:  First of all, with regard to

17  falsity, there is a new argument that appeared somewhere

18  in this trial that's never been disclosed that I want to

19  take on right now because it's not in the pretrial

20  disclosures.  We are hearing it for the first time in the

21  last two days, and that is that this broadcast made it

22  appear as if people came in to help out of the blue and

23  that WAVY did all the work and that the plaintiffs had no

24  part in that.  That's now being alleged as a defamatory

25  message that is included in this broadcast.

P. Ritzi – Redirect                    351

1          You will not find it in the plaintiff's
2    disclosures, you will not find it in the jury
3    instructions, and we object to it being popped on us at
4    this late date as a defamatory inference when this had
5    been requested repeatedly from the plaintiffs.

6          Now, as far as the falsity goes, a lot of things
7    just went by very quickly, but I do want to mention a
8    couple of them.  First of all, Mr. Walsh admitted in the
9    broadcast, admitted on the face of the broadcast he could
10   not pay the money back.  So all this stuff about whether
11   he could or could have done something different, the
12   plaintiff admitted that on the face of the broadcast
13   itself.

14         I would suggest to you that the defamatory sting
15   of this broadcast was not that these folks went out of
16   business per se.  Lots of people do go out of business.
17   The thing that creates the defamatory sting in this
18   broadcast is the true statement that knowing they were
19   going out of business, they were not candid with their
20   customers.

21         I would expect that if Mr. Denton was packing up
22   the doors of his law practice and was going to send it
23   somewhere else, regardless of our disagreement on what
24   the ethics rules might require as far as notice to the
25   clients, one thing he would do, he would stop taking new

1  clients, and that's the problem the Walshes had.  They

2  knew they were dead in the water and they kept taking new

3  customers.

4         And, as Mr. Denton just acknowledged, this was,

5  in his words, a moving-target deal, a moving target

6  between the Walshes and the Daughertys.  The Walshes

7  didn't know how this was going to land, and as I

8  mentioned when I stood up the first time, they knew it

9  was risky.  They just didn't tell their customers about

10 the risk, and that's the substantial truth that is

11 conveyed by this story.

12        Now, the other piece on proximate cause, let's

13 forget whether their reputational injury comes from WAVY

14 or from other things for the moment and let's just go on

15 the more narrow defamation clause.  In Instruction No. 28

16 this Court has given to us, you cite several cases or we

17 have cited several cases, *Mason versus New Yorker* and the

18 Fourth Circuit case, *Biospherics,* and a couple of others.

19        The critical part of that instruction is this

20 last sentence:  "Put differently, if you find the Walshes

21 have suffered reputational injury that caused them to

22 suffer embarrassment or emotional distress, but that the

23 injury or damage resulted from truthful information

24 presented in the broadcast or web site article, as

25 opposed to minor inaccuracies, they may not recover."

P. Ritzi - Redirect                353

1  And I firmly believe that is the state of the record at

2  the close of the plaintiff's case.

3          THE COURT:  Is that a jury question, as

4  Mr. Denton says, I shouldn't address?

5          MR. MERRITT:  Not on this record.  That's the

6  whole purpose of a Rule 50 motion.  They can't rise above

7  their own testimony, and they have said the only deal

8  they had was a consent to the sale of their assets.  They

9  had a lot of lose talk from the Daughertys about what

10 might happen in the future.  They knew they were in a

11 risky situation.  They didn't tell their customers about

12 it.  They have admitted all of that.

13          That is the substantial truth of the story.

14 It's the defamatory message of the story, if any, and

15 these minor pieces about whether Boots Daugherty knew

16 about it or didn't know about it don't amount, for

17 defamation law purposes, to a hill of beans.  They have

18 done a great job in this case of whipping up that minor

19 detail into a very big deal.  I give them full credit,

20 but I think it's now time for the law of Virginia, the

21 law of defamation to kick in and put an end to this so

22 the jury is not allowed to decide this on that kind of

23 speculative basis.

24          Thank you.

25          THE COURT:  We will take a ten-minute recess and

 1  be back at 20 minutes after.

 2          MR. DENTON:  Your Honor, may I be heard on one

 3  very small part of what he said, just one little point?

 4          THE COURT:  Go ahead.

 5          MR. DENTON:  Thank you, your Honor.

 6          THE COURT:  Come to the podium.  If you need to

 7  use that, go ahead from right there.

 8          MR. DENTON:  Mr. Merritt said that I have added

 9  something to my theory.  I don't know if your Honor

10  remembers seeing it in the motion for summary judgment,

11  but here it is in the complaint.  At the end of the

12  newscast in the calculated double entendre, the

13  newscaster said, "Character and integrity.  A lot of

14  those businesses stepping up to help, that's nice."

15          Taken in the context of the rest of the

16  broadcast, the false implications and fraudulent

17  statements were that the plaintiffs had unlawfully

18  converted or embezzled money, monetary deposits of

19  customers, and fraudulently sold their business to Boots

20  without disclosing the existence of the 25,000 in

21  accounts payable.  But the double entendre, your Honor,

22  refers to those businesses stepping up to help.

23          That's why I'm arguing that was a deliberate dig

24  to the Walshes because the Walshes had been the ones, and

25  Lori Crouch knew it, who went out and got Distinctive and

1  the others to cover for these contracts.  It's not added

2  at the eleventh hour and 59th minute as has been

3  suggested.  It's been the case all along.

4        It's very easy for a lawyer to make a sweeping

5  statement like that and it's not so easy for the opposing

6  lawyer to come back and go through the haystack and

7  demonstrate why it was a misrepresentation, but that's

8  been done here.

9        MR. MERRITT:  Your Honor, if I may respond.

10        THE COURT:  Last time.

11        MR. MERRITT:  This point at page 19 of the final

12  pretrial order, paragraph 4, which is what Mr. Denton was

13  referring to, says this:  "Tom Schaad's statement in the

14  news broadcast as a whole also failed to acknowledge that

15  the three named companies that were stepping up to help

16  were companies the Walshes had lined up to honor the

17  contracts."

18        That is not what has been pitched to this jury

19  in this case.  What was pitched to this jury is that it

20  creates the inference that WAVY was taking credit for

21  doing something that it didn't do, and that's the first

22  time we have seen, read or heard that in this case.

23        THE COURT:  We will be back at 20 after.

24        Would you tell the jury that we haven't gone to

25  lunch, and we will see them in awhile.

1            COURT SECURITY OFFICER:  Yes, sir.

2            THE COURT:  Court's in recess.

3            You don't mind if he just tells them that we are

4    continuing to discuss this matter without bringing them

5    out to tell them that?

6            MR. MERRITT:  That's fine, your Honor.

7            MR. DENTON:  No, sir.

8            (A recess was taken at 12:11 p.m., after which

9    court reconvened at 12:20 p.m.)

10           THE COURT:  All right.  The defendant has made a

11   motion pursuant to Rule 50 (a) and I'm going to read it.

12           "Judgment as a matter of law:  In general, if a

13   party has been fully heard on an issue during a jury

14   trial and the Court finds that a reasonable jury would

15   not have a legally sufficient evidentiary basis to find

16   for the party on that issue, the Court may resolve the

17   issue against the party and grant a motion for judgment

18   as a matter of law against the party on a claim or

19   defense that under the controlling law can be maintained

20   or defeated only with a favorable finding on that issue."

21           I'm faced here with this very high bar for a

22   judgment as a matter of law, that a reasonable jury would

23   not have a legally sufficient evidentiary basis.

24           The second part is that under Virginia law the

25   jury is to determine whether a statement is false unless

P. Ritzi - Redirect          357

 1  there is insufficient evidence to show that anything was
 2  false about it.  The jury makes that determination.
 3          The third spoon in the soup is the fact that the
 4  plaintiff's case on the evidence of falsity and proximate
 5  cause and damages, even, is pretty weak.  But I am
 6  denying the Rule 50 motion.  I find that there is
 7  sufficient evidentiary basis to find for the plaintiff,
 8  and there is proximate cause, and there is a finding the
 9  jury could find both proximate cause and negligence on
10  the issue of defamation on some of the issues in the
11  final pretrial order.
12          Mr. Merritt, are you ready to call your first
13  witness or would you like to take a recess?
14          MR. MERRITT:  Whatever the Court's pleasure is.
15  She is here.  I will take your lead on that.
16          THE COURT:  I generally take a lunch break at
17  1.  The jury has had quite a long break, so they should
18  be alert for the next 20 minutes.
19          MR. MERRITT:  If you want to take one witness
20  before lunch, that would be fine.
21          THE COURT:  Your one witness will take about how
22  long, do you think?
23          MR. MERRITT:  I'm thinking this one witness,
24  including cross, is no more than 30 minutes.
25          THE COURT:  All right.  Bring the jury in.

J. Bastas – Direct          358

1              (Jury in.)

2         THE COURT:  All right.  Ladies and gentlemen,

3    you took a much longer break than I thought you were

4    going to be taking, but we've had some discussions out

5    here and now it's time for the defendant to proceed with

6    its case.  So now the defendant will present its

7    witnesses, and the plaintiff may cross-examine them.

8         Mr. Merritt, call your first defense witness.

9         MR. MERRITT:  Your Honor, the defendants call

10   Jamie Bastas.

11        THE COURT:  Mr. Lacy, this is a pretty secure

12   place, but the witness left her purse way in the back of

13   the room.  Would you mind bringing it up at least to the

14   front row?

15        MR. LACY:  Absolutely, your Honor.

16        (The witness was sworn by the deputy clerk.)

17        JAMIE BASTAS, called as a witness, having been

18   first duly sworn, was examined and testified as follows:

19                   DIRECT EXAMINATION

20   BY MR. MERRITT:

21   Q.  Good afternoon.

22   A.  Hi.

23   Q.  You will need the defendant's exhibit book.  Will

24   you just make sure that you have it in front of you

25   before we start.  I think it's probably at the bottom of

J. Bastas - Direct          359

```
 1  that big stack there.  It's a big three-ring binder.
 2  A.   Defendant's trial exhibits?
 3  Q.   Yes, ma'am.  If you can just have that available to
 4  you.
 5  A.   Okay.
 6  Q.   State your name, please.
 7  A.   Jamie Bastas.
 8  Q.   Ms. Bastas, where do you work?
 9  A.   WAVY-TV.
10  Q.   How long have you worked at WAVY-TV?
11  A.   About eight and a half years.
12  Q.   What is your current position at WAVY-TV?
13  A.   10 On Your Side producer.
14  Q.   And what was your job in January of 2010?
15  A.   10 On Your Side producer.
16  Q.   Would you please tell the jury what a 10 On Your
17  Side story is?
18  A.   Basically, we go to bat for consumers, is the best
19  way to describe it.
20  Q.   In March 2010 were you involved in a 10 On Your Side
21  story concerning the party rental business?
22  A.   Yes, I was.
23  Q.   How did you become involved in that story?
24  A.   Through a series of e-mails.
25  Q.   Would you look in the defendant's exhibit book,
```

 1   please, at Tab No. 47, 4-7.

 2   A.   Okay.

 3   Q.   Can you identify Defendant's Exhibit 47, Ms. Bastas?

 4   A.   Yes.

 5   Q.   What is it?

 6   A.   It's an e-mail that stemmed from a viewer by the

 7   name of Sandra Lam.

 8   Q.   Did you receive this as you went about your business

 9   in March of 2010?

10   A.   I did.

11   Q.   I don't see your name on this.  Where is Jamie

12   Bastas?

13   A.   This was under my maiden name.  My maiden name was

14   Jamie Shackleford.

15        MR. MERRITT:  Your Honor, I move the admission

16   of Defendant's Exhibit 47.

17        THE COURT:  Received.

18        (Defendant's Exhibit 47 was admitted.)

19   BY MR. MERRITT:

20   Q.   Would you explain to the jury, please, the

21   circumstances under which you received this e-mail

22   exchange?

23   A.   It originally came in through the WAVY.com web

24   site.  There's a form that viewers can go in and fill

25   out.  There's a drop-down menu.  This viewer in

J. Bastas - Direct                    361

1    particular chose our community affairs form, and the

2    community affairs director e-mailed it over to me,

3    forwarded it on to me.

4    Q.   If you will look at the bottom of the first page of

5    the exhibit, you see the beginning of an e-mail that

6    continues over to the second page.  Do you see that?

7    A.   Yes.

8    Q.   What did you understand the message to be when it

9    was forwarded to you?

10   A.   Well, just reading through it, you can just see that

11   she was a bride who had paid a deposit to a company and

12   she found out that the company was no longer in

13   business.  She, in fact, calls them, quote, vanished.

14   Q.   After the receipt of this message, did you receive

15   any other e-mail messages in connection with the party

16   rental industry?

17   A.   I did.

18   Q.   Tell the jury about further e-mail messages or

19   message or messages that you received.

20   A.   I received two.  The second one, rather -- Sandra

21   Lam was the first one, the one we just discussed.

22   Another one was from a woman named Gail who said she was

23   in the party planning business and she had some brides

24   who had contacted her to make her aware of the fact that

25   a company that these brides --

J. Bastas – Direct                362

```
 1            MR. DENTON:  Objection to hearsay, your Honor.

 2            THE COURT:  Sustained.

 3  BY MR. MERRITT:

 4  Q.  All right.  So you received a second e-mail from

 5  someone raising concerns?

 6  A.  Yes, yes.  And I also received a third e-mail

 7  raising concerns.

 8  Q.  Would you turn to Defendant's Exhibit 48, please.

 9            Can you identify Defendant's Exhibit 48,

10  Ms. Bastas?

11  A.  Yes.

12  Q.  What is it?

13  A.  This would actually be the third e-mail that I

14  received.

15  Q.  When did you receive this third e-mail?

16  A.  The date that it came in to me was March 30th, 2010.

17            MR. MERRITT:  Your Honor, I move the admission

18  of Defendant's Exhibit 48.

19            THE COURT:  Received.

20            (Defendant's Exhibit 48 was admitted.)

21  BY MR. MERRITT:

22  Q.  Now, Ms. Bastas, could you tell us first, from whom

23  did you receive this e-mail?

24  A.  Ms. Ulla Capps.

25  Q.  And did you form an understanding after receiving
```

J. Bastas - Direct                363

1  this e-mail of the nature of the complaint?

2  A.   I did.

3  Q.   What was your understanding?

4  A.   My understanding was that she had hired a company to

5  perform a wedding.  She had paid them approximately $150

6  deposit for their services.

7  Q.   Now, as a result of receiving these various messages

8  between March 18th and March 30th of 2010, did you take

9  any steps to look into it?

10 A.   I did.

11 Q.   What did you do?

12 A.   As a matter of fact, I -- well, from the first

13 e-mail that I received, I was given some information and

14 I was able to reach out to actually another company.  It

15 was Affordable and Luxury Tents, I believe.  I obtained

16 some information from them, which then in turn, just in

17 the course of research they told me a couple --

18 Q.   Stop.  I don't want to hear what anyone told you.

19 A.   Okay.

20 Q.   Let me ask you this.  Did you also reach out to any

21 of the people who had sent you e-mails?

22 A.   Oh, absolutely.

23 Q.   How did you do that?

24 A.   The original person who e-mailed me, I e-mailed her

25 back.  The Exhibit No. 47, I called her.  And then Ulla

1  Capps, I e-mailed her back.

2  Q.   Okay.  Now, as a result of your initial work on this

3  story, did WAVY decide to pursue it a bit to see if it

4  were proper for a 10 On Your Side segment?

5  A.   Yes.

6  Q.   How does that process work?  How is that decision

7  made?

8         THE COURT:  If you could stop for a second,

9  perhaps the jury doesn't know what a news producer does.

10  What does a producer do?

11         THE WITNESS:  In my case, I'm kind of a special

12  segment producer, if you will.  I will receive stories

13  into the newsroom, whether it's from e-mails or phone

14  calls or a number of different sources, and what I will

15  do is I will look into them and just do background

16  research.  In the course of that research, sometimes I

17  talk to other parties involved.

18         Obviously, I'm going to talk to the person that

19  reached out to us initially, and then I will try to do

20  the research in a way that would help me get a better

21  understanding of the story.

22  BY MR. MERRITT:

23  Q.   How many stories of that type have you done in your

24  career?

25  A.   Oh, my gosh!  I don't know that I could count,

J. Bastas – Direct                365

1  honestly.

2  Q.   Okay.  Now, with regard to this particular story,

3  was a decision made to pursue it a little bit?

4  A.   Yes.

5  Q.   Who made that decision?

6         THE COURT:  If you would answer verbally.  I

7  didn't hear you.

8         THE WITNESS:  Yes.

9  BY MR. MERRITT:

10 Q.   Who made the decision to pursue the story?

11 A.   Well, it gets pitched in a morning meeting, in a

12 morning assignment meeting.  That meeting is comprised

13 of managers and other producers who actually produce the

14 shows, as well as reporters and photographers.

15        After I do my initial research on the story, I

16 pitch the story, if you will.  I bring it up and tell

17 people what I have learned, and then the managers and

18 the staff in the meetings will typically determine which

19 stories we will cover.

20 Q.   So it's a collective decision?

21 A.   Absolutely.

22 Q.   And that collective decision-making process was used

23 in the case of this story?

24 A.   Yes.

25 Q.   Who was assigned to cover or to further investigate

J. Bastas – Direct                366

1   this story?

2   A.   Lori Crouch.

3   Q.   Who made that assignment?

4   A.   Well, in this case it was probably a manager who

5   made it.

6   Q.   All right.  After the story was assigned, did you

7   have any further contact with it?

8   A.   Yes.  Lori and I spoke on a couple of different

9   occasions.

10   Q.   On what general subject?

11   A.   Well, I would like to touch base with the reporters

12   who are working on my story just to make sure everything

13   is going okay and to check in on them.

14   Q.   Okay.  And other than Ms. Crouch's contacts with you

15   as she was going about the story, did you have any

16   further responsibility for it?

17   A.   I did make a phone call to the Commissioner of the

18   Revenue to try to look at tax records and things of that

19   nature, and business licenses and things like that.  So

20   I kind of did some of the background helping Lori.

21        MR. MERRITT:  All right.  Ms. Bastas, I have no

22   further questions.  Mr. Denton may have some questions

23   for you.

24        THE WITNESS:  Okay.  Thank you.

25        THE COURT:  Mr. Denton, you may cross-examine.

J. Bastas – Cross                367

```
1              MR. DENTON:  Thank you, your Honor.
2                    CROSS-EXAMINATION
3  BY MR. DENTON:
4  Q.   Good afternoon, Ms. Bastas.
5  A.   Hi.
6  Q.   So you got the first e-mail on March 18th, right?
7  A.   Yes.
8  Q.   Okay.  And the story actually ran on March 31st,
9  right?
10  A.   Yes.
11  Q.   And in addition to whatever Lori Crouch did, you did
12  some independent investigation of your own?
13  A.   Yes.
14  Q.   Okay.  And who all did you talk to during the course
15  of your independent investigation?
16  A.   I actually spoke to -- well, I left a message for
17  Sandra Lam, which was the original e-mail that we
18  received.  I e-mailed with Ulla Capps, and I spoke to
19  Boots Daugherty.
20  Q.   Okay.  Anyone else?
21  A.   And I spoke to somebody in the Commissioner of the
22  Revenue's office at that time as well.
23  Q.   Okay.  And you talked to Lori Crouch, obviously,
24  internally?
25  A.   Yes, um-hum.
```

J. Bastas – Redirect                368

1   Q.   So you talked, then, to the three people.  And was

2   there any particular reason you didn't talk to the

3   Walshes, other than so Lori Crouch could catch them

4   off-guard by showing up on their doorstep unannounced?

5   A.   No, there isn't.  As a matter of fact --

6            MR. DENTON:  Thank you.

7                    REDIRECT EXAMINATION

8   BY MR. MERRITT:

9   Q.   Please finish your answer, ma'am, to the last

10  question.

11  A.   As a matter of fact, I am not the person who would

12  be the one to make that phone call to them.  At that

13  point I did not have any background information as far

14  as their initial address or a phone number for them.  I

15  did not get that until later.

16           MR. MERRITT:  Thank you, ma'am.

17           THE COURT:  Mr. Denton.

18           MR. DENTON:  Nothing further.

19           THE COURT:  All right.  Ms. Bastas, you can step

20  down and return to work, or wherever it is that you are

21  going, and you are directed not to discuss your testimony

22  with anybody, and that means anybody at WAVY or your

23  husband, anybody else until the completion of the

24  evidence in this case.

25           THE WITNESS:  Okay.  Thank you.

U. Capps – Direct                    369

```
 1              (Witness excused.)
 2              THE COURT:  Your next witness?
 3              MR. MERRITT:  We call Ulla Capps.
 4              (The witness was sworn by the deputy clerk.)
 5              ULLA CAPPS, called as a witness, having been
 6  first duly sworn, was examined and testified as follows:
 7                    DIRECT EXAMINATION
 8  BY MR. LACY:
 9  Q.   Good afternoon, Ms. Capps.
10  A.   Good afternoon.
11  Q.   Ms. Capps, can you say your name for the record,
12  please.
13  A.   It's Ulla, U-l-l-a, B. Capps, C-a-p-p-s.
14  Q.   And where do you live, Mrs. Capps?
15  A.   In Virginia Beach.
16  Q.   How long have you lived in Virginia Beach?
17  A.   Off and on about 35 years.
18  Q.   Okay.  What do you do for a living?
19  A.   I own an events and catering company.
20  Q.   What's the name of that company?
21  A.   Ohh La La's.
22  Q.   I'm sorry.
23  A.   O-h-h, capital L-a, capital L-a.
24  Q.   How long has Ohh La La been in business?
25  A.   Well, off the books I would say 30 years.  On the
```

1  books, two years.  I actually did it just for friends

2  and family and people I knew so that they could afford

3  to do whatever they needed to do.  Then in the last two,

4  three years I decided I needed to go ahead and become a

5  business.

6  Q.   Make it formal?

7  A.   Yes.

8  Q.   Ms. Capps, in conducting your business, have you

9  ever done any business with a company called Atlantic

10  Event Rentals?

11  A.   Yes, I have.

12  Q.   Okay.  More than once?

13  A.   Yes.

14  Q.   Okay.  Can you give us an approximate number of

15  times you did business with them?

16  A.   At least three or four times.  I have done it with

17  different events for -- I also do events with my church,

18  and that's how I started off with them.

19  Q.   Okay.  And by doing business, I understand them to

20  rent inventory.  Is that what you were doing, is renting

21  inventory from them?

22  A.   Right.  Plates, dishes, tablecloths, things like

23  that, yes.

24  Q.   In January of 2010 did you do any business with

25  Atlantic Event Rentals?

1   A.   Yes, I did.

2   Q.   Can you tell the jury what it was for.

3   A.   It was for my oldest son's wedding.

4   Q.   And do you recall what equipment you rented from

5   Atlantic Event Rentals?

6   A.   Yeah, because I thought it was very unusual the

7   bride chose brown and orange tablecloths, which was

8   unusual for me.  White plates, square, forks, knives,

9   tear-drop glasses.  She had very unusual taste.  So,

10  yeah, I remember it.

11  Q.   So it was a whole lot of stuff?

12  A.   Oh, yeah.

13  Q.   When was the wedding scheduled to take place?

14  A.   In August of that year.

15  Q.   Okay.  So you were renting the equipment in January

16  to actually use it in August?

17  A.   Well, both of them were up in Boston, so they came

18  down and I was planning all the items because I was

19  going to put it together for them.  Her mother didn't

20  want to do it, so I told her I would help her out.  And

21  they had to be back in Boston very early in January, so

22  that's when we did it.

23  Q.   Well, did you give the Atlantic Event Rentals -- let

24  me, actually, back up.  Do you have an understanding of

25  who at the time in January of 2010 was running Atlantic

U. Capps – Direct                372

1   Event Rentals?

2   A.   Annabelle Walsh was.

3   Q.   Okay.  So if I said did you tell the Walshes or tell

4   Atlantic Event Rentals, that would be the same thing?

5   A.   Yes.

6   Q.   Okay.  Did you give Atlantic Event Rentals a deposit

7   for the equipment?

8   A.   I paid half, which was 850.

9   Q.   Okay.  Was that a lot of money for you, or is that a

10  little bit of money for you?

11  A.   At that time that was an extremely lot of money for

12  me.

13  Q.   When you were making this deposit in January 2010 do

14  you recall who specifically you dealt with at Atlantic

15  Event Rentals?

16  A.   Annabelle.

17  Q.   Okay.  When you were making this deposit did

18  Ms. Walsh mention anything to you about her company

19  having any financial difficulties?

20  A.   None.

21  Q.   Did she mention anything to you about her company

22  potentially selling its inventory to another company?

23  A.   No.

24  Q.   Did Ms. Walsh mention to you that when August came

25  around when you would need the equipment, it might

U. Capps - Direct                    373

1   actually be owned by another company?

2   A.   No.

3   Q.   Okay.  Did she mention to you when you gave her the

4   deposit -- did she give you any indication that your

5   contract with Atlantic Event Rentals might have to be

6   performed by another company?

7   A.   No.  In fact, I had misgivings about the color, and

8   she said in August they would look very well.

9   Q.   Did Atlantic Event Rentals ultimately perform or

10  fulfill the contract?

11  A.   No.

12  Q.   Okay.  Why not?

13  A.   Because they were no longer in business when I went

14  back.

15  Q.   Well, did your son's wedding go down in August?

16  A.   No.  Actually, in February the bride got cold feet

17  and she decided that she did not want to get married to

18  my son.

19  Q.   I'm sure it was her loss.

20  A.   It was.  I have got a great daughter-in-law now.

21  Q.   Okay.  Well, after the wedding was canceled, did

22  Atlantic Event Rentals refund your $850 deposit?

23  A.   No.

24  Q.   Okay.  Did you attempt to get a refund?

25  A.   Yes.

U. Capps - Direct                374

1   Q.   Did you contact Atlantic Event Rentals about getting

2   a refund?

3   A.   I did, and the first time that I called -- I'm a

4   little -- I mean, it's been quite awhile.  But the first

5   time, I believe, I couldn't get ahold of them.  The

6   second time she said --

7            MS. JORDAN:  Your Honor, objection, hearsay.

8            THE COURT:  Sustained.  Well --

9            MR. LACY:  No, this is a statement of a party

10  opponent.

11           THE COURT:  I'm sorry.  Overruled.  It's a

12  party --

13           MS. JORDAN:  Your Honor, we don't know whether

14  what she is going to say is going to be an admission or

15  not.

16           THE COURT:  I guess you are going to find out.

17           MR. LACY:  Thank you, your Honor.

18  BY MR. LACY:

19  Q.   Please finish your answer, Ms. Capps.

20  A.   Okay.  She said that I could not get my money back

21  and I would have to go to another company.

22           MS. JORDAN:  Your Honor, objection.  I would

23  like to take this matter up outside of the jury, please.

24           THE COURT:  Step out for a moment.

25           (Jury out.)

1           THE COURT:  Come to the podium.

2           MS. JORDAN:  Your Honor, during her deposition

3    she stated that she wasn't sure who she was talking to

4    and if she wasn't talking to Annabelle Walsh, the

5    statements of the person that she was talking to is

6    hearsay.  And it's in her deposition that she was most

7    likely speaking to JoAnn Daugherty and not Annabelle

8    Walsh.  So, therefore, all of the statements she is about

9    to repeat are absolutely hearsay.

10          THE COURT:  All right.  Examine her off the

11   record.  Not off the record, but out of the presence of

12   the jury.

13   BY MR. LACY:

14   Q.   Ms. Capps, after you were unable to get your

15   deposit, did you contact WAVY-TV?

16   A.   Yes, I did.

17   Q.   Okay.  And how did you contact them?

18   A.   I e-mailed them.

19          THE COURT:  Wait a minute.  The objected to

20   portion is who she was talking to.  That's what you

21   were --

22          MR. LACY:  Well, your Honor, there is an exhibit

23   that has not been objected to, it's actually already in

24   the record, that was made at the time that all of this

25   happened contemporaneous with these discussions from --

1  it's an e-mail from Ms. Capps to WAVY-TV 10 where she

2  explains what happened.

3          THE COURT:  But did she say in her deposition

4  she didn't know who she was talking to?  It's a

5  difference between a party opponent and --

6          MR. LACY:  I'm looking at page 20 --

7          THE COURT:  What page are you referring to,

8  Ms. Jordan?

9          MS. JORDAN:  I'm referring to page 12, line 24

10 through 13, 3 through 7.  It says, "Do you know exactly

11 who you spoke with?"

12         She wrote, "I think it was Annabelle.  I'm not a

13 100 percent sure."

14         And then the question was, "What?"

15         And she said, "It could have been JoAnn."

16         MR. LACY:  I'm sorry.  What page are you on?

17         MS. JORDAN:  Bottom of 12, top of 13.

18         MR. LACY:  I'm looking at page 12, your Honor,

19 line 6.  There's a reference in that message, the e-mail

20 message I was just referring to, to making a call to

21 Annabelle Walsh.  Do you see that, about two lines down

22 near the end?  Quote, When I called up to Annabelle

23 Walsh, she told me?

24         "Answer:  Yes, I see that.

25         "Question:  Is that a reference to the

U. Capps – Direct          377

1    conversation you described a few minutes ago?

2            "Answer:  Yes.

3            "Question:  Annabelle Walsh was the lady you

4    were talking with?

5            "Answer:  Yes."

6            THE COURT:  What page are you on?

7            MR. LACY:  I'm on page 12.  Do you need a copy?

8            THE COURT:  No.

9            MR. LACY:  Okay.  Then it goes on to say, "After

10   you sent this e-mail to WAVY, did you have any subsequent

11   discussions with Annabelle Walsh?"

12           What we are talking about is --

13           THE COURT:  Bring the jury back in.

14           The objection is overruled as to the first part,

15   and you can cross-examine her on it if you wish.

16           Mr. Lacy, don't go to the second series of

17   questions after the e-mail.

18           MR. LACY:  Oh, right.  Fair enough.

19           THE COURT:  Well, thank you.

20           (Jury in.)

21           THE COURT:  All of the jurors have returned.

22           You may proceed, Mr. Lacy.

23           MR. LACY:  Thank you, your Honor.

24   BY MR. LACY:

25   Q.  Ms. Capps, we were talking about --

U. Capps – Direct                378

```
 1            THE COURT:  Just ask the question.
 2            MR. LACY:  Okay.
 3  BY MR. LACY:
 4  Q.  Ms. Capps, did you attempt to get a refund from
 5  Atlantic Event Rentals after your son's wedding was
 6  canceled?
 7  A.  Yes, I did.
 8  Q.  Okay.  And who did you speak with at Atlantic Event
 9  Rentals?
10  A.  Annabelle.
11  Q.  Okay.  Did Atlantic Event Rentals agree to give you
12  your deposit?
13  A.  No.
14  Q.  Okay.  Afterwards -- well, let me back up.  What did
15  Ms. Walsh tell you in that conversation?
16  A.  That she couldn't give me back the money because
17  they were no longer there.
18  Q.  The inventory was no longer there?
19  A.  They were no longer there.
20  Q.  Okay.  After you were unable to get your deposit
21  back, did you contact WAVY-TV?
22  A.  Yes, I did.
23  Q.  Okay.  How did you contact WAVY?
24  A.  E-mail.
25  Q.  If you would look, please, Ms. Capps, there should
```

1    be a binder in front of you called defendant's

2    exhibits.

3    A.   Yes.

4    Q.   If you would look behind Tab 48, please.

5    A.   Okay.

6    Q.   And if you would look on the second page behind it.

7    It appears to be an e-mail from you to WAVY on March

8    30th, 2010.  Do you see that?

9    A.   Yes.

10   Q.   Do you recognize that?

11   A.   Yes.

12   Q.   Is this the e-mail you sent to WAVY?

13   A.   Yes.

14   Q.   Did you do your best to be as accurate as you could

15   in what you told WAVY?

16   A.   Yes.

17   Q.   Did you receive any response from WAVY?

18   A.   Yes.  They asked me if I would go on camera and say

19   something about this.

20   Q.   Did you agree to do that?

21   A.   Absolutely.

22   Q.   Okay.  Were you ultimately interviewed by somebody

23   from WAVY?

24   A.   Yes.

25   Q.   Do you remember who that person was?

U. Capps – Direct                380

1   A.   I do not remember her name.

2   Q.   Can you describe her?

3   A.   Well, she had heels on.  About 5 foot 8, a real

4   pretty brunette.

5   Q.   Does the name Lori Crouch ring a bell with you?

6   A.   Yes.

7   Q.   That is who interviewed you?

8   A.   Yes.

9   Q.   How would you describe Mrs. Crouch's demeanor during

10  the interview?  Was she professional, civil, uncivil,

11  rude?

12  A.   She was very pleasant.  We sat down and talked for a

13  little while so I could get comfortable.  She just asked

14  questions, and she just said, "Just go ahead and speak,

15  and we will let the camera roll, and we will go from

16  there."

17  Q.   Okay.  Ms. Capps, if you would, please look in that

18  same binder at Defendant's Exhibit 50, behind the tab

19  that says 50.

20  A.   Okay.

21  Q.   And if you look on the second page.

22  A.   Um-hum.

23  Q.   If you look at the top of the second page,

24  Ms. Capps, beginning with the sentence, "One of those

25  customers."  Do you see that?

U. Capps – Direct                    381

```
 1  A.   Yes.
 2  Q.   Would you read to yourself that paragraph and the
 3  paragraph after it.
 4  A.   Okay.
 5  Q.   Is that a true and accurate statement of what you
 6  told to WAVY?
 7  A.   Absolutely.
 8  Q.   Okay.  So you gave the Walshes an $850 deposit?
 9         MS. JORDAN:  Objection, leading.
10         THE COURT:  Sustained.  The statement speaks for
11  itself.
12         MR. LACY:  Absolutely.
13  BY MR. LACY:
14  Q.   Do you stand by those statements today?
15  A.   Yes, sir.
16         MR. LACY:  Thank you very much, Ms. Capps.
17         THE COURT:  Are you finished with the witness?
18         MR. LACY:  I believe she's got
19  cross-examination.
20         THE COURT:  Excuse me?
21         MR. LACY:  No further questions, your Honor.
22         THE COURT:  Ms. Jordan, you may proceed.
23         MS. JORDAN:  Thank you.
24                    CROSS-EXAMINATION
25  BY MS. JORDAN:
```

U. Capps - Cross                    382

```
1    Q.   Ms. Capps, you stated that you signed a contract
2    with the Walshes; is that correct?
3    A.   That's correct.
4    Q.   Where is that contract?
5    A.   I don't know where their copy is.  Mine was kept in
6    my taxes for a couple of years, and I'm not exactly sure
7    where it is now.
8    Q.   So isn't it true that you don't know exactly what
9    the terms of that contract were anymore, do you?
10   A.   No.
11   Q.   And you don't know whether or not that contract
12   entitled you to a refund of that deposit, do you?
13   A.   Well, I did ask Annabelle if something happened,
14   would I get it back, and she said yes.
15   Q.   Do you know if the contract stated whether or not
16   you were entitled to the refund?
17   A.   No.
18   Q.   And isn't it true that you were attempting to break
19   the contract, true?
20   A.   Yes.
21   Q.   You stated earlier that you spoke to Annabelle Walsh
22   and had a conversation with her.  When was that
23   conversation?
24   A.   I'm going to say in -- I can't exactly remember
25   exactly.  It was late January, February.
```

U. Capps - Cross                   383

```
 1   Q.   I would like to bring your attention to Defendant's
 2   Exhibit 48.
 3          About how many days before you sent this e-mail
 4   did you talk to who you thought was Annabelle Walsh?
 5   A.   I couldn't really say.  It was some time, I know.
 6   Q.   Who is it that told you to go to WAVY-TV 10?
 7   A.   Me.
 8   Q.   Nobody told you to do that?
 9   A.   No.
10   Q.   Do you recall taking a deposition in this case?
11   A.   Yes.
12   Q.   How many phone calls did you have with Annabelle
13   Walsh after you entered into the contract?
14   A.   I think it was two.  I don't know if it was
15   conversations.  I think I might have called and there
16   was one conversation.
17   Q.   One conversation or two?  I'm unclear.
18   A.   I think it was one conversation.
19          THE COURT:  Just to clarify something for me,
20   you said you had one call and one conversation.  What's
21   the difference?
22          THE WITNESS:  I left a voicemail.
23          THE COURT:  Voicemail on the call?
24          THE WITNESS:  On the call.
25          THE COURT:  Thank you.
```

U. Capps - Cross                    384

```
 1  BY MS. JORDAN:
 2  Q.   Did you talk to Annabelle Walsh or not?
 3  A.   Yes.
 4  Q.   When did you talk to her?
 5  A.   When I asked for my money back.
 6  Q.   About how long before you sent this e-mail was that
 7  phone call placed?  Was it days?  Was it weeks?  Was it
 8  months?
 9  A.   I can't tell you how far back it was.
10  Q.   When did you enter into the contract?
11  A.   The beginning of January.
12  Q.   How long after you entered into the contract were
13  you attempting to get your deposit back?
14  A.   Between, let's see, I think it was the early part of
15  February when the bride called me.
16  Q.   And did you call Annabelle Walsh or who you thought
17  to be Annabelle Walsh that day, within a week, within
18  two weeks?  How long after did you make a phone call?
19  A.   Probably within days.
20  Q.   How many phone calls did you make attempting to get
21  your deposit back?
22  A.   Quite a lot.
23  Q.   To Annabelle Walsh?
24  A.   Well, to the rental place.  I even went down there.
25  Q.   And did you call their business phone number?
```

U. Capps - Cross                385

1  A.   Oh, yeah.

2        THE COURT:  Who's there?  I mean, you said their

3  business phone number.

4  BY MS. JORDAN:

5  Q.   The phone number you knew to be the phone number

6  from the company that you rented the equipment from?

7  A.   Yes.

8  Q.   Do you recall taking a deposition?

9  A.   Yes.

10  Q.   Do you recall stating, "If you sign an agreement, if

11  you handshake, you have to deliver?"

12        MR. LACY:  Objection, your Honor.  I think the

13  proper way for impeachment is to ask the same question.

14        THE COURT:  Ask the question and then let her

15  answer.  If she doesn't answer, you can read the

16  question.

17  BY MS. JORDAN:

18  Q.   The question was, what were you intending to convey

19  when you said that?

20  A.   What was the question again?

21  Q.   That was the question.

22  A.   What was the statement?

23  Q.   "If you sign an agreement, if you handshake, you

24  have to deliver?"

25  A.   Well, it's just that.  As far as I'm concerned, when

SHARON B. BORDEN, OFFICIAL COURT REPORTER

1  you shake a hand or when you sign a contract and you are

2  saying you are going to deliver something, if you don't

3  deliver it, then you have to give back the money.

4  Q.  But it was you that was asking for that service to

5  no longer be delivered, correct?

6  A.  Yes.  But if I had known that she wasn't going to be

7  able to, I would have never gotten into the contract

8  with her.

9  Q.  That wasn't the issue, was it.  The issue was

10  that --

11       MR. LACY:  Objection.  It's getting

12  argumentative.

13       THE COURT:  You can ask questions in a

14  non-argumentative tone.

15       Go ahead.

16  BY MS. JORDAN:

17  Q.  Were you asking for performance of the contract or

18  not?

19  A.  No.

20       MS. JORDAN:  Okay.  Thank you.

21       MR. LACY:  Ms. Capps, thank you for being here

22  today.  I have no further questions.

23       THE COURT:  All right.  May Ms. Capps leave?

24  Anybody want her to remain?

25       MR. MERRITT:  Yes, your Honor.  We are happy to

1  release her.

2           THE COURT:  All right.  Ms. Capps, you are free

3  to go about your business, but you are not to discuss

4  your testimony in this court with anyone except the

5  lawyers involved until the end of trial.

6           THE WITNESS:  Okay.

7           (Witness excused.)

8           MR. MERRITT:  Your Honor, the defendants rest.

9           THE COURT:  All right.  I'm going to send you to

10  lunch.  Be back at 2:00.  All the instructions I gave you

11  yesterday still stand.

12          You don't go to any of these sites.  You don't

13  attempt to talk to any of the witnesses.  I doubt there

14  are many witnesses left, but there may be some that we

15  may still have called.  Just go to wherever you are going

16  to go to lunch and come back, or if you brought your

17  lunch, you can sit in the jury room and eat it.  When you

18  come into the building, go directly to the jury room.

19          You may step out.

20          (Jury out.)

21          THE COURT:  Mr. Denton, do you intend to put on

22  any rebuttal witnesses, or do you need some time to think

23  about that?

24          MR. DENTON:  I need some time to think, and if I

25  do, it will be very short.

388

```
 1          THE COURT:  All right.  We will come back at 2.
 2          Now, I have asked you folks to get together on
 3  the jury instructions and the verdict forms.  We
 4  presented one and the defendants presented one.  Do you
 5  have any resolution or any agreement in the jury
 6  instructions?
 7          MR. MERRITT:  Your Honor, I know that Mr. Lacy
 8  and counsel for plaintiffs, I'm not sure exactly who,
 9  spoke briefly yesterday evening.  I think there are some
10  things on which we do have agreement.  I don't want to
11  present that until I am certain as to what's agreed or
12  not agreed.
13          As to the Court's verdict form, the defendants
14  are fine with the verdict form except for the fact that
15  we understood last night that the punitive damages claims
16  either were going to be dropped or may be dropped.  That
17  being the case, then there would be no reason to have
18  that in the verdict form.
19          THE COURT:  I haven't heard anything about that.
20          MR. DENTON:  Well, I don't think there is a
21  punitive damage claim in the complaint and we are not
22  seeking punitive damages, so we have no objection to
23  that.
24          THE COURT:  All right.  Punitive damages are
25  struck, if there is anything in the complaint.
```

```
 1            All right.  Well, then I will encourage you to
 2   eat a quick lunch and go over the jury instructions, and
 3   report back to me at 2:00.  We can try to get the case to
 4   the jury if we don't have to fight over jury instructions
 5   for four hours.  That's why I sent them to you last
 6   week.  But I will see you at 2.
 7            Court's in recess.
 8            (A luncheon recess was taken at 1:03 p.m., after
 9   which court reconvened at 2:00 p.m.)
10                    AFTERNOON SESSION
11            THE COURT:  Did the marshals take Mr. Denton
12   into custody or what?
13            MS. JORDAN:  No, sir.  He's in the conference
14   room.  I will go and get him.
15            THE COURT:  Thank you.
16            Mr. Denton, before we bring the jury in, do you
17   have any other witnesses?
18            MR. DENTON:  Yes.  We have just one witness to
19   come back.
20            THE COURT:  Bring the jury in.
21            Now, this is pure rebuttal, is it not?
22            MS. JORDAN:  Yes, your Honor.  It's limited
23   to --
24            THE COURT:  That's okay.
25            (Jury in.)
```

1        THE COURT:  All members of the jury have

2   returned after lunch.

3        Ladies and gentlemen, I understand there's one

4   witness to be presented for the plaintiff.  It's a

5   rebuttal witness.  This witness's testimony is limited

6   only to an attempt to contradict evidence from the

7   defendant's side.  So that's the purpose of this.  That

8   way each side puts on their evidence and put on any to

9   rebut and then rebut, same thing with closing arguments.

10       Call your witness.

11       MS. JORDAN:  Annabelle Walsh.

12       ANNABELLE WALSH, recalled as a rebuttal witness,

13   having been previously sworn, was examined and testified

14   further as follows:

15                DIRECT EXAMINATION (Rebuttal)

16   BY MS. JORDAN:

17   Q.   Ms. Walsh, what was the phone number given to

18   clients at Atlantic Event Rentals?

19   A.   757-461-2727.

20   Q.   Was that same phone number given to Ulla Capps?

21   A.   Yes.

22   Q.   Did Ulla Capps have your home phone number or your

23   cell phone number?

24   A.   No, she did not.

25   Q.   What happened to the phone number 757-461-2727?

1  A.   Affordable and Luxury Tents took that phone number.

2  Q.   When did they take it?

3  A.   Sometime around the end of January, maybe early

4  February of 2009.

5  Q.   Did you ever have any conversation with Ulla Capps

6  after she signed the contract?

7  A.   Not after she signed the contract.

8  Q.   Did you or did you not tell Ulla Capps that she

9  couldn't have her deposit back?

10  A.   I did not tell Ulla Capps that she could not have

11  the deposit back.

12  Q.   Do you recall meeting with Ulla Capps in January and

13  signing a contract with her?

14  A.   I do recall meeting with Ulla Capps and seeing her

15  sign the contract.

16  Q.   Was the contract presented to her your standard

17  contract?

18  A.   Yes, it was.

19  Q.   And did it contain terms regarding the refundability

20  of the deposit?

21  A.   Yes, it did.

22  Q.   And what were the terms?

23  A.   The standard terms on the contract that everyone

24  signs with us states a 50 percent deposit.  If that

25  event is canceled, the deposit is held and it can be

1  used at another time.

2  Q.  Did you give Ulla Capps any verbal assurances and

3  make any agreements with her outside of this written

4  contract?

5  A.  No, I did not.

6  Q.  Was the refundability of the contract ever discussed

7  with Ulla Capps?

8  A.  I never discussed the refundability of the contract

9  with Ulla Capps.

10        MS. JORDAN:  Thank you.  No further questions.

11                 CROSS-EXAMINATION

12  BY MR. MERRITT:

13  Q.  Ms. Walsh, what did your contracts provide with

14  regard to refundability?

15  A.  The contract stated that the 50 percent as a deposit

16  will be held towards the next event.  We wouldn't refund

17  the money.

18  Q.  All right.  So if a customer canceled, they knew

19  they were making a nonrefundable deposit?

20  A.  It says it on the front and back of the contract.

21  Q.  That's true on every one of your contracts?

22  A.  I believe so, sir.

23  Q.  And that was true of all those contracts that you

24  were making in January of 2010?

25  A.  I would have to look at the contract to verify it,

1   but I believe so.

2   Q.   Is there any reason it wouldn't be on those

3   contracts?

4   A.   You are correct.  You are correct.

5   Q.   So as you were taking money in January of 2010, not

6   only did you know you were going out of business, but

7   you knew the money you were taking, in your view, was

8   nonrefundable?

9   A.   You are correct.

10          MR. MERRITT:  I have no further questions.

11          THE COURT:  Nothing?

12          All right.  You may step down.

13          (Witness excused.)

14          THE COURT:  Do you have any more evidence,

15  Mr. Denton?

16          MR. DENTON:  No, your Honor.

17          THE COURT:  Mr. Merritt?

18          MR. MERRITT:  No, your Honor.

19          THE COURT:  All right.  Ladies and gentlemen,

20  you have been here seven minutes and now you are going

21  back out again.  This may take a little while.  We are

22  going to discuss the jury instructions.

23          I gave proposed jury instructions last week, but

24  neither the lawyers nor I knew what evidence would unfold

25  and which ones we would need and which ones we wouldn't.

1  But hopefully, since they have had them, we will be able

2  to get through the instructions pretty quickly and then

3  get the case to you, but I'm going to ask you to step

4  out.  We are not going anywhere.  We are going to be

5  working hard.  So we will see you shortly.

6          (Jury out.)

7          THE COURT:  Any motion before we get to the jury

8  instructions?

9          MR. MERRITT:  There is, your Honor.  I believe

10  we are obliged under the federal rules at this time to

11  renew our motion under Rule 50 and to state the grounds.

12          With your Honor's permission, I will not

13  elaborate or reargue, but we stated three grounds at the

14  close of the plaintiff's evidence.  One had to do with

15  the falsity issue, the second had to do with the

16  proximate cause issue, the third had to do with the

17  negligence issue.  We argued that extensively, as did

18  Mr. Denton, but we renew our motions on those previously

19  stated grounds.

20          THE COURT:  All right.  I will not grant a

21  motion for judgment as a matter of law under Rule 50(a).

22  However, the rule provides that the Court is considered

23  to have submitted the action to the jury subject to the

24  Court's later deciding the legal questions raised by the

25  motion, and there are time limits for filing appropriate

1  motions.  So that's where we stand.

2         Jury instructions.  Have you agreed on things

3  and -- just one second.  It would probably be easier to

4  do this in the conference room.  I'm not going to have

5  the court reporter to listen to your arguments.  I've

6  always found it to be an Eighth Amendment violation to

7  require the court reporter to listen to two lawyers plus

8  me talking all at the same time.

9         MR. LACY:  Judge, I think that would, actually,

10 work very well.

11        MS. JORDAN:  We have no objection, your Honor.

12        THE COURT:  All right.  Well, court's in recess.

13        (A recess was taken at 2:10 p.m., after which

14 court reconvened at 3:00 p.m.)

15        THE COURT:  Do you know where Mr. Denton is?

16        MS. JORDAN:  Yes.  He went to the rest room.

17        THE COURT:  If you need to refer to him on any

18 of these housekeeping matters, I will wait.  I mentioned

19 to him during the jury instruction discussion that I

20 would read the stipulation into the record, and then I

21 took a look at it.  It's Exhibit 6 and Exhibit 7.  I

22 think I will read the first three paragraphs, which are

23 on page 1 of the final pretrial order, and that's all,

24 because I understand Mr. Denton is going to play the

25 Exhibit 6 anyway, and, therefore, they will have that and

1  they will have 7 in written form.

2        Mr. Denton, I don't plan to read the

3  stipulation, which is the transcript of the television

4  broadcast, or the transcript of the Internet that was in

5  the final pretrial order.  Usually I read the

6  stipulations, but I will just read the first three

7  paragraphs.

8        MR. DENTON:  Yes, your Honor.  I do plan on

9  running the video for the jury.

10        THE COURT:  That's fine.  That's why I don't

11  want to read it to them.  They are going to see it

12  anyway.

13        How much time do you want for arguments?  It's

14  3:00.

15        MR. DENTON:  Your Honor, I would like an hour.

16  I do not believe I will use an hour.

17        THE COURT:  Do you want me to, as Judge

18  MacKenzie used to say, pitch a water pitcher at you at a

19  particular time so that you will sit down and have some

20  for rebuttal?  But I won't throw a water pitcher at you.

21        MR. DENTON:  Oh, I see what you are asking.

22        THE COURT:  15 minutes?  35?

23        MR. DENTON:  For rebuttal, you mean?

24        THE COURT:  No.

25        MR. DENTON:  Total?

1          THE COURT:  First, if you go one hour on your --

2          MR. DENTON:  45 minutes on my basic, and then 15

3 for rebuttal, your Honor

4          THE COURT:  I will just give you a warning on

5 the 45.  You can go the additional 15.

6          Mr. Merritt, do you need more than an hour?

7          MR. MERRITT:  I will be conservative and say 30

8 minutes.

9          THE COURT:  Well, you are going to get the same

10 amount of time he is, an hour.

11          MR. MERRITT:  Okay.  An hour is fine.  I pray,

12 for all of our sakes, that I don't use it.

13          THE COURT:  I do, too.  I will give you a

14 warning at 5 minutes if you get to 55.

15          MR. MERRITT:  Okay.  Thank you, sir.

16          THE COURT:  All right.  The exhibit books and

17 the exhibits, many of these documents, and I think I was

18 a little loose at the final pretrial conference, they are

19 received, but generally if you don't move to admit them,

20 they don't go to the jury.  If you want to look through,

21 then I think we ought to do this now, the exhibits to see

22 if there's any that you wish to move into evidence that I

23 haven't already ruled against you on.  The ones that

24 weren't objected to, I should say.  Are there any

25 additional ones?

```
 1            MR. DENTON:  Your Honor, I believe we got
 2    everything we wanted in.
 3            THE COURT:  In other words, if you didn't move
 4    it, we are not going to send it to the jury.
 5            MR. DENTON:  Correct.  I understood that all
 6    along, yes, sir.
 7            THE COURT:  Mr. Merritt, the same thing?
 8            MR. MERRITT:  That was our understanding as
 9    well, your Honor.
10            THE COURT:  And, Ms. Forehand, do you understand
11    that, as to which exhibit goes and which doesn't?
12            THE DEPUTY CLERK:  I have a list of everything.
13            MR. MERRITT:  Your Honor, if the parties could
14    check our respective list against the one the Court has
15    before we send the books back, it might not be a bad
16    idea.
17            THE COURT:  All right.  We will do that.
18            MR. DENTON:  Can I ask a question also, your
19    Honor?
20            THE COURT:  Yes.
21            MR. DENTON:  Is the jury going to have the
22    videotape in the back?  The disk itself is an exhibit,
23    but they are not going to have the ability to watch it.
24            THE COURT:  The machine is out here that
25    sometimes works, but nothing in the back that works at
```

1  all.

2         MR. DENTON:  All right, your Honor.  Thank you.

3         THE COURT:  Do counsel want to state your

4  objections to the instructions that I -- I tell you

5  what.  Let's go ahead and get the jury going, and we will

6  do this at the break.  I plan to read the instructions to

7  the jury.  That will take about 25 minutes, and then

8  Mr. Denton, you can go ahead and do your closing.

9         MR. DENTON:  Thank you.

10        (Jury in.)

11        THE COURT:  All right.  All eight jurors are

12 back here, and let me explain what's going to occur

13 next.  I'm going to give you jury instructions now, and

14 I'm required to read them to you, and you are going to

15 have them in the jury room with you.  I will tell you

16 that the numbering system looks very strange.  I'm

17 starting with Instruction No. 2.  As you go through here,

18 you will find some missing numbers and then, I think it's

19 22, 22A, 22B and 23.

20        The reason for that is we don't know what the

21 case is going to be like at the end.  We can guess pretty

22 close, but some of the proposed instructions just aren't

23 applicable to the way the evidence happened.  So rather

24 than to bring you back tomorrow to make sure the numbers

25 are straight, don't worry.  If it's skipped, you are

1  going to get the full package and don't concern yourself

2  with the numbers.

3  　　　　Counsel, I think No. 2 should be admitted.  I

4  have already read them that.  This is an introductory

5  instruction.  That's the top one that I have.  It's No. 4

6  that I start with.  Agreed?

7  　　　　MR. MERRITT:  Agreed.

8  　　　　THE COURT:  That's three pages less I have to

9  read to you.

10  　　　　All right.  Ladies and gentlemen of the jury,

11  now that you have heard the evidence and the argument --

12  well, you haven't heard the argument yet -- it is my duty

13  to instruct you about the applicable law.  It is your

14  duty to follow the law as I will state it.  You must

15  apply the law to the facts as you find them from the

16  evidence in the case.  Do not single out one instruction

17  as stating the law, but consider the instructions as a

18  whole.  Do not be concerned about the wisdom of any rule

19  of law stated by me.  You must follow and apply the law.

20  　　　　If the lawyers refer to some of the governing

21  rules of law in their arguments to you, and their version

22  of the law differs from my instructions, you must follow

23  my instructions.

24  　　　　Nothing I say in these instructions indicates

25  that I have any opinion about the facts.  You, not I,

1  have the duty to determine the facts.

2         You must perform your duties as jurors without

3  bias or prejudice to any party.  The law does not permit

4  you to be controlled by sympathy, prejudice or public

5  opinion.  All parties expect that you will carefully and

6  impartially consider all the evidence, follow the law as

7  it is now being given to you, and reach a just verdict,

8  regardless of the consequences.

9         You should consider and decide this case as a

10 dispute between parties of equal standing in the

11 community, of equal worth, and holding the same or

12 similar stations in life.  An individual is entitled to

13 the same fair trial as a corporation.  All persons,

14 including corporations and other organizations, stand

15 equal before the law, and are to be treated equally.

16        You are to consider only the evidence in the

17 case.  However, you are not limited to the statements of

18 the witnesses.  In other words, you are not limited to

19 what you see and hear as the witnesses testify.  You may

20 draw from the facts that you find have been proved such

21 reasonable inferences that seem justified in the light of

22 your experience.

23        Inferences are deductions or conclusions that

24 reason and common sense lead you to draw from the facts

25 established by the evidence in the case.

1          Credibility.  You are the sole judges of the

2     credibility of the witnesses and the weight their

3     testimony deserves.  You may be guided by the appearance

4     and conduct of the witnesses, or by the manner in which

5     the witness testifies, or by the character of the

6     testimony given, or by evidence contrary to the

7     testimony.

8          You should carefully examine all the testimony

9     given, the circumstances under which each witness has

10    testified, and every matter in evidence tending to show

11    whether a witness is worthy of belief.  Consider each

12    witness's intelligence, motive and state of mind, and

13    demeanor or manner while testifying.

14         Consider the witness's ability to observe the

15    matters as to which the witness has testified, and

16    whether the witness impresses you as having an accurate

17    recollection of these matters.  Also, consider any

18    relation each witness may have with either side of the

19    case, the manner in which each witness might be affected

20    by the verdict, and the extent to which the testimony of

21    each witness is supported or contradicted by other

22    evidence in the case.

23         Inconsistencies or discrepancies in the

24    testimony of witnesses, or between the testimonies of

25    different witnesses, may not cause you to discredit such

1  testimony.  Two or more persons seeing an event may see
2  or hear it differently.
3         In weighing the effect of a discrepancy, always
4  consider whether it pertains to a matter of importance or
5  an unimportant detail, and whether the discrepancy
6  results from innocent error or intentional falsehood.
7         After making your own judgment, you will give
8  the testimony of each witness such weight, if any, that
9  you think it deserves.  In short, you may accept or
10  reject the testimony of any witness, in whole or in part.
11         In addition, the weight of the evidence is not
12  necessarily determined by the number of witnesses
13  testifying to the existence or nonexistence of any fact.
14  You may find the testimony of a small number of witnesses
15  as to any fact is more credible than the testimony of a
16  larger number of witnesses to the contrary.
17         Evidence that, at some time, while not under
18  oath, a witness who is not a party to this action has
19  said or done something inconsistent with the witness's
20  testimony at trial, may be considered for the sole
21  purpose of judging the credibility of the witness.
22  However, such evidence may never be considered as
23  evidence of proof of the truth of any such statement.
24         Where the witness is a party to the case, and by
25  such statement or other conduct admits some fact or facts

1  against that witness's interest, then such statement or

2  other conduct, if knowingly made or done, may be

3  considered as evidence of truth of the fact or facts so

4  admitted by such party, as well as for the purpose of

5  judging the credibility of the party as a witness.

6         An act or omission is knowingly done if the act

7  is done voluntarily and intentionally and not because of

8  mistake, accident or other innocent reason.

9         The law does not require any party to call as

10 witnesses all persons who may have been present at any

11 time or place involved in the case, or who may appear to

12 have some knowledge of the matters in the issue of this

13 trial.  Nor does the law require any party to produce as

14 exhibits all papers and things mentioned in the evidence

15 in the case.

16         Mr. and Mrs. Walsh each bear the burden to

17 prove every essential element of their claim by a

18 preponderance of the evidence.  As I have noted, if a

19 plaintiff fails to establish any essential element of a

20 defamation claim by a preponderance of the evidence, the

21 claim must fall.

22         Establish by the preponderance of the evidence

23 means evidence, which, as a whole, shows that the fact

24 sought to be proved is more probable than not.  In other

25 words, a preponderance of the evidence means such

1  evidence as, when considered and compared with the
2  evidence opposed to it, has more convincing force and
3  produces in your mind's belief that what is sought to be
4  proved is more likely true than not.  The standard does
5  not require proof to an absolute certainty, since proof
6  to an absolute certainty is seldom possible in any case.
7          In determining whether any fact in issue has
8  been proved by a preponderance of the evidence, unless
9  otherwise instructed, you may consider the testimony of
10  all witnesses, regardless of who may have called them,
11  and all exhibits received in evidence, regardless of who
12  may have produced them.
13          Some of you, I believe, said you sat on a jury
14  in a criminal court.  Let me advise you that those who
15  sat on a criminal case will have heard of proof beyond a
16  reasonable doubt.  The standard of proof in a criminal
17  case is a stricter standard, requiring more proof than a
18  preponderance of evidence.  The reasonable doubt standard
19  does not apply to a civil case and you should put that
20  standard out of your mind.
21          When I instruct you that a party has the burden
22  of proof on any proposition or use the expression "if you
23  find" or "if you decide," I mean that you must be
24  persuaded, considering all the evidence in the case, that
25  the proposition is more probably true than not.

1          Remember, the scales I had up here, 51 percent
2 would be a preponderance of the evidence, 51 to 49.  50.1
3 to 49.9 is just slight tippy.  It's the preponderance of
4 the evidence.
5          Now, the position of the parties can be
6 summarized as follows:
7          Plaintiffs claim that a broadcast by WAVY-TV,
8 Channel 10 in Portsmouth, Virginia, on March 31st, 2010,
9 as well as the related web site --
10          The next series of instructions I'm going to
11 read relates to the actual law that applies to this
12 particular case, and I have made a finding that these
13 various statements are facts as opposed to opinion so
14 that you can consider them.
15          The positions of the parties can be summarized
16 as follows:
17          Plaintiffs claim that a broadcast by WAVY-TV,
18 Channel 10 in Portsmouth, Virginia, on March 31st, 2010,
19 as well as a related web site article on Fox43TV web
20 site, defamed them.  They seek to recover damages for the
21 injury that they say the broadcast and web site article
22 caused to their reputations.  Specifically, plaintiffs
23 contend that each of the following statements was both
24 false and injurious to their reputations, implying that
25 they were incompetent, unethical or criminal:

1          (1) A statement by anchorman Tom Schaad at the
2  beginning of the broadcast, specifically:  "10 On Your
3  Side's Lori Crouch tracked down the owners for answers."
4          Then in parenthesis, (This statement appeared in
5  the broadcast only, not in the text of the web site
6  article.)
7          (2) A statement by the reporter Lori Crouch
8  referring to businessman Boots Daugherty, and a quote
9  from Boots Daugherty that immediately followed,
10 specifically:
11         Lori Crouch: "Boots Daugherty, owner of
12 Affordable and Luxury Tents bought the Walsh's
13 inventory.  The computers held an unwelcome surprise."
14         Boots Daugherty:  We realized that it was about
15 $25,000 balance dues on bridal or brides' weddings that
16 we were unaware of."
17         (3) A statement by Lori Crouch referring to
18 businesswoman Ulla Capps, and a quote from Ulla Capps
19 that immediately follows, specifically:
20         Lori Crouch:  "She gave the Walshes a deposit
21 unaware that weeks later the business would fold."
22         Ulla Capps:  If you don't have it in the first
23 place to give it back, you shouldn't take it.  It comes
24 back to character and integrity."
25         (4) A statement by anchorman Tom Schaad at the

1  close of the broadcast, specifically:

2          "Character and integrity.  A lot of those

3  businesses stepping up to help, that is nice.  (This

4  statement appeared in the broadcast only and was not in

5  the text of the web site article."

6          Defendants claim that the facts in both the

7  broadcast and web site article are true in all major

8  respects, and that the plaintiffs cannot meet their

9  burden to show substantial falsity, and that any

10  embarrassment or reputational injury suffered by

11  plaintiffs is a result of publication of true facts.

12          You shall return your verdicts for the

13  plaintiffs John J. Walsh and Annabelle Walsh, if they

14  have proved by a preponderance of the evidence that:

15          (1) The defendants aired the news broadcast and

16  published the Internet article; and

17          (2) The news broadcast and the Internet article

18  were about the plaintiffs; and

19          (3) The news broadcast or the Internet article

20  was viewed by others; and

21          (4) The news broadcast or the Internet article

22  contained false statements or implications;

23          (5) The defendant made the statements knowing

24  them to be false or, believing them to be true, the

25  defendants lacked reasonable grounds for such belief, or

1  acted negligently in failing to ascertain the facts on

2  which the statements were based.

3        You shall find your verdict for the defendants

4  if the plaintiffs failed to prove any one or more of the

5  five elements above.

6        Now to define these elements.

7        A defamatory statement is deemed published

8  whenever communicated to and understood by a person other

9  than the plaintiff.  Publications may be proved either by

10 direct evidence of a third party or by circumstantial

11 evidence.  The plaintiff need not identify the person to

12 whom the defamatory words were published, and need not

13 place in evidence testimony from a third party regarding

14 what that person heard and understood.

15       In order for the statement made by the defendant

16 to be about the plaintiffs, it is not necessary that the

17 plaintiffs be designated by name in the statement.  It is

18 sufficient designation of or reference to the plaintiffs

19 if under all the surrounding circumstances those who hear

20 or read the statement would reasonably believe that the

21 plaintiffs were the persons.

22       An essential element that the plaintiffs must

23 establish in order to recover from the defendants is that

24 the published statement has a defamatory meaning.  A

25 statement is defamatory if it tends to injure the

reputation of the plaintiffs, to reflect shame or disgrace upon them, or hold them up as an object of scorn, ridicule or contempt.

In determining whether words have a defamatory meaning, you are to take them in their ordinary sense and give them their plain meaning as they would be generally understood in the entire broadcast and the entire web site article.

A statement that is not directly defamatory may nonetheless suggest a defamatory meaning in an indirect way, that is, by implication. However, the meaning of an allegedly defamatory language cannot be extended beyond its ordinary and commonly accepted uses. In determining whether the material published by the defendants implies a defamatory meaning, you may make only reasonable inferences from the words used. To be actionable as defamation by implication, a statement must also affirmatively suggest that the author intends or endorses the inference.

Another element that the plaintiffs must prove in order to recover is falsity. The law places on the plaintiffs the burden of proving that a statement is false. The defendants do not have to prove the truth of any statement. Falsity must be substantial and not minor or inconsequential. If the basic thrust of the statement

1  made by the defendant is accurate, that is, if the "gist"

2  or "sting" of a statement is true, plaintiff may not

3  recover on the basis of that statement.

4         I used the word "negligence" in an earlier

5  instruction.  Negligence is the failure to use ordinary

6  care, and ordinary care is the care a reasonable person

7  would have used under the circumstances of the case.

8         An employer is liable for all damages

9  proximately caused by the negligence of his employee

10 while acting within the scope of that person's

11 employment.

12        Now, you have noted that there are two

13 plaintiffs in this case, Mr. Walsh and Mrs. Walsh.

14 Although there are two plaintiffs in this action, it does

15 not follow from the fact alone that if one plaintiff is

16 entitled to recover, both are entitled to recover.  The

17 defendant is entitled to fair consideration as to each

18 plaintiff, just as each plaintiff is entitled to fair

19 consideration of that plaintiff's claim against the

20 defendants.  All instructions I give you govern the case

21 as to each plaintiff.

22        In order for the plaintiffs to recover, they

23 must show that any injury to reputation they suffered was

24 the direct and approximate result of the publication of

25 the statement that meet each of the essential elements of

1  defamation that I have explained.  The proximate cause of

2  an injury or damage is a cause which in natural and

3  continual sequence produces the injury or damage claimed

4  by the plaintiff.

5          If you believe that Mr. or Mrs. Walsh suffered

6  reputational injury as a result of the broadcast or the

7  publication of the web site article, you may only find in

8  their favor if that harm was the result of one or more

9  statements that were proved to be substantially false.

10  Put differently, if you found the Walshes suffered

11  reputational injury that caused them to suffer

12  embarrassment or emotional distress but that the injury

13  or damage resulted from truthful information presented in

14  the broadcast or the web site article, as opposed to

15  minor inaccuracies, they may not recover.

16          Now, if you find the elements that I have just

17  mentioned and for the plaintiffs, then you have to

18  consider damages.

19          If you find your verdict for the plaintiffs,

20  then in determining the amount of damages to which they

21  are entitled, you may take into consideration all of the

22  circumstances surrounding the news broadcast or the

23  Internet article, the occasion on which each of them was

24  made, and the extent of the broadcast or publication, the

25  nature and character of the insult, the probable effect

1  on those who viewed the broadcast or the article, and the

2  probable and natural effect of the news broadcast or the

3  Internet article upon the plaintiffs' personal feelings

4  and on their standing in the community.

5       Your verdict should be for an amount that will

6  fully and fairly compensate the plaintiffs for:

7       (1) Any insult to them, including pain,

8  embarrassment, humiliation, or mental suffering; and

9       (2) Any injury to their reputation.

10       If you find that the plaintiffs are entitled to

11  be compensated for their damages, and you further believe

12  by a preponderance of the evidence that a defendant made

13  the statements knowing they are false or, believing them

14  to be true, the defendants lack reasonable grounds for

15  such belief, or acted negligently in failing to ascertain

16  the facts on which the statements were based, then

17  damages are presumed.

18       The verdict must represent the considered

19  judgment of each of you.  In order to return a verdict,

20  it is necessary that each juror agree.  Your verdict must

21  be unanimous.

22       It is your duty, as jurors, to consult with one

23  another and to deliberate with a view toward reaching

24  agreement, if you can do so without disregard of

25  individual judgment.  You must each decide the case for

1  yourself, but only after an impartial consideration of

2  the evidence in the case with your fellow jurors.  In the

3  course of your deliberations, do not hesitate to

4  reexamine your own views and change your opinions, if

5  convinced it is erroneous.  But do not surrender your

6  honest conviction as to the weight or the effect of

7  evidence solely because of the opinion of your fellow

8  jurors, or the mere purpose of reaching a verdict.

9          Remember at all times that you are partisans.

10  Let me read that again.

11          Remember at all times that you are not

12  partisans.  You are judges, judges of the facts.  Your

13  sole interest is to seek the truth from the evidence in

14  the case.

15          Upon retiring to the jury room, you will select

16  one of your number to act as a foreperson.  The

17  foreperson will preside over your deliberations and will

18  be your spokesman.

19          Forms of verdict have been prepared for your

20  convenience.  I will go over them in a minute.  You will

21  take the form to the jury room and, when you reach

22  unanimous agreement over your verdict, you will have your

23  foreperson fill it in, date and sign the form that sets

24  forth the verdict upon which you unanimously agree; and

25  then return with your verdict to the courtroom.

1          Nothing said in these instructions and nothing

2  in any form of verdict prepared for your convenience is

3  meant to suggest or convey in any way or manner any

4  suggestion or hint as to what verdict I think you should

5  find.  What that verdict shall be is your sole and

6  exclusive duty and responsibility.

7          Those are the instructions, and there's an

8  additional one instruction, but I will read that after

9  all the closing arguments are made.

10          Let me get the verdict form, which was here.

11          Here it is.

12          Would you put this on the Elmo?  It will be

13  easier if they see this.

14          All right.  It's got the caption of the case in

15  the beginning, John J. Walsh and Annabelle Walsh versus

16  WAVY Broadcasting Company and LIN Television Corporation.

17          Verdict form.  Here are the first questions, the

18  elements I read in more detail:

19          Do you find that the plaintiffs have proven each

20  of the following by the preponderance of the evidence:

21  And then it lists these five things.  You answer yes or

22  no to this question.

23          And then is there anything at the bottom after

24  yes or no?

25          Go to the next page.  If you answer no, you need

1  not answer the remaining questions.  You have found in

2  favor of the defendants.  Have the foreperson date and

3  sign this form, and return it to the courtroom.

4        Now, if you answer no to one of them and yes to

5  the other, you would stop with one plaintiff with the no,

6  but on the yes person, you would continue on with these

7  next instructions.

8        (2) Answer the following question only if you

9  answered yes to Question 1 to John J. Walsh.  And the

10  question is:  Did John J. Walsh suffer reputational

11  injury as a direct result of the publication of

12  substantially false statements in the broadcast or the

13  web site article?

14        You answer yes or no.  If you answered no, you

15  don't proceed.  If you answered yes, you go to Question 3

16  answering the following question only if you answered yes

17  to Question 2.

18        Should Mr. Walsh be awarded damages to

19  compensate for his reputational injury?

20        Answer yes or no.  If your answer is yes, the

21  damage is in what amount?

22        Paragraph 4 is the same as to Mrs. Walsh.

23  Answer the following questions only if you answered yes

24  to Question 1 as to Ms. Annabelle Walsh.

25        The question is in paragraph 4:  Did Annabelle

1   Walsh suffer reputational injury as a direct result of

2   the publication of substantially false statements in the

3   broadcast or the web site article?

4         Answer yes or no.  And, again, only if you

5   answered yes, do you move on to Question 5.

6         Should Mrs. Walsh be awarded damages to

7   compensate her for reputational injury?

8         Answer it yes or no.  And if you say yes, state

9   the damage is in what amount.

10        Then the next page is for the foreperson to sign

11  and date.  And return to the courtroom once you reach

12  your verdict.

13        All right, Counsel.  Mr. Denton, are you ready

14  to proceed with the --

15        Well, let me ask the jury first.  We have been

16  going about a half-hour.  Mr. Denton may go 30, 45

17  minutes.  I have put a limit on him.  I'm not sure how

18  long his opening statement will be.  Do you need to take

19  a break now, or are you ready to go?  I will give you a

20  break after he finishes.

21        As I explained a moment ago, the plaintiffs go

22  first and presents his case or his and her case; then the

23  defendants go and rebuts the plaintiffs' case and

24  presents the defendants' case; and then the plaintiff can

25  come back and rebut the defendants' case.  So everybody

1  gets an opportunity to present their case and to rebut

2  it.

3       Mr. Denton, you may proceed with your closing

4  argument.

5       MR. DENTON:  Thank you, your Honor.

6       Members of the jury, you have been going a

7  while.  You saw the video clip at the beginning.  You

8  know a lot more about the case, and the implications, and

9  so forth at this point, so I want to begin my closing

10 argument simply by replaying the videotape one time.  It

11 may take a second to get this right.

12      Well, your Honor, it's not working.

13      THE COURT:  Well, it worked before.

14      Mr. Denton, if during the break we can get it

15 fixed, I will let you play it.

16      MR. DENTON:  All right.  Thank you, your Honor.

17      Members of the jury, this defamation case is

18 about what the news clip said about deposits.  The news

19 clip said nothing, or virtually nothing, about debts.

20      You have heard a lot about debts.  We are not

21 suing over debts.  Anything that was in the clip about

22 debts was, essentially, correct.  We are suing about the

23 suggestion that the Walshes, essentially, cheated brides

24 out of their deposits, took the deposits with no way of

25 making good on the contracts, and the added statement in

1  there that, therefore, Mr. Walsh and Mrs. Walsh lacked

2  character and integrity.  Whether that was a

3  substantially true statement is what the case is about.

4         It's not about these other issues about whether

5  or not their business owed too much to their landlord, to

6  the bank, and so forth.  That's not what we are suing

7  about.

8         With that in mind, think of this:  What evidence

9  have you actually seen that wedding deposits were not

10  honored?  Depending on who you believe, there's either 25

11  or $19,000 worth of deposits in play, so to speak.

12         We heard from one live witness who said she

13  didn't get her deposit back, Ms. Capps, $850.  Her

14  testimony was contested.  It's unclear whether she is

15  telling the truth, whether she remembers it right,

16  whether Ms. Walsh remembers it right.  It's in contest.

17  It's questionable.

18         Earlier, of course, she canceled her contract on

19  her own, so, really, the "going out of business" business

20  has nothing to do with her losing her 850, if she really

21  lost it.

22         So we have got a case involving these deposits

23  of 19 to $25,000, and at the most you have heard evidence

24  of $850.  Now, where are the other, let's say, 18 brides?

25         With WAVY having the excellent lawyers that they

1  have, do you not think that if there were 18 women

2  running around Tidewater, or anywhere in the world, that

3  these guys wouldn't have found a few of them and brought

4  them in?  You didn't hear from them.  So with the

5  deposits, there's virtually no evidence that even the

6  25,000 or the 19,000 in deposits was missing.  But even

7  if some of those deposits, even if all of those deposits

8  turned out missing, does that mean that Annabelle or Jack

9  bilked that money, took it from ladies trying to get

10 married, with no reasonable expectation of being able to

11 return it?

12         Businesses morph and change, and form

13 partnerships, joint ventures and mergers, and people do

14 things for each other in business all the time.  The fact

15 that you are going to go into business with somebody else

16 doesn't mean that you have no expectation, that you are

17 somehow being reckless with your customers' money.

18         Now, there was a lot of back and forth in this

19 trial about whether there was a merger, and whether there

20 was a deal, what's the significance of the fact they only

21 ended up becoming employees?  All of that really was

22 directed at a single point, and that is did the Walshes

23 have a reasonable expectation that they were going to be

24 able to honor these deposits?

25         And you may remember yesterday Mr. Merritt

1 brought out some pretty effective testimony by trying to

2 show there was a difference in wording between how one

3 question was answered in the deposition months ago and

4 how it was answered here as to whether or not there was a

5 deal, and the deal he was talking about supposedly

6 occurred on January 28th.

7        I ask you when you go back, and you should look

8 at everything, but please look at this in particular, if

9 I haven't destroyed both of these devices.  Please look

10 at this Plaintiff's Exhibit 32, it says Exhibit 32.  Now,

11 this is an e-mail from Sturdyfloss, which is Boots

12 Daugherty's wife, JoAnn Daugherty.  You see it says JoAnn

13 and Boots here.

14        This is signed on January 29th, 2010, right

15 after the two couples struck whatever deal it was, vague

16 as it may have been.  Right after they struck it, look at

17 what JoAnn and Boots are saying.  "Dear Jack, Boots and I

18 cannot tell you how comfortable we felt having you,

19 Annabelle and Scott," Scott being their operations guy,

20 "in the office today," the Walsh's previous operations

21 guy.  "It was as if we all worked together for years.

22        "Boots and I know today was such a hard day for

23 you both -- " this being about the time that they lost

24 their inventory -- "and I am so proud of you and

25 Annabelle for keeping your heads high."  And here's the

1  punch line, if you will, "We are going to make a great,

2  great team.  Jo and Boots."

3          And does that not tell you that these two

4  couples were looking forward going together in the future

5  with their combined or merged resources?  It's very

6  supportive of what Jack and Annabelle have said about

7  they thought it was going to be a merger.

8          Did it end up being a partnership of equal

9  footing, or joint ownership, or anything like that?  No.

10  They ended up being employees at the sufferance of the

11  Daughertys, and it ended really quick.  But going into it

12  and back when they were taking deposits, they thought

13  they had a -- I don't know about a marriage made in

14  heaven, but they thought they had a good business deal

15  and that they were going to be able to merge these two

16  companies that had been doing, essentially, the same

17  thing and go on forward and be able to honor the

18  contracts.

19          Now, Mr. Merritt, you may remember at the

20  beginning of the case, he marched Mr. Walsh through his

21  bank loan, his $10,000 a month bank payments, talked

22  about the loss of the lease from La-Z-Boy, talked about

23  the IRS being on their backs, and so on.  Ladies and

24  gentlemen of the jury, it is not dishonorable to get into

25  more debt than you mean to.  It is not necessarily

1  dishonorable to get into more debt than you can handle.

2  The United States of America is probably in more debt

3  than it can handle.  A lot of consumers are in debt that

4  they can't handle.  The Walshes' business was upside down

5  or underwater, like a lot of people's mortgages are

6  today.  Are we going to blame these two people for not

7  predicting the recession of 2008?

8        Just because their business didn't work out

9  doesn't mean they acted rashly in undertaking the

10  business.  And it also doesn't indicate they acted

11  deceptively in staying in business.  Let's face it, the

12  simple thing for them to do in late 2009 was what?  Go

13  down to their bankruptcy lawyer, sign a few papers, start

14  afresh, leaving their customers in the dust.  That would

15  have been the simple thing.

16        They didn't do that.  They tried to make ends

17  meet.  They joined up with a competitor to try to

18  continue servicing their business.  They loved the

19  business.  Who in the world puts $400,000 of retirement

20  money, then pays back taxes, back interest and back

21  penalties on that and puts it into his business to keep

22  it running?  Somebody who's living a lavish, high

23  lifestyle?  He put it in his business.

24        Now, they drive a couple of Mercedes Benzes.

25  That's unusual, but they bought the cars in 2000 before

1  all this started.  The cars were nearly paid off.  What

2  are you going to do, get rid of them and start over with

3  payments on a new car?  There's no legitimate suggestion

4  here made by Mr. Merritt that they were taking money from

5  brides, of course, and pumping up their standard of

6  living.  They are living without heat in part of their

7  house, for crying out loud.

8          But, in any event, regardless, the money that

9  they took, that they had available to them wasn't in

10  these thousand dollars a bride thing, it was from an

11  $800,000 loan from the bank and their own 400,000 from

12  their retirement, and her parents' $200,000.

13          Now, was it proved prudent for a guy with an MBA

14  to throw good money after bad for the number of years he

15  did?  Well, maybe and maybe not, I don't know, and I

16  don't know that you would know.  We didn't have anybody

17  in this case testify about decisions that an MBA makes

18  and whether or not if you owe this much money and your

19  business is -- you know, you have got the tax returns,

20  you will be able to look at it, I don't know, but it

21  looked like there was about, you know, 100,000 a year or

22  so, maybe 200,000 going out more than was coming in.

23          Okay.  He goes into a business -- he works for

24  corporate America.  He goes into a business and he

25  predicts incorrectly.  It ends up they are making less

1 than they are spending.  Well, that's a calculation.

2 Calculations don't turn out right sometimes.  It doesn't

3 mean they were trying to -- I mean, if they did anything

4 wrong, they cost their bank money and they cost

5 themselves money.

6         You think there would have been a show on, a

7 so-called news program, this 10 On Your Side thing, if

8 all it was was a business going out of business?  Just

9 one more small business not making it?  That's not what

10 got this on the air.  What got this on the air was the

11 specter, if you will, of these blushing brides losing out

12 on their weddings because of these creepy people that

13 were taking advantage of brides.  That's what made it

14 interesting.

15        Now, what do you have?  You have got WAVY-TV --

16 what do they call it -- 10 On Your Side -- 10 on what

17 side?  -- coming in on their white stallions to rescue

18 damsels in distress, 10 On Your Side.  10 On Your Side

19 only published one side of the story.  That's what this

20 case is about.

21        They sat there in their living room and they

22 listened to them saying, Boots Daugherty lied, although

23 they are too polite to use a term like that, but in

24 substance that's what they said.  They said Boots lied

25 when he told you he didn't know about those deposits.

1  And then Jack goes and talks to her the next day to

2  really lay it out, trying to defend his honor and his

3  family, and the lady didn't run his side of the story.

4  10 On Your Side is 10 On One Side in this case.  I don't

5  know what they were generally, but that's what they were

6  here.

7          And I don't mean I don't know.  I take that

8  back.  We don't have evidence on that, but they ran one

9  side of the story.  They did not carry the denials.

10         Now, what basis did 10 On Your Side have to

11  suggest that the Walshes lacked character and integrity?

12  How many witnesses came into this courtroom and said that

13  the Walshes lacked character and integrity?  You

14  remember, every single witness who had anything to say on

15  that subject said they have very high character,

16  integrity and honor.  They all did, a hundred percent.

17         A grossly false statement, not an implication.

18  It wasn't an implication, it was a flat out assertion,

19  from a lady who had broken her own contract.

20         Put yourself in the shoes of this news

21  producer.  You get a call from a bride, her name, it's in

22  one of these exhibits that she identified that came in,

23  because it looks like we have a great story, or something

24  like that, a pop.  Who knows what pop means, but the

25  evidence seems to be the T.V. station was basically

1  salivating this story.

2        You talk about negligence in the instructions.

3  How did they go about the investigation?  We had some

4  very impressive ladies that work for this T.V. station,

5  good-looking, smart, eloquent, expressed themselves very

6  well.  Don't stumble with their words at all.  I don't

7  remember the exact date.  You remember me asking her

8  about it.  It's in her e-mail when she got the first

9  e-mail from the bride.  It was something like the 18th, I

10 want to say, of March.  The story ran, or the Walshes

11 were interviewed on the 30th of March at their house and

12 then he the next day, and it was on, on the 31st, on T.V.

13       Now, both the news producer and the news

14 actress, Lori Crouch, said they interviewed this bride,

15 this bride and this bride, and they checked a few sources

16 during this two-week period.

17       Well, now, if they were interested in presenting

18 a story without a predetermined outcome that would have a

19 real good impact, do you think they might have picked up

20 the phone and called the Walshes and said, hey, what's

21 your -- you know, you think they might have checked with

22 them?  No.  Oh, they eventually checked with them, all

23 right, but how do they do it?  Show up at the door,

24 unannounced, cameraman behind the news actress, pointing

25 the camera in Mrs. Walsh's face and bam, bam, bam, bam,

1   hits her with rapid fire loaded questions about is it
2   true that you took these deposits with no ability to deal
3   with it?
4           Well, shock effect.  What was she doing?  What
5   does your common sense say she was doing?  She was trying
6   to get a damning quote.  That's what she was doing.  She
7   didn't get a damning quote.
8           After recovering her composure, Annabelle
9   invited her into her house.  They sat on the sofa.  They
10  had a few words.  Mr. Walsh said, I will talk to you more
11  about this tomorrow.
12          Then he goes out, and you heard Ms. Crouch say
13  that this interview took up to an hour, 30 minutes to an
14  hour.  We got, what, a few seconds ended up on T.V.  He
15  testified I told her what the deal was with the
16  Daughertys.  The deal was that they would absorb our good
17  contracts and our bad contracts, and we would all go
18  forward together.
19          That didn't fit the picture, so they didn't
20  print that part.  It was a set-up.  It was simply a
21  set-up.  It was a set-up which gave WAVY-TV 10 On Your
22  Side a scintillating news story that lasted about five
23  minutes and went out to whatever number of people we have
24  got in Tidewater who watch that channel, gave WAVY five
25  minutes of benefit, and it gave them maybe a lifetime of

1  injury to their reputation, maybe a lifetime of injury to

2  their self-esteem, maybe a lifetime of having to worry

3  about how their own children look at them because you

4  know how kids are with their peers.  They just believe

5  what their peers say sometimes rather than their parents,

6  although that would be doubtful in this case.  Five

7  minutes of a quick little clip on T.V., they did that.

8        All they had to do to make it right was to put

9  the Walshes' version of the story on, too.  They could

10 have still gone on with Boots' reply, but put the Walshes'

11 statement on, too.  Let the viewers decide what's the

12 truth.  WAVY 10 On Your Side didn't give the viewers the

13 option of deciding the case.  The Walshes were tried and

14 convicted before the thing ran on television.

15        By the way, and you can well understand why I

16 did not call Boots Daugherty as a witness, because I say

17 he's a liar.  However, WAVY 10 On Your Side, which says

18 it stands behind the story, didn't call him.  Why didn't

19 any of these good lawyers call Mr. Boots or Ms. JoAnn

20 Daugherty in here?  Because they didn't think you would

21 believe them.  Is there any other possible explanation?

22        They didn't mind putting Boots on T.V. where he

23 can't be questioned, but they wouldn't bring him in here

24 where he could be.

25        Based on the tip from an innocent -- these

1  brides who e-mailed in, they didn't know what the

2  arrangement was.  They had no way of knowing what the

3  arrangement was between Atlantic and Affordable and the

4  Daughertys and the Walshes.  They had dealt primarily

5  with the Walshes.  So when the Daughertys said they

6  weren't going to fulfill their contracts, of course, they

7  hadn't dealt with them, so naturally they blamed

8  Annabelle; they didn't blame them.  But they didn't know

9  what was going on.

10        The fact that they were confused does not mean

11  that Annabelle took their money thinking that she

12  couldn't honor those contracts.  You heard her say they

13  had hundreds of wedding deposits over the four or five

14  years and no complaints.

15        Mr. Merritt is a doggone good lawyer.  If there

16  was a complaint over there with the Better Business

17  Bureau, do you not think you would have seen it on this

18  little view graph thing?  They had a stellar record just

19  for conducting their business.  As far as the front end

20  of it was concerned, yep.  On the back end with the debt

21  and so on or the finances with the bank and so on that

22  Jack was involved in, not very good.

23        Now, in a good economy, could he have turned it

24  around?  Maybe, maybe.  We don't know.  He's not a bad

25  man because his business didn't work out, because his

1  $400,000 retirement couldn't bridge the problem for him.

2      All right.  As your Honor said, there are two

3  plaintiffs in this case.  There are, essentially, two

4  lawsuits.  There's one on behalf of Annabelle Walsh

5  against the defendants and there's one by Jack Walsh

6  against the defendants.  And if you will look at the jury

7  instructions, which I'm sure you will, and you have

8  listened to them, but they can be confusing in every

9  case, not just this one.  I ask that you pay attention in

10 particular to No. 46, and it lays out for you in black

11 and white --

12     THE COURT:  That's not the instruction that they

13 will actually see.

14     MR. DENTON:  Beg your pardon, your Honor?

15     THE COURT:  Did you say Instruction 46?

16     Take that off the view screen.  It may be one of

17 the instructions that were proposed, but it's not the

18 instruction they are going to see because there are only

19 36 instructions.

20     MR. DENTON:  Oh, I see, your Honor.  I'm looking

21 for the actual damages instruction, if I may borrow that

22 from the Court.

23     THE COURT:  I think we gave it to your --

24     MR. DENTON:  I will just say there is an

25 instruction --

1          THE COURT:  One second.  In fact, that was an

2    instruction that was denied.  It was a finding, 43.  I

3    will give you two minutes to consult with your associate.

4          Ladies and gentlemen, let me explain this.  Each

5    side submits instructions, I have instructions, and we

6    put them altogether in one batch of instructions.  So I'm

7    not faulting Mr. Denton.  And we just finished them

8    before picking up the instruction, which may or may not

9    be given.  I clicked it off so fast, I don't really

10   remember what instruction it was, but I knew we didn't

11   have 46 instructions.  So just hold fast.

12         It's instruction No. 29, the one that I read to

13   the jury.

14         MR. DENTON:  That's what I have, your Honor.  It

15   has two numbers on it.  One of the numbers is 29 and for

16   some reason it also says 46.

17         THE COURT:  We retyped it and copies were given

18   to your counsel.

19         MR. DENTON:  Well, I don't want to break this

20   up.  Ladies and gentlemen, you will see the instruction

21   when you get it.  What it says --

22         THE COURT:  Go ahead, Mr. Denton.  We will give

23   you the Court's instruction.

24         These things happen, ladies and gentlemen.

25         MR. DENTON:  The main point I'm trying to make

1  with this instruction, there's a fair amount of

2  introductory language, and it's important and please read

3  it, but the main thing I'm trying to get across to you is

4  that even though this is a defamation case, and we all

5  sort of think of a defamation case as only being about

6  injury to reputation, there are actually two prongs to a

7  defamation case, two elements of damage.  One is the

8  defamation or the injury to reputation.  See here No. 2

9  of the bottom, injury to reputation.

10       But you can also award damages and should award

11  damages if you find liability and that damages exist for

12  this Item 1:  Any insult to them, including any pain,

13  embarrassment, humiliation or mental suffering.  That's

14  the only point I was trying to make.

15       I want to go back to where I was that this was,

16  really, in reality two suits by two separate people.  The

17  amount of humiliation, and embarrassment, and so forth

18  that Annabelle suffered might be, in your judgment or in

19  your finding, different from that which Jack suffered.

20       Similarly, the amount of injury to reputation

21  might have been different for one than the other.  So you

22  have to consider them independently.

23       Now, let me speak about one reputational issue.

24  This is a kind of interesting thing.  All the witnesses

25  who came in here said they had great reputations, right?

1  So, Mr. Denton, why are we here over a suit for damage to

2  reputation?  Here's why.  When somebody defames you, the

3  people who know you the best, your friends, your family,

4  your business associates, they know the truth.  They know

5  that what was said was not true and so their opinion of

6  you doesn't lower.  But it's the rest of the world that

7  only knows you slightly or casually, or who maybe hasn't

8  met you but later sees you on Google.  They, or a future

9  employer, that is where the defamation really strikes at

10  the heart of your reputation.  It's where there are

11  people out there who don't know you well enough to know

12  that it was false.

13        Thank you very much, members of the jury.  I

14  appreciate it.  As your Honor said, I have the

15  opportunity to step back up, and I might or might not do

16  that.  I will only do that if counsel says something that

17  I feel I haven't covered adequately, and then I will step

18  up; otherwise, I won't.  And maybe we will be able to

19  show you the video.

20        Thank you very much, your Honor.

21        THE COURT:  All right.  Ladies and gentlemen, we

22  will give you a short break before the defendant does his

23  closing argument, and Mr. Denton may step back up.

24        (Jury out.)

25        THE COURT:  Mr. Denton, Exhibit 32 that you put

1  on the screen was never admitted into evidence.  In fact,

2  there was an objection to it on hearsay grounds.  I

3  didn't want to interrupt you, and Mr. Merritt --

4          MR. MERRITT:  I didn't want to interrupt him,

5  either, your Honor.  It's a cardinal sin.

6          MR. DENTON:  I thought it was in.  I mean, I

7  remembered it vividly, your Honor.  I thought you said it

8  was received because I questioned the witness about it.

9  I thought it was introduced and admitted into evidence,

10  and I believe it was.

11          THE DEPUTY CLERK:  We don't have it as being

12  admitted.

13          THE COURT:  All three of us don't have it as

14  being admitted.

15          MR. DENTON:  Is there any way to search the

16  transcript?

17          MR. MERRITT:  Your Honor, we have been trying to

18  keep a running list, and we do not see it on our list.

19          THE COURT:  So, now, I could just instruct the

20  jury when they come back in that exhibit was not admitted

21  and inadvertently put on the screen, and when I was

22  advised it wasn't admitted or reminded while you were

23  talking, I turned off the exhibit from the screen that

24  the jury was looking at.  So it was on for several

25  minutes when you referred to it.

1          Mr. Merritt, you are not going to ask for a

2     mistrial on this issue, are you?  What type of

3     instruction do you want me to give?

4          MR. MERRITT:  Your Honor, I would hate at this

5     late point to ask for a mistrial.  It's, of course, the

6     immediate gut reaction one has, but I certainly don't

7     want to do that.  I suppose that the cure to this might

8     be to tell the jury that during the closing argument an

9     exhibit was shown to you, that's Exhibit 32, that will

10    not be in your book.  It was not admitted into evidence.

11    It was an e-mail that was supposedly from Ms. Daugherty,

12    and you are to disregard it.

13         THE COURT:  All right.

14         MR. MERRITT:  I think that's the best we can do

15    under the circumstances.

16         THE COURT:  Do you have any suggestions?

17         MR. DENTON:  That is perfectly fine.  I would

18    like the opportunity to just tell the jury that I thought

19    it was admitted.  It wasn't, and I apologize, which I can

20    do in my rebuttal time.

21         THE COURT:  We will leave it as it is, except

22    that I will tell them to disregard it.

23         MR. MERRITT:  If it's all the same, your Honor,

24    I think it would be better handled from the bench and not

25    from counsel.

```
 1              THE COURT:  I agree.
 2              The second thing that causes me some concern,
 3  Mr. Denton, you indicated you didn't call Mr. Daugherty
 4  because you didn't believe him, but you filed a motion to
 5  add him, didn't you, to your witness list and I denied
 6  it?
 7              MR. DENTON:  Well, that doesn't mean I believed
 8  him.  I could have, through impeachment, called him as an
 9  adverse witness to simply get an e-mail in, your Honor.
10  That's all I was trying to do.
11              THE COURT:  All right.  We will just leave it
12  lie.
13              MR. MERRITT:  Your Honor, there is one other
14  matter, if I may raise it, while we are out of the
15  presence of the jury.  I am concerned also, and I don't
16  believe it was intentional, but I believe there may have
17  been a misstatement of the law made in that argument
18  concerning injury to reputation and damages.
19              I don't believe in a defamation case you get to
20  the question of mental distress damages, which are
21  certainly awardable.  But in the absence of a finding of
22  injury to reputation to hang that on, then the very
23  injury the defamation claims are supposed to be
24  addressing is not present.  So I think the law is you
25  must find injury to reputation.  If you do, you can
```

1  certainly place a value on that reputational injury and

2  add any other emotional distress.  I'm not questioning

3  that it's available, but I think that it is dependent

4  upon the finding there's an injury to reputation, and I

5  don't believe that's what the jury was just told.

6         THE COURT:  In other words, you think

7  Instruction No. 29 that I submitted after everybody

8  discussed it was --

9         MR. MERRITT:  No, your Honor.  I think the

10  instruction is fine.  I think the way the instruction was

11  spun out of the context of the other instructions that

12  require a finding of injury to reputation may have

13  suggested to them that if they think someone was just

14  embarrassed, even in the absence of finding injury to

15  reputation, they can just start making awards for

16  embarrassment and that's not, I don't believe, the nature

17  of this exercise.

18         I think your instructions are correct as a

19  whole.  I'm concerned about that disassociating of the

20  types of damages awarded from the rest of the findings

21  that have to be made.

22         THE COURT:  Mr. Denton, do you have any comment

23  about that?

24         MR. DENTON:  Your Honor, I hadn't given that any

25  thought.  I mean, he's reading something into my comments

1   that I hadn't even thought about.  I agree you have got

2   to have an injury to reputation to win one of these

3   cases.  I don't disagree with what he's saying, but I

4   don't know that any input from the Court is appropriate

5   under the circumstances.  I think he could certainly

6   argue that.

7           THE COURT:  Instruction 28 and 29 together, I

8   think, accurately state the law, and you may refer to

9   them, Mr. Merritt, and we are going to take --

10          I will give you 15 minutes to see if you can get

11  it to work, Leon.  If not -- all we need to do is play

12  that one disk.

13          I'm going to say ten minutes since the jury has

14  been out, or until you finish.  Within a reasonable

15  time.  Court's in recess.

16          (A recess was taken at 4:09 p.m., after which

17  court reconvened at 4:20 p.m.)

18          (Jury in.)

19          THE COURT:  All jurors have returned to the jury

20  box.

21          Ladies and gentlemen, during Mr. Denton's

22  closing argument, he showed you an Exhibit 32.  You will

23  not see that in your jury room.  That exhibit was not

24  admitted into evidence, and I'm sure it was inadvertence

25  on the part of Mr. Denton in displaying it.  So you are

1  to disregard what you saw on Exhibit 32, and you will not

2  see it in your jury room.

3          But we now have our equipment, once again,

4  working properly, and if somebody would just start this,

5  and after we look at this, which is Exhibit 6, we will

6  continue with closing arguments.

7          (The video was played.)

8          THE COURT:  Before Mr. Merritt starts his

9  argument, I neglected to read a stipulation, a very short

10 stipulation.

11         A stipulation means that these are agreed

12 facts.

13         "Stipulation of Undisputed Facts No. 1.

14 Plaintiffs sued the defendants for defamation arising

15 from the publication of a news broadcast, an Internet

16 article appearing as Plaintiff's Exhibit 6 and 7.

17         (2) The defendants disseminated the news

18 broadcast on WAVY-TV throughout its broadcast area on

19 March 31st, 2010.

20         (3) Defendants published the Internet article

21 titled "Rental Company Folds, Clients Out Cash" beginning

22 March 31st, 2010."

23         Mr. Merritt.

24         MR. MERRITT:  Your Honor, are we going to need

25 this laptop again?  I certainly would like the space.  I

1  don't want to mess with it in case we need it again.

2          THE COURT:  No.

3          MR. MERRITT:  Thank you for your patience with

4  all of us.  Sometimes very complicated things can be

5  illustrated by kind of a simple story, and when I was

6  thinking about this case a couple days ago, I was

7  reminded of something that happened to me when I was a

8  kid.

9          When I was a little boy, I really liked

10 baseball, and we lived kind of out in the country on a

11 little two-lane road.  So to play baseball, you have to

12 do a pick-up game.  I was about 8 years old.  You grabbed

13 anybody you could.  There weren't that many people out

14 there, but you grabbed boys, girls, fat kids, skinny

15 kids, good players, bad players.

16         And we had this old dead-end where we would play

17 baseball on this more or less level field.  Everybody

18 would bring their gloves and their bats and throw them in

19 a pile, and we would grab the equipment and play pick-up

20 baseball.  You know, as much as we would play, I couldn't

21 get enough of playing baseball.  So when I was alone and

22 there was nobody around, our house was out on kind of the

23 side of a hill with a garage under part of it.  And there

24 was a big, old cinder block wall on the side of the

25 garage, and I had one of those hard rubber baseballs, and

1  hour after hour I would throw that ball against the wall,

2  like a kid will do eight years old, just throwing that

3  ball against the wall.

4          Now, one day there were two things that came

5  together that created a problem for me.  One of those

6  things was that inside that garage was a brand new

7  midnight blue 1963 Pontiac Catalina that my dad had just

8  bought.  It was a pretty big deal to him because he

9  worked three jobs, and so that was his pride and joy.  He

10  kept that car just polished immaculate.

11          And the second thing, unfortunately, that

12  happened that day was that there was a window on the side

13  of the garage.  I can see at least a couple of you

14  saying, uh-oh, I know where this story goes.  You know,

15  depending on what day of the week it was, and some of you

16  aren't as old as I am, but depending on the day, I was

17  either Willie Mays or Mickey Mantle.  It just depended on

18  the day.  On that day, I don't know if it was Mays or

19  Mantle, but they made an error, and I let go of that

20  ball.  I had thrown that ball against that wall a

21  thousand times without making a mistake, but that was my

22  day to make an error.

23          Now, everybody has had the experience, everybody

24  has had the experience, that little voice in your head

25  that says, Oh, dear God, make time stop.  Make this ball

1  come back into my hand.  Don't let this happen.  Spare me

2  all the pain and all the embarrassment, spare me all the

3  humiliation that's about to happen to me because I know

4  in this split second what's just about to happen.  But

5  time didn't stop for me that day, and that baseball

6  exploded through that glass window and it put a million

7  little shards of glass all over the hood of the brand new

8  midnight blue 1963 Pontiac Catalina.

9         Now, I have a little brother named Mark.  He was

10  six at the time, and Mark was doing what little brothers

11  do.  He was bugging me while I was throwing the ball.

12  And I was doing what big brothers do, I was ignoring him

13  while he tried to bug me.  So it was a great moment in

14  his life when that ball exploded through the window, and

15  he did exactly what little brothers do, he made a beeline

16  into the house where my dad was sitting at the kitchen

17  table, having just had dinner and having come off work

18  from his main job, which was at a telephone company

19  lineman, and he was in there telling dad all about it.  I

20  was out in the backyard with my glove still on my hand

21  just sobbing my eyes out, just crying.

22         Now, I had forgotten that story for a really

23  long time until a couple days ago when I was thinking

24  about this case, and when I was thinking about this case,

25  that old broken window came back to me because in that

1  moment I was Jack and Annabelle Walsh in 2009.  I was in

2  an impossible situation, my mind was racing.  I was

3  trying to figure out a way out of it, and I wanted very

4  badly to come up with some excuse.

5        I wanted to say that my brother, Mark, had

6  distracted me while I was throwing that ball.  And really

7  more to the point, I was mad at Mark for running into the

8  house to tell my father, even though he told the truth

9  about me and even though there was no turning back time

10 because, you see, on that day Mark simply broke the

11 news.  I broke the window.  I broke the window.

12        Now the evidence in this case of the points that

13 really matter are very clear.  In fact, most of it is

14 undisputed and most of it came out of the mouths of Jack

15 and Annabelle Walsh.  And just like I broke the window,

16 we now know in the first part of 2010 they failed to take

17 good care of their customers.

18        Just as my brother, Mark, went in and told my

19 dad what had happened, WAVY just pulled back the curtain

20 on March 31st, 2010 to reveal the truth about something

21 that had already happened between the Walshes and their

22 customers a couple months before that.  That was already

23 long gone, long done.  They were reporting on the

24 consequences of events that were true and had already

25 happened.

1        Now, the plaintiffs, Jack and Annabelle Walsh,

2   can rise no higher in this case than their own

3   testimony.  On the witness stand you heard Jack Walsh

4   yesterday admitting that by the end of 2009 they knew the

5   business was dead in the water.  You heard Annabelle

6   Walsh this morning in response to a question, not from me

7   but from Mr. Denton, saying that she knew that by the end

8   of 2009 the business was dead in the water.

9        And, in fact, you saw an e-mail message January

10  4th, 2010, right in the beginning of the calendar year,

11  right at the beginning of January 2010, in which

12  Mr. Walsh is laying out what was really going on to

13  Mr. Miles at PNC Bank, and he reported to him on January

14  4th, 2010 "We were evicted from our warehouse space."

15  You recall the testimony about that.  La-Z-Boy back in

16  the fall had evicted them, and they had found a temporary

17  place in the Ames Department Store where their stuff was

18  sitting, as this e-mail was written.

19       Now, on January 4, 2010 Jack Walsh, not WAVY,

20  not anybody else, said, "I have come to realize I can't

21  make this business work."

22       So you have the testimony of both plaintiffs

23  that their business was dead in the water by 2009, by the

24  end of the year, and you have a confirmation of that in

25  this January 4, 2010 exhibit as the new year rolled in,

1    "I can't make this business work."  And it goes on to

2    say, "And I have been approached by a guy in the

3    business, a competitor, who is looking to buy some of the

4    equipment."  Okay?  That's where things were in the

5    beginning of January.

6            Now, we also know that throughout the month of

7    January the bank was sending its people in to take a look

8    at the inventory to value it.  There was a discussion

9    between the bank and the Daughertys about the bank

10   selling the assets to the Daughertys.  That's not a deal

11   between the Walshes and the Daughertys.  That's the bank

12   selling off their collateral to another party.

13           And by the end of the month during that roughly

14   30-day period, 29 days to be exact, from the 1st of

15   January to the 29th, everybody knew that these assets,

16   the rental assets were going to be sold.  And so finally

17   at the end of the month the only paper, the only paper

18   the Walshes ever signed was the piece of paper they

19   signed agreeing with PNC Bank on the PNC Bank letterhead

20   that they would consent to having the bank sell off their

21   assets, and that's Defendant's Exhibit 41.  You may

22   recall it.

23           Although it bears the date January 26, 2010, I

24   will show you in a minute that at the end it was actually

25   signed by then on the 29th and you will recall they were

 1  in Mr. Levinson's office Saturday morning, the 29th.

 2          And so you see the initials in the lower

 3  left-hand corner of each page.  You will see his initial

 4  when you look at this exhibit by the Walshes.

 5          And without belaboring it, we will turn to the

 6  third page of that exhibit.  There it is, paragraph

 7  3(a). "With this letter, borrower, that's AJW

 8  Enterprises, and the guarantors, the Walshes, as of

 9  January 29th are giving lender peaceful possession of the

10  collateral," and the collateral was their rental

11  inventory.  And you can see that they both signed it

12  January 29th, 2010.

13          Now, between January 4th, 2010 and January 29th,

14  2010 what the evidence has shown very clearly is that

15  these folks continued to make contracts with new

16  customers.  They continued to make contracts with new

17  customers, and you will recall that Defendant's Exhibit

18  44, which was printed out on February 3rd, 2010, and

19  Mr. Walsh told you this comes from their Universal

20  inventory system.  He couldn't remember who printed it

21  out on February 3rd, but he did tell you this was in a

22  password protected computer, so either he printed it out

23  or somebody to whom he gave the password printed it out

24  on February 3rd.

25          These are all the contracts that were open at

1 that time, and it is a combination of those old contracts

2 that you recall Mrs. Walsh telling you about this morning

3 that had been -- that were still open from 2009, plus new

4 ones they had taken during January of 2010 while they

5 were waiting for this sale.

6          And so you will see February 3rd, 2010 -- you

7 will have this Exhibit 44 -- these are all the open

8 contracts.  And the date you see on here is actually the

9 date the contract is to be performed.  Some of those, as

10 you can see, were well out into the future, and they

11 included Ohh La La Catering, Ulla Capps' $850 is in

12 there, along with everybody else's deposits.

13          Now, an awful lot has been made about what

14 passed between the Walshes and the Daughertys.  Who

15 knows, really?  Who knows?  We know what didn't happen.

16 We know now, because you have heard both of the Walshes'

17 depositions read back to them, that they admitted there

18 was no merger.  There was no anything.  There was a lot

19 of talk about what might happen in the future, and you

20 may remember that even as late as the end of January

21 there was an exhibit that you saw where Mr. Walsh told

22 Michael Levinson, the Daughertys' lawyer, the day before

23 this January 29th agreement was signed that I understand

24 that our situation with PNC Bank is different from these

25 employment things we have been talking about, and by the

1  way, could you send me some forms or some contracts,

2  looking to the future as to the possibility of what might

3  happen with the Daughertys and, in a sense, confirming

4  that nothing had been agreed to, even at that late date,

5  with the Daughertys, even though they have continued to

6  take contracts.

7        Now, things were chaotic for the Walshes, and

8  the one thing I like you-all to, please, appreciate.  We

9  are not here to minimize in any way the stress and the

10 pain that the Walshes were under.  I believe that to the

11 fiber of my being.  I cannot imagine being in the

12 circumstances, that they found themselves in.  They were

13 under pressure from the outside, the creditors; they were

14 under pressure from the inside, maintaining the

15 appearance with people that things were going swimmingly,

16 even as they collapsed.

17       Wasn't it remarkable this morning when the

18 Walshes called in their good friend, Ms. Ritzi, the very

19 last witness they called, today, a few hours ago, was the

20 first time she had ever heard about the financial

21 problems the Walshes' business had.  You remember that,

22 when I cross-examined her?

23       Had she told you about any of these financial

24 troubles?  No.

25       Are you hearing about that for the very first

1  time today?  Yes.

2          That's a lot of stress to maintain that facade

3  with your friends.  That's a lot of stress.

4          Now, despite all these pressure-packed

5  circumstances the Walshes continued to write new

6  contracts, they continued to take deposits, even when it

7  was obvious that the sale of their assets was about to

8  take place.  And some customers, at least, got no message

9  when they made their contracts of what the risks were

10 that they were facing by contracting with Atlantic Event

11 Rentals in January of 2010.

12         And you will recall Mr. Walsh testified to that

13 effect yesterday.  I questioned Mr. Walsh:  "You

14 understood, didn't you, that this situation was very

15 fluid with the Daughertys and the ability to perform

16 these contracts was somewhat at risk?

17         "Oh, yes, I understood that.

18         "But your customers didn't understand that, did

19 they?

20         "No, they did not."

21         They knew the contracts were at risk with these

22 customers as they were making them.  The customers

23 didn't, though.

24         And then there are apparently some other

25 customers, including close friends in the industry, that

1  were told about a fictional merger, a merger that we now

2  know never happened, although, Lord knows, they keep

3  sticking to that story, but it didn't happen.  The only

4  thing that happened was that exhibit that you saw that

5  the bank sold off their assets.

6          And some of the friends of theirs didn't even

7  realize that there hadn't been a merger until after the

8  whole thing fell apart and then the truth came out.  So

9  these folks are telling close friends and business

10  associates about a merger that they knew with certainty

11  wasn't happening.

12          Now, I'm not really assigning any bad intention

13  to that.  It could have been stress, it could have been

14  pressure, it could have been, my God, our world is

15  falling apart.  You don't have to believe that these

16  people are criminals or bad people in order to find for

17  WAVY, in order to find in our favor.  But what is true is

18  what was reported, that they didn't handle their

19  relationships with their customers well in their dying

20  days.  And you just saw the broadcast.  You saw the way

21  it was presented.

22          Mr. Walsh got more air time than anybody to talk

23  about the problems his business had and that they tried

24  their best.  Nobody was looking to take a cheap shot at

25  him.

1          Now, we know now the Walshes have admitted what
2     their behavior was in January of 2010, but they are at
3     kind of an odd denial about all of this.  You know, it's
4     not clear why this is so hard for them to say we didn't
5     handle our customers well in January 2010.  It would be
6     okay.  People wouldn't dislike them for acknowledging
7     that, for acknowledging what is just woefully obvious
8     based on the evidence.
9          But maybe Mr. Denton touched on it in his
10    opening statement to you.  I was struck by a word that he
11    used, and I went back and got a transcript of his opening
12    statement just to confirm that he did use the word.  He
13    was talking about the Walshes facing bankruptcy, or what
14    do I do about this?  How do I go forward?  Why did they
15    act this way?  Why did they deal with this sort of facade
16    that everything was going swimmingly with their customers
17    when it obviously wasn't, and the word was pride, pride,
18    pure pride.
19         And so you have heard the Walshes actually use
20    the term "pride" and "integrity."  He likes to talk about
21    the integrity, but not the pride, and the pride really
22    shows through in this.  And so you heard the Walshes
23    criticize Lori Crouch, you heard them criticize Ulla
24    Capps, you heard them talk about their landlord, you
25    heard them talk about the failure of the bank to be nice

1  to them and restructure their loan, you heard them

2  criticize the Daughertys.  You heard an awful lot of

3  criticism of others, direct or indirect, but you never

4  once heard the words out of their mouths or any of their

5  friendly witnesses, you know, they told me they were

6  sorry about what happened to their customers.

7          You sat here for two days and heard everybody in

8  the world criticized.  You never heard the word, we are

9  really sorry about what we did.  Everybody else in the

10 world got criticized.  And there's this argument about,

11 well, where is Boots Daugherty?  Where is Boots Daugherty

12 in this case?

13         Well, I will tell you why we didn't call him.

14 We didn't call Boots Daugherty because we have always

15 taken the position, and we take it today, that this whole

16 thing about Boots Daugherty is a side show.  It's an

17 insignificant detail in the story.

18         You remember I was asking Mrs. Walsh about

19 this.  She was working her way around it, but we sort of

20 got there.  This is Plaintiff's Exhibit 7.  This is the

21 web site article version of the story.  And I asked her,

22 Well, really, the thing that delivers the defamatory

23 message in this story is not whether Boots knew about

24 this or not.  Who cares?  What delivers the message was

25 that there were substantial balances due on bridal

1  weddings, and that fact is true because they have been

2  taken.  You can't deny that.  It's not even disputed in

3  this case.

4        And so what these folks want you to do is make a

5  defamation case out of an insignificant detail about the

6  Daughertys' awareness while ignoring the elephant in the

7  living room, and the Court has instructed you that that's

8  not proper.

9        You will have these instructions back in the

10 jury room, but in order to recover -- first of all, they

11 have to show injury to reputation.  They don't get

12 anything without injury to reputation, including

13 emotional distress and all this stuff.  It's not

14 freestanding.  If you don't find injury to reputation,

15 you can forget any other damages.

16       That it was a direct and proximate result of the

17 publication of a statement that meets each of the

18 essential elements of the defamation.

19       Go down to the last sentence.  If you find that

20 the Walshes suffered reputational injury that caused them

21 to suffer embarrassment or emotional distress, but that

22 the injury or damage resulted from truthful information

23 presented in the broadcast or web site article, as

24 opposed to minor inaccuracies, they may not recover.

25 They may not recover.

1          Then you go to Instruction No. 29, which
2   Mr. Denton showed you about damages.

3          Now, truthful information.  We were unaware.
4   Minor inaccuracy.  Do this experiment when you go back to
5   deliberate.  Sit down with this story and pick those two
6   paragraphs and substitute this, substitute this:  Boots
7   Daugherty, owner of Affordable and Luxury Tents, bought
8   the Walshes' inventory.  The computers held something that
9   was no surprise at all to Mr. Daugherty.  There were
10  about $25,000 balances due on bridal or brides' weddings
11  that I was completely aware of.  Does that change the
12  fact that they had been taken or that they were due?  Not
13  a bit.  The result on people's reputation is exactly the
14  same, even if you had written it the way the Walshes
15  would like to have seen it written.

16          If tomorrow morning the Virginian-Pilot does a
17  story that says Craig Merritt robbed a Wells Fargo bank
18  using a 40-caliber pistol but in fact, I robbed a
19  SunTrust using a 22-caliber pistol, can I sue the
20  Virginian-Pilot successfully?  It ain't gonna happen
21  because the defamatory part of it that affects my
22  reputation is that I robbed a bank.  Whether it was a
23  SunTrust or a Wells Fargo, whether I used a .22 or .40
24  caliber, those are details that are disconnected from the
25  core message of the story, and what the plaintiffs have

 1   done with this Boots Daugherty episode is to elevate that

 2   minor detail in hopes that it will overshadow the core

 3   message of the story, and the Court has instructed you

 4   that allowing them to do that is not proper under the

 5   law.

 6          Now, I believe genuinely that jurors and juries

 7   are always concerned about doing the right thing.  I know

 8   you are.  We have all watched you listen very carefully.

 9   You are to follow the law and be studying the facts.  I'm

10   sure you will look at the exhibits and you are going to

11   do a good job.

12          The Walshes are in very many ways very

13   sympathetic people.  They are very sympathetic people.

14   As I said, I don't think you have to consider them to be

15   low-lifes or criminals in order to find in favor of my

16   client, in favor of WAVY.  And there's very substantial

17   evidence, in fact, there's no real dispute, that their

18   lives got pretty crazy, had a lot of craziness in it a

19   long time before my client ever came on the scene:  the

20   IRS, the Commonwealth of Virginia, the landlords, PNC

21   Bank, go to Annabelle's family for money, which I am sure

22   was very unpleasant for everybody involved.

23          Over a period of years the strain must have been

24   absolutely crushing, no doubt about it.  And you can see

25   some glimpses of it in a couple of the exhibits, Exhibit

1   25 and 31.  I won't even show you them.  I will move on.

2   You will recall both of them were to people at PNC Bank.

3   Jack Walsh says, "The strain of this on me and my family

4   is just crushing."

5           One of those was from 2009, a year before any of

6   this even happened.  There's no question these folks were

7   under real duress.  And they had this sort of tenuous

8   hope that somehow through some sort of magic these

9   discussions they were having with the Daughertys were

10  going to lead them through this problem and over to the

11  other side unblemished, but the deal just wasn't there.

12          And it's this evidence about all the other

13  pressure that they were under that makes it very clear

14  that WAVY television is not the source of their

15  distress.  WAVY television is not the source of their

16  distress.  Having an $860,000 loan that's gone unpaid for

17  a couple of years, I would suggest, is a lot more

18  stressful.  Having a judgment for over $900,000 entered

19  against you by the bank on that loan is a lot more

20  stressful.  You are wondering what's going to happen in

21  your life.

22          But, you know, the law doesn't, and really

23  shouldn't, relieve us of the consequences of every

24  decision we make, and it really shouldn't permit us to

25  demand compensation from other people when those others

1   aren't the real source of our troubles.

2          Now, WAVY was brought into this story by

3   complaining consumers.  You heard Ulla Capps.  She

4   expressed her heartfelt views on this, as she was

5   entitled to do.  The facts on which her views were based

6   are disclosed in the story.  Viewers who looked at that,

7   I expect, realized it was a viewpoint-based statement,

8   and they could take it or leave it if they agreed or

9   disagreed with her.

10         Now, let's talk about Lori Crouch for a minute.

11  First of all, Lori Crouch is not an actress.  She is not

12  a news actress.  She's a reporter.  She was a reporter.

13  She's actually doing a different job now.  Nobody ever

14  asked her what it was, so I can't tell you.  It's not in

15  evidence.  But this so-called news actress followed up

16  with the interviews that Jamie Bastas had done.  She

17  visited the Daughertys, she visited the Walshes, she

18  visited Ulla Capps, she made phone calls to the other

19  complaining people, she talked to other people in the

20  industry, and then she presented this story from all

21  angles.  Everybody got to say their piece in the story.

22  She was even-handed.  She was fair.  There's no

23  suggestion anywhere that she thought anything in the

24  story was false in any way, doesn't to this day.

25         These minor things that counsel talked about,

1   the use of the word "track down."  I mean, really, I

2   track down my kids at dinnertime when I can't find them.

3   Saying you track somebody down is hardly even worthy of a

4   discussion.

5           This stuff about character and integrity from

6   Ms. Capps, as I said, she expressed her views.  Viewers I

7   think, obviously, realized it was her viewpoint and she

8   is entitled to it.  It doesn't change the underlying

9   facts that we all know are true that were in the story.

10          Now, I don't think you should worry that

11  entering a verdict for the defendants in this case is

12  unjust somehow, or unfair, or it's depriving someone of

13  anything.  In fact, I'm going to tell you what my father

14  did when I broke that window.  Now, he's a tough guy, and

15  he had a bad temper, and as I was standing there in the

16  backyard crying, waiting for the hammer to come down, I

17  had this vision of his belt coming off, which it did once

18  in a while because that's the way it was back in those

19  days, and he had certainly been known to use it.  But he

20  did something remarkable and it's why I remember the

21  story.  I'm convinced it's why I remember the story.

22          He looked at that car, his brand new baby, with

23  a million scratches all over the hood, little pieces of

24  glass piled up all over it, and he took his breath and he

25  just looked at me.  He said, "Help me clean this up."

```
 1          And so for the next two hours he stood there.
 2  He carefully picked glass off the hood.  He wasn't going
 3  to let me do that and make it any worse.  I had an old
 4  broom, and I took every tool out of that garage.  I swept
 5  every square inch of it and got every shard of glass out
 6  of that garage, and there we were for two hours, the sun
 7  going down, side by side cleaning it up, cleaning it up.
 8          It took me a long time to realize what he did.
 9  He showed compassion for me by making me bear the
10  consequences of my mistake.  He didn't belittle me.  He
11  didn't tell me what I had done was okay.  He didn't let
12  me shift the blame.  He didn't make my brother, Mark,
13  pick up the broom and say, Hey, get in here and help him
14  clean this up.  He let me stand in my own wreckage and
15  clean it up.
16          Sometimes we need to stand in our own wreckage.
17  And I suggest to you that the Walshes are going to
18  survive.  I think they are going to thrive before their
19  lives are over.  Clearly she has good friends.  She's
20  already getting back into the business working for East
21  Beach Rentals with her good friend, Cathy Carter, who,
22  obviously, takes care of her.  So there's really only one
23  message you can send to the Walshes that's not
24  compassionate or kind, that's not just, and that is to
25  allow them to shift the responsibility for their behavior
```

1  with their own customers to WAVY-TV because just as my

2  dad was just to me that day, I'm asking you to be just in

3  this case.

4         Don't punish the messenger.  Don't let the

5  person who broke the window make excuses, lay it off on

6  other people.  We didn't need to call the Daughertys

7  because we didn't think what the Daughertys said amounted

8  to a hill of beans in all of this, what they thought.

9  It's what the Walshes did, regardless of what the deal

10 was with the Daughertys.

11        And interestingly enough, you will recall that

12 the burden of proof to prove falsity is not on the

13 defendant; it's on the plaintiff.  You have got that

14 instruction.  So rather than standing here and casting

15 aspersions on the Daughertys for two days, if the

16 plaintiffs wanted to prove falsity, those were their

17 witnesses to call, not ours.

18        Now, the plaintiffs, as you know, bear the

19 burden of proof on the elements of their claims.  There's

20 no substantial falsity in this story.  There's no

21 connection between any injury to reputation and any

22 substantially false fact.  There's no negligence by the

23 reporter.  No unreasonable act or omission by Lori

24 Crouch, Jamie Bastas, or by people you heard from WAVY,

25 and there's no belief by the defendants, even now, that

1   any of the material facts in the story are false.  They

2   are what they are.

3         Now, the Judge has already gone over the verdict

4   form with you.  I respectfully ask that you answer the

5   first question in favor of the defendants.  If you answer

6   that first question in favor of the defendants, you can

7   stop.  You don't need to get into, you know, was injury

8   caused about this and is money awardable for that.  The

9   elements that have to be proven under that very first

10  question of substantial falsity actually causing injury

11  cannot be proven.

12        For the last two days you have now found out

13  that that story has proven to be substantially true.  So

14  when you fill out that verdict form, I very respectfully

15  ask you on behalf of WAVY Broadcasting, of LIN Television

16  Corporation that you enter your verdict in favor of the

17  defendants.

18        THE COURT:  Mr. Denton, you actually have a

19  half-hour.

20        MR. DENTON:  Oh, I don't need a half-hour, but

21  thank you.

22        Before I go forward, though, your Honor, I just

23  want to confirm that Plaintiff's Exhibit 41 was

24  introduced into evidence.  I've been told it was, and I

25  want to hear it from the Court.

```
 1          THE COURT:  Plaintiff's 41?

 2          MR. DENTON:  Yes, your Honor.

 3          THE COURT:  We all agree it's been admitted.

 4          MR. DENTON:  All right.  Thank you, your Honor.

 5          MR. MERRITT:  Your Honor, we agree it's been

 6  admitted.  Is this going to be new matter introduced in

 7  rebuttal?

 8          MR. DENTON:  Nope.

 9          THE COURT:  Remember, ladies and gentlemen of

10  the jury, Mr. Denton can respond to anything Mr. Merritt

11  said.

12          Go ahead.

13          MR. DENTON:  I only want to respond to three

14  little things.  The first thing is that Mr. Merritt made

15  quite a point of telling you, and his exact words were

16  "The notion that there was a merger is incorrect," and he

17  called it a fictional merger.

18          Well, look at Plaintiff's Exhibit 41, which is

19  an e-mail from Affordable, from JoAnn Daugherty, to Cathy

20  Carter, who testified here, and you will see her telling

21  Cathy Carter, "Yes, mergers are difficult for everyone

22  involved," referring to Atlantic Event Rentals and to

23  Jack and Annabelle Walsh.  That's Ms. Daugherty saying

24  that.  So the merger was not fictional.  It may not be

25  real formal as in signed off on, but it wasn't
```

1  fictional.  The Daughertys thought there was one, the

2  Walshes thought there was one.

3          The second thing I want to address is that

4  Mr. Merritt characterizes the question of whether

5  Mr. Daugherty knew or didn't know of the deposits as

6  being a mere detail, a fly on the back of an elephant.

7  Without that little assertion in there, none of the rest

8  of the story would have meant anything.  It was a

9  suggestion that that assertion -- what follows from that

10 assertion is if he didn't know about it, then that wasn't

11 part of the merger, that wasn't part of the deal.  The

12 Walshes never took any steps to protect their customers.

13 So it's not a detail.  It's not a detail.

14         And WAVY, what they did was they presented one

15 side of the story.  They had him saying he didn't know

16 about it.  They interviewed the Walshes to find out.

17 Found out the Walshes disagreed and they didn't run that,

18 so the viewers never got to decide that.  WAVY-TV decided

19 it for the viewers.

20         The third thing I want to say, and I liked it,

21 as I'm sure everybody did, the baseball story, but

22 there's a big difference, though.  There's a flaw, a

23 fallacy in Mr. Merritt's story about himself and his

24 dad.  Mr. Merritt broke the window when he was a boy.

25 The Walshes didn't break any contracts.

1        Remember what I said of all the 19 to $25,000 in

2    contracts that the T.V. put on the news?  We heard about

3    one.  I mean, we had evidence on one, from one customer,

4    involving $850, and what did she do but admit that, not

5    the Walshes, but that she broke her contract because the

6    bride-to-be for her son got cold feet.  She broke her

7    contract, and she wanted to get a refund and she didn't

8    get it.  And there's a dispute as to who she asked for

9    the refund from, but that's neither here nor there.  The

10   fact is nobody broke her contract except her, and we've

11   got no evidence on any other contracts.  She didn't break

12   any window.  Thank you.

13        THE COURT:  All right.  Ladies and gentlemen, we

14   have concluded the evidence and the arguments and the

15   jury instructions, except for one which I will cover with

16   you right now.

17        I will remind you that I advise that you will go

18   back into the jury room and select a foreperson.  Now,

19   the foreperson is who gently supervises discussion, count

20   the votes, etc.  We need somebody to sign the verdict

21   form and who will lead the discussion, but all of you

22   have an equal vote.

23        The verdict must be unanimous.  All of you must

24   agree to the verdict.  And remember, you are to consult

25   with each other and listen to what each other says in

1  your jury room.  I discussed the verdict form with you,

2  and that's going to go back into the jury room with you.

3         Now, when you are back there deliberating, if it

4  becomes necessary during your deliberations to

5  communicate with me, you may send a note by the bailiff,

6  that's the court security officer here, signed by your

7  foreperson or by one or more members of the jury.  No

8  member of the jury should ever attempt to communicate

9  with me by any means other than a signed writing, and I

10  will never communicate with any member of the jury on any

11  subject touching the merits of the case otherwise than in

12  writing or orally here in open court.

13         You will note that the bailiff, court security

14  officer, is forbidden to communicate with you in any

15  manner or in any way with any member of the jury on any

16  subject touching the merits of the case.  Which door you

17  go out of when you go home, he can talk to you about

18  things like that.

19         Bear in mind also you are never to reveal to any

20  person, not even me, how the jury stands numerically or

21  otherwise, on the question before you, until after you

22  have reached a unanimous verdict.

23         And the first thing I will ask you to do when

24  you go back, it will take us a few moments to make sure

25  we have got the right exhibits, that they have been

1   admitted and that they go back with you, the instructions

2   will go back with you.  You can go ahead and select your

3   foreperson during that period of time and tell me if you

4   want to stay this evening for a while or if -- I probably

5   will not let you stay later than 6 unless you demand it,

6   or if you want to start up tomorrow.  Because of other

7   matters that I have, we will start at 10:15, if that's

8   what you want to do.  So I'm giving you guidance on that.

9           So don't start your deliberations on the case

10  until you get the jury instructions, the exhibits, etc.,

11  but you can elect your foreperson and let me know if you

12  want to go ahead and start today.

13          All right.  You can go back with the marshal.

14          (Jury out.)

15          THE COURT:  The jury instructions.  All the

16  instructions I read, as I recall, were agreed to by both

17  sides.  There were two instructions that I rejected, and

18  first we will cover Plaintiff's Rejected Instruction No.

19  43.

20          Does someone on the plaintiff's side wish to

21  explain why they wish this instruction?  And I will

22  explain why I rejected it.

23          MS. DIETRICH:  Your Honor, I am addressing the

24  denial of the proposed Plaintiff's Instruction No. 43.

25  The plaintiffs have alleged allegations of libel, libel

1   per quad initiative.  The libel, per se, alleged

2   defamatory statements do make substantial danger to

3   reputation apparent where they say that the plaintiffs

4   are unethical or lack integrity.  I believe this

5   instruction is relevant to that matter and should be

6   admitted and offered.

7          THE COURT:  All right.  I made the finding

8   earlier, or at least I made the finding during the jury

9   instruction phase that this was per se defamation if the

10  jury finds that the elements of the offense, because it

11  harmed the -- if there was a finding that the event

12  occurred in favor of the plaintiffs, then it was per se

13  and, therefore, we used that instruction.

14         In addition, this type of libel, according to

15  the Virginia case law, requires special damages, and the

16  instruction says at paragraph 6, If the plaintiff

17  sustained actual damages as a result of these

18  instructions, Virginia case law repeatedly says that you

19  must have some actual damages.  Not just reputation, but

20  money, etc., and, therefore, I rejected that instruction

21  and I will have the clerk make it part of the record.

22  It's certainly not to go to the jury.

23         And the defendant, I rejected one of your

24  instructions.

25         MR. LACY:  Your Honor, the instruction at issue

 1  is Defendant's Proposed Instruction 11.  Before I begin

 2  on that, I would like to note for our record the

 3  defendants' objections to the statement during the

 4  reading of the instructions that everything in the story

 5  was a statement of fact; it did not include opinions.

 6          THE COURT:  I made that finding.

 7          MR. LACY:  We are just noting for the record our

 8  objection to that.

 9          Additionally, Judge --

10          THE COURT:  The other instructions in there,

11  just because it's a statement of fact doesn't mean it's a

12  correct fact.  It's distinguishing it from an opinion,

13  but go ahead.

14          MR. LACY:  Thank you, your Honor.

15          And then with respect to the objection to

16  Defendant's Proposed Instruction No. 11, entitled

17  Statement of Facts, we object to the Court's refusal to

18  permit the jury to determine whether or not any of the

19  allegedly defamatory statements at issue in this case

20  were opinions versus statements of facts, and in

21  particular, the statements by Ms. Capps and repeated by

22  the newscaster about character and integrity, it's the

23  defendants' opinion these are viewpoint statements that

24  constitute opinion protected by the Fourth Amendment.

25          THE COURT:  Mr. Lacy, did you mention those

1  particular two statements in the jury room, I mean, when

2  we were discussing the jury instructions?

3         MR. LACY:  Judge, I don't think I specifically

4  referenced Ms. Capps' --

5         THE COURT:  I am confident that you did not.

6         MR. LACY:  Okay.  I didn't, and I apologize for

7  that, Judge.  I guess when you work a case so long, you

8  think you have got summary judgment, and I vouch for

9  that.  But that has long been the defendants' position

10 that, in particular, the statements by Ms. Capps about

11 character and integrity constitute opinion.

12        Thank you, your Honor.

13        THE COURT:  And Ms. Forehand, if you can mark

14 these as part of the record.

15        And this is the jury instruction and verdict

16 form.

17        THE COURT:  The jury has elected a foreperson

18 and they have communicated that as far as the time,

19 whether to stay tonight or go back, they have decided

20 something.  So let's bring them out and find out what

21 they have decided.

22        (Jury in.)

23        THE COURT:  I understand someone is the

24 foreperson?

25        All right, ma'am.  If you will stand.

1          FOREPERSON HEATH:  Yes, sir.

2          THE COURT:  The second question, since you won

3   the Virginia election before November 6th, you did a good

4   job, what, do you want to stay this evening or come back

5   tomorrow?

6          FOREPERSON HEATH:  Well, if your Honor is

7   stopping us at 6 -- that's what you said.

8          THE COURT:  I can go further, if you want.

9          FOREPERSON HEATH:  Okay.  But at this point we

10  don't think we can really give it the justice it

11  deserves --

12         THE COURT:  So you want to start tomorrow?

13         FOREPERSON HEATH:  Until tomorrow morning, yes,

14  sir.

15         THE COURT:  All right.  So you won't have to go

16  out and come back again, I will follow your instructions,

17  as long as you follow my instructions on the law that you

18  will be back here -- it will be at 10:15.  I have some

19  matters I have to attend to in the morning.  And you will

20  come back to the jury room, just as you have been, and I

21  will ask you tomorrow, just like I asked you this

22  morning, did you see any articles in any newspaper,

23  Internet, anywhere else, T.V., about this?  If something

24  flashes a headline, tell me about it, but don't read the

25  article.

1          I don't know that there will be anything, but

2   that's what we will do.

3          Yes, ma'am.

4          FOREPERSON HEATH:  Your Honor, I do have one

5   question.  Is it allowable for us to, before we leave

6   tonight, take an initial vote from everyone as to how

7   they are feeling at this point and whether we are talking

8   6, 5 or 1, 2, you know, whatever?  Is there any way we

9   would be able to speak about the case at this point, or

10  do we need to not discuss it until tomorrow morning?

11         THE COURT:  If you want to discuss the case, it

12  will take a few more minutes.  We have yet to make sure

13  the exhibit books are squared away and that you get the

14  ones that were admitted and don't get the ones that were

15  not admitted.  I think it's going to be another 15

16  minutes or so before you get that, and you are not going

17  to be allowed to take a straw vote until after you have

18  the jury verdict and the instructions.  So I think it's

19  best that you come back tomorrow morning.

20         All right.  You heard my instructions, and you

21  will leave.  Don't talk to any of the folks as you leave

22  the building.  See you tomorrow morning at 10:15.

23         (Jury excused for the evening recess.)

24         THE COURT:  Well, I didn't ask your permission

25  as to what to tell them, but there's no sense in their

1   rushing into this thing.  This will give you time to

2   complete the jury instruction books with my law clerk and

3   Ms. Forehand.  Not the jury books, the exhibit books to

4   make sure only what has been admitted goes back.

5           All right.  Counsel, I will see you tomorrow

6   morning at 10:15.  Court's in recess.

7           By the way, there were some copies made of

8   redacted exhibits that had Social Security numbers and

9   things on them, so those will be put in as well.

10          (Court adjourned for the evening recess at

11  5:22 p.m.)

12                      *    *    *

13                    CERTIFICATION

14      I certify that the foregoing is a correct

15  transcript from the record of proceedings in the

16  above-entitled matter.

17                      X_____/s/ Sharon B. Borden_____X

18                        Sharon B. Borden, RMR, FCRR

19                        X April 5, 2012 X

20                              Date

21

22

23

24

25